1              **UNITED STATES DISTRICT COURT**

2              **FOR THE DISTRICT OF ARIZONA**

3                    _____

4    **United States of America,**        )
                                          )
5                        Plaintiff,       )  **CR 17-01311-PHX-DGC (BSB)**
                                          )
6              vs.                        )  Phoenix, Arizona
                                          )  **January 31, 2019**
7    **Anthony Espinosa Gonzales,**       )
                                          )
8                        Defendant.       )
     _____)

9

10   United States of America,            )
                                          )
11                       Plaintiff,       )  CR 18-00539-PHX-DGC (BSB)
                                          )
12             vs.                        )  Phoenix, Arizona
                                          )
13   Aaron Anthony Ordonez,               )
                                          )
14                       Defendant.       )
     _____)

15

16        **BEFORE:   THE HONORABLE DAVID G. CAMPBELL, JUDGE**

17            **REPORTER'S TRANSCRIPT OF PROCEEDINGS**

18                    <u>**EVIDENTIARY HEARING**</u>

19

20

21   Official Court Reporter:
     Patricia Lyons, RMR, CRR
22   Sandra Day O'Connor U.S. Courthouse, Ste. 312
     401 West Washington Street, SPC 41
23   Phoenix, Arizona  85003-2150
     (602) 322-7257
24
     Proceedings Reported by Stenographic Court Reporter
25   Transcript Prepared with Computer-Aided Transcription

1                      **A P P E A R A N C E S**

2

3    For the Government:

4              U.S. Attorney's Office
               By:  **GAYLE L. HELART,** ESQ.
5              By:  **BRETT A. DAY,** ESQ.
               40 N. Central Ave., Ste. 1200
6              Phoenix, AZ  85004

7

8

9    For Defendant Gonzales:

10             Law Office of Barbara Hull
               By:  **BARBARA L. HULL,** ESQ.
11             77 E. Columbus Ave., Ste. 201
               Phoenix, AZ  85012

12

13

14   For Defendant Ordonez:

15             Ber Law Firm, PLLC
               By:  **HERSHEL BER,** ESQ.
16             11120 N. Tatum Blvd., Ste. 101
               Phoenix, AZ  85028

17

18

19

20

21

22

23

24

25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

# I N D E X

## EXAMINATION

**WITNESS**                                                          **PAGE**

TAMI LOEHRS

       Direct Examination By Ms. Hull                       10

       Cross-Examination By Ms. Helart                      33

       Examination By The Court                             54

       Redirect Examination By Ms. Hull                     55

       Direct Examination By Mr. Ber                        56

       Cross-Examination By Ms. Helart                      61

       Redirect Examination By Mr. Ber                      63

JIMMIE J. DANIELS

       Direct Examination By Ms. Helart                     64

       Cross-Examination By Ms. Hull                       127

       Direct Examination By Mr. Ber                       130

       Redirect Examination By Ms. Helart                  135

       Examination By The Court                            137

**EXHIBITS**

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| 101 | Application for Search Warrant | 10 |
| 102 | Search and Seizure Warrant | 10 |
| 103 | Letter to Brett Day, Esq., dated 5/3/2018 | 10 |
| 104 | Letter from Assistant United States Attorney Gayle L. Helart, dated 5/3/2018 | 10 |
| 105 | Affidavit of Tami Loehrs | 10 |
| 106 | Report of DexT Analysis (305a-PX-2125742), dated 2/16/17 | 10 |
| 107 | Report of Forensic Examination – Loehrs & Associates, dated 7/18/2018 | 10 |
| 109 | Tami Loehrs – Curriculum Vitae | 10 |
| 1 | DD.torrent log file for Count 1 | 38 |
| 13 | Jimmie Daniels CV | 66 |
| 2-1 | 2 Little Girls Suck Mans Dick so (HOT).mp4.torrent log file for Count 2 | 92 |
| 2-2 | Adry Pack.torrent log file for Count 2 | 92 |
| 3 | (Russian characters).torrent log file for Count 3 | 92 |
| 4 | Asi se mama linda mp4.torrent log file for Count 4 | 92 |
| 5 | TrueAnal.mp4.torrent log file for Count 5 | 92 |

**(Index of Exhibits Continued)**

**EXHIBITS**

| NUMBER | DESCRIPTION | PAGE |
|--------|-------------|------|
| 6-1 | mov_0211.mp4.torrent log file for Count 6 | 92 |
| 6-2 | MVI_0084.mpg.torrent log file for Count 6 | 92 |
| 7 | cpack1_newfag_happiness.torrent log file for Count 7 | 92 |
| 8 | VID_2013030807_205140.mp4.torrent log file for Count 8 | 92 |
| 1. | Excerpted pages from log file for Count 1 | 100 |
| 2. | Excerpted pages from log file for Count 2 | 100 |
| 3. | Excerpted pages from log file for Count 3 | 100 |
| 4. | Excerpted pages from log file for Count 4 | 100 |
| 5. | Excerpted pages from log file for Count 5 | 100 |
| 10. | Jimmie Daniels CV | 100 |
| 9 | Exhibit of .torrent file names for Counts 1-8 | 109 |
| 10 | Listing of 114 .torrent names on Tablet | 110 |
| 11 | Exhibit of jump list / link (lnk) files, including from Counts 1-8 | 113 |
| 12 | Transcript of Anthony Gonzales interview | 119 |

1                        **(Index of Exhibits Continued)**

2                                    **EXHIBITS**

3    **NUMBER**       **DESCRIPTION**                          **PAGE**

4    7.          Example of .torrent file              121
                 names on computer
5
     8.          Two examples of files from            123
6                awe pthc videos and Recycle
                 Bin activity
7
     9.          Jump list files examples              124
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                         **P R O C E E D I N G S**

2

3              THE COURTROOM DEPUTY:  This is case number

4    CR 17-1311, United States of America versus Anthony Espinosa

5    Gonzales, and case number CR 18-539, United States of America

6    versus Aaron Anthony Ordonez, on for evidentiary hearing.

7              MS. HELART:  Good morning, Your Honor.  Gayle Helart

8    and Brett Day for the government.  Also with us today is FBI

9    Agent Jimmie Daniels, who will be our one and only witness.

10             THE COURT:  Good morning.

11             MS. HULL:  Good morning, Your Honor.  Barbara Hull on

12   behalf of Mr. Gonzales, who is present, standing, and out of

13   custody.  And also present at defense table is Ms. Tami Loehrs

14   of Loehrs & Associates.  She will be our one and only witness.

15             MR. BER:  Morning, Your Honor.  Hershel Ber on behalf

16   of Aaron Ordonez, who is present.  I don't expect to call any

17   witnesses.

18             THE COURT:  All right.  Good morning.

19             All right.  Counsel, I have read the motions and

20   responses.  I've read the declaration of Ms. Loehrs --

21             Loehrs?  Loehrs?

22             MS. LOEHRS:  Loehrs.

23             THE COURT:  -- Loehrs twice.  I've read her report.

24   I've read the *Budziak* case with care.  I've read the Eighth

25   Circuit case -- Sixth Circuit case, *Pirosko*, and half a dozen

1    of the district court cases that have been cited.  So we don't

2    need to go through the basics and cover ground already covered

3    in the written materials.

4            Ms. Hull, this is your motion.  It's also Mr. Ber's.

5    Tell me what it is you would like to do this morning.

6            MS. HULL:  Judge, I'd like to put Ms. Loehrs on the

7    stand and have her explain -- and I'll await the Court's

8    instruction.  I am not tech savvy, so if I go overboard you

9    can -- if it's too much information for the Court.  But I do

10   want to complete the record as to what was found, what wasn't

11   found, an explanation of the details of the software and the

12   examination or partial examination that Ms. Loehrs conducted,

13   the report she provided, prepared, and how it is that that

14   information provides the materiality component of the

15   information that we're seeking from the government for

16   purposes of testing the subject software.

17           THE COURT:  And how long do you think that will take?

18           MS. HULL:  I'm thinking, and I've seen

19   cross-examination, easily an hour.  Maybe more.

20           THE COURT:  You say with cross-examination?

21           MS. HULL:  Yes, sir.

22           THE COURT:  How much do you think your questioning

23   will take?

24           MS. HULL:  30 minutes.  30 to 40 minutes.

25           THE COURT:  All right.  Okay.

 1          Mr. Ber, besides arguing, is there anything you want

 2    to present today?

 3          MR. BER:  I may have some questions for Ms. Loehrs,

 4    who may have worked a little bit on my case, as well as some

 5    general questions --

 6          THE COURT:  Pull the mic over, if you would.

 7          MR. BER:  As well as some general questions that

 8    might help the Court evaluate whether a motion to compel

 9    should be granted.

10          THE COURT:  All right.

11          Ms. Helart, tell me what it is you want to present.

12          MS. HELART:  The main reason the government called a

13    hearing, especially for Mr. Ordonez's case because I know that

14    Ms. Hull wanted a hearing, we just want to make sure the Court

15    understands the BitTorrent network and how it operates, and

16    also important things about the Torrential Downpour software

17    and, really, the three main modifications that it has, but

18    also things that it just doesn't do.  And so we just want the

19    Court to really understand this factually.  That's the main

20    point of the government.

21          I guess it's hard to know.  We really tried to

22    explain that in our two responses, how BitTorrent works, to

23    work on this peer-to-peer file-sharing network.  It is similar

24    and it is different than other file-sharing networks, and the

25    differences are important, especially to how Torrential

1    Downpour works.  That's our goal.

2              THE COURT:  And how long do you think that will take?

3              MS. HELART:  Well, if the defenses goes first and I

4    treat Agent Daniels more like a rebuttal witness, probably --

5    probably an hour for him.

6              THE COURT:  Of direct?

7              MS. HELART:  Yes.

8              THE COURT:  We don't need to repeat what's in the

9    briefs; I've read that.

10             MS. HELART:  All right.

11             THE COURT:  I'd like to get this done by noon, so

12   let's be as efficient as we can.  If I think you're repeating

13   stuff that we don't need to cover, I'll tell you all.

14             But why don't we go ahead and start, Ms. Hull, with

15   you.

16             MS. HULL:  Thank you, Judge.  Proceeding or argument?

17             THE COURT:  No.  I understand the arguments.  Let's

18   go ahead and present the evidence you want, and then I'll let

19   you argue after the evidence is presented.

20             MS. HULL:  Thank you, sir.  Do you want me at the

21   podium for the hearing?

22             THE COURT:  Yes.

23             MS. HULL:  Defense calls Ms. Tami Loehrs to the

24   stand, please.

25             For the record, before we proceed, Your Honor, I

1    believe we have a stipulation for admission of defense

2    Exhibits 101 through 107 and 109.  I believe they're all in

3    front of Ms. Loehrs, including 107, which we may -- I don't

4    believe is appropriate for admission.

5             THE COURT:  Any objection, Ms. Helart?

6             MS. HELART:  No objection.

7             THE COURT:  All right.  Those exhibits are admitted.

8             THE COURTROOM DEPUTY:  I'm sorry, Your Honor.  She

9    said 107 is not appropriate for admission but included that --

10            MS. HULL:  I'm sorry.  108 is not.  My apologies.

11            THE COURT:  So tell me exactly what you're moving in.

12            MS. HULL:  101 through 107 and 109.

13            THE COURT:  All right.  Those are admitted.

14       (Exhibits 101-107 and 109 admitted.)

15       (Exhibits 101 through 107 and 109 admitted.)

16            THE COURT:  Go ahead, Ms. Hull.

17                         **TAMI LOEHRS,**

18   called as a witness herein, after having been first duly sworn

19   or affirmed, was examined and testified as follows:

20              D I R E C T   E X A M I N A T I O N

21   BY MS. HULL:

22   Q    State your name and spell it for the court reporter.

23   A    Tami Loehrs.  T-A-M-I, L-O-E-H-R-S.

24   Q    What is your current occupation?

25   A    I'm a digital forensic expert and I own a company called

1    now Loehrs Forensics, formerly Loehrs & Associates.

2    Q    And please tell the Court your educational background.

3    A    I have a bachelor of science in information systems and I

4    have four industry-standard certifications in forensics, the

5    ACE and EnCE, which are both associated with software, a CHFI

6    which is a Certified Hacking Forensic Investigator, and CCFE,

7    Certified Computer Forensic Examiner.

8    Q    And do you hold any licenses?

9    A    I have an Arizona private investigator agency license.

10   Q    Can you describe your experience with computers in

11   general, please.

12   A    I grew up around computers.  I started -- when I started

13   my company back in '99 I did computers for law firms and other

14   businesses.  Mainly law firms.  I've done everything with

15   computers from running cable through the ceiling to building

16   entire networks, running Web servers, doing security, routers.

17   Pretty much anything involving computers and electronics I've

18   been involved in.

19   Q    Do you have any specialized training in the field of

20   computer forensics?

21   A    Yes.  I have hundreds of hours of specific forensics

22   training and I have to continue that, it's like continuing

23   education, to keep some of my certifications.

24   Q    How long have you been conducting computer forensic

25   examinations?

1   A   About 20 years.

2   Q   And how many cases have you -- in how many cases have you

3   conducted the forensic exams?

4   A   I think we're up over a thousand now.

5   Q   And how many and what types of evidence items have you

6   examined?

7   A   Thousands of items.  Basically anything that contains

8   data.  So everything from computers and cell phones to

9   surveillance systems, dash cams in police vehicles, copy

10  machines, PlayStations.  Anything that contains data.

11  Q   And what operating systems have you examined?

12  A   Pretty much all of them that are out there.

13  Q   And have you testified in court before?

14  A   I have.

15  Q   How many times?

16  A   About 120.

17  Q   And your education and experience and everything, and

18  testimonial experience, is all in your CV which has been

19  admitted into evidence; is that right?

20  A   That's correct.

21  Q   When were you retained on this case, Mr. Gonzales's case?

22  A   I believe I was retained in February 2018.  Last year.

23  Q   And how were you retained?

24  A   I received an approval from the Court for a certain number

25  of hours.

1    Q    And did you receive any documents related to the case that

2    you reviewed?

3    A    I did.

4    Q    And what did you review?

5    A    They're specifically listed in my report.  I don't know if

6    I remember everything.  I know I reviewed the affidavit for

7    search warrant, the forensic exam by the government, the

8    indictment.  Probably some FBI reports.

9    Q    Okay.  And did you independently examine the evidence in

10   this case?

11   A    Yes, I did.

12   Q    And can you describe that process, please, for the Court.

13   A    The evidence is not sent to our lab in these cases, so it

14   was sent to the FBI here in Tucson.  I actually sent an

15   associate to go for a couple of days and extract data.  She

16   runs initial processes to bring information out, takes data

17   back to our lab, and then we examine it back there at the lab.

18   Q    And do you personally do the collection during the initial

19   exam?

20   A    On this case I did not personally do the collection, no.

21   Q    Okay.  Who did that?

22   A    That was Sara McDermott.

23   Q    Someone in your firm?

24   A    Correct.

25   Q    Okay.  And when did that initial examination take place?

1    A    I believe that was in March.  Shortly after we were hired.

2    Q    And how did the examination proceed from there?

3    A    Well, once the data came back and we started looking at

4    it, well, the first thing was the files in Counts 1 through 8

5    weren't found.  So we immediately decided to prepare an

6    affidavit on this case.

7    Q    And did you personally examine the evidence in this case?

8    A    I did.  The evidence that was brought back to my lab, yes.

9    Q    And you prepared -- did you prepare a report based on your

10   examination?

11   A    I did, yes.

12   Q    And that's -- when did you prepare that report?

13   A    I believe that report was prepared in April.

14   Q    And that is -- let me see.  Exhibit number 107.

15        Do you see that in front of you?  Is that the report

16   that you prepared?

17   A    Yes, that's my report.

18   Q    Okay.  And what was the purpose of your examination?

19   A    The purpose of this examination was to determine if the

20   forensic evidence corroborates or refutes what Mr. Gonzales is

21   being charged with.  And in Counts 1 through 8 he's being

22   charged with knowingly distributing images of child

23   pornography.  So one of the first things we do is go in to

24   look for those images of child pornography to see how they got

25   there, if there's any evidence that he had knowledge of them.

1           And on this particular exam, those images were not

2     found anywhere on any of the evidence items seized from him.

3     Q    And that would have been -- the examination, I'm sorry,

4     that you did was conducted on everything that was seized from

5     Mr. Gonzales's home; correct?

6     A    Correct.  I believe we received seven evidence items.

7     Q    And did you review the government's forensic report?

8     A    I did.

9     Q    And did that report indicate the files were found on the

10    evidence seized from Mr. Gonzales?

11    A    It did not.

12    Q    And were those findings significant to you?

13    A    They're very significant, yes.

14    Q    Why is that?

15    A    Again, I've worked on over a thousand cases and we keep

16    seeing on these file-sharing cases, law enforcement's

17    file-sharing says it's finding files on people's computers,

18    and then when we do the forensic exam there's no evidence that

19    those files ever existed.  And since it's software reading

20    software, I personally believe there are flaws in how that's

21    reading information.  And when you don't find evidence of the

22    files, then I immediately say, well, I think we need to test

23    the software that's reading that information.

24    Q    And did you prepare an affidavit in this case?

25    A    Yes, I did.

1    Q    And did you prepare that on June 28th of '18?

2    A    Yes.

3    Q    And is that attached -- is that the exhibit that is

4    numbered -- well, just a minute.

5          Do you see it there in front of you?  I thought it

6    was 107?

7    A    No.  107's my report.

8          THE COURT:  Looks like it's 105?

9          MS. HULL:  Thank you, Judge.

10   BY MS. HULL:

11   Q    105, Ms. Loehrs; correct?

12   A    Yes.

13   Q    And do you prepare these affidavits in every case that

14   involves law enforcement software?

15   A    No, I don't.

16   Q    Do you know how many cases involving law enforcement

17   software you've been an expert on?

18   A    Hundreds.

19   Q    Why do you not prepare an affidavit in every case?

20   A    Well, if I do the forensic exam and it corroborates what

21   the software says it did, law enforcement software says it

22   downloaded eight files, we find the eight files on the

23   computer, I find the eight files on the computer, evidence

24   that they're there, that they were distributed, that the

25   defendant had knowledge of them, I don't need to prepare an

1    affidavit.

2         But when I find forensic evidence that directly

3    contradicts what law enforcement software says it's doing,

4    then I prepare an affidavit requesting that it be tested.

5    Q   So why -- if -- if the -- if your examination corroborates

6    what the government software reports, why do you believe it

7    would still need to be tested?

8    A   Oh, I still -- regardless of the case, I believe it needs

9    to be tested.  But I can't just prepare an affidavit for the

10   Court saying, hey, I think this needs to be tested.  I have to

11   find reason for that.

12        And on case after case after case, we're finding

13   forensic evidence that directly refutes what law enforcement

14   software says it does.

15        So I still believe it needs to be tested regardless

16   what the findings are.  It may work on one case.  I'm not

17   saying it doesn't work at all.  I believe it has flaws in that

18   it's not always doing what it's supposed to do because that's

19   how software is.

20   Q   What is the name of the propriety software used to

21   identify the files in Counts 1 through 8?

22   A   Torrential Downpour.

23   Q   And how are you familiar with this software?

24   A   We've been asking to test the software for years.  I've

25   been on a number of cases with this software.  The individual

1   who is in charge of -- who created the software and is in

2   charge of the database of files, I've heard him testify.  He

3   has produced affidavits in my other cases.  He's done

4   demonstrations of the software for us.  So I'm very familiar.

5   Q    Okay.  And some other questions about that as far as

6   testing.  What would you consider a valid test of the

7   software?  What, in industry standard, would be a valid

8   testing of the software?  What would that include?

9   A    Well, software testing and validation, first of all,

10   cannot be done by anybody who has a stake in it.  So

11   software's not tested by the person who wrote it.  It has to

12   be tested independently.

13         It has to be tested by a person or group of people

14   who have experience and knowledge in software validation and

15   testing, and it has to be tested to fail.

16         So when you're testing a piece of software, you don't

17   just run a simple example of my software, grab a file from

18   your sharing folder and it's done.  You have to create

19   different scenarios and see what that software does in those

20   scenarios.  You test it to fail.

21         What if my software reads a computer that's riddled

22   with viruses?  Does it read the information correctly?  What

23   if my software is reading a computer where files have been

24   moved out of the shared folder and put in a private location?

25   Is the software still going through a back door and seeing

1   those files?

2       There's so many things in computers:  Different

3   operating systems, different software applications that

4   conflict with each other, viruses, malware.  Thousands and

5   thousands of things that can affect how a piece of software

6   works, whether it works correctly or not.  And so that's how

7   testing is done.  Keep giving those scenarios.  And when you

8   find that software doesn't work in a particular scenario, you

9   need to fix that.  That's why we have all these updates,

10  because of bugs, other problems that we see.

11  Q   If I can use an analogy, and I think this is maybe the

12  closest thing I could come up with, is like a breath testing

13  device.

14  A   Yes.

15  Q   The devices that are used to measure blood or breath

16  alcohol.

17  A   Yes.

18  Q   Are you -- you're aware that at some time during their use

19  it became obvious this device needed to be tested.

20  A   Correct.

21  Q   And the testing showed that there needed to be certain

22  calibrations done, before and after tests, user checklists,

23  things of that nature to affect accuracy; correct?

24  A   Correct.

25  Q   That was all as a result of the testing and validation of

 1    that device.

 2    A    Yes, it was.

 3    Q    That's a simplified analogy, but am I close?

 4    A    You're 100 percent on.  I believe they found -- because

 5    I've looked at the DUI testing.  I believe they found

 6    hairspray, if you're wearing hairspray it can affect the

 7    results of how the machine reads your blood alcohol.  There

 8    was a number of things that they found after testing it that

 9    would change the outcome of your blood alcohol.

10    Q    And did you conduct a complete exam or partial exam in

11    this case?

12    A    I have only conducted a partial exam.  Specifically

13    related to Counts 1 through 8, which is the distribution

14    charge.

15    Q    Okay.  And then you prepared your affidavit and report

16    based on that limited examination; is that right?

17    A    That's correct.  Yes.

18    Q    Okay.

19          Now, what -- okay.  We've talked -- in the defense

20    motion we talked about the three types of evidence that we're

21    dealing with here, and they are the items of evidence that are

22    in public space; correct?

23    A    Yes.

24    Q    And then deleted space -- I'm sorry.  Private space and

25    deleted space.  Is that fair?

1    A    That's fair.

2    Q    Okay.  And I'm going to ask you specific questions about

3    the types of terms and such used, okay --

4    A    Okay.

5    Q    -- in your examination.

6         What is -- what is a BitTorrent.

7    A    BitTorrent is the name of the protocol that the network

8    uses.  The BitTorrent network.  It's also the name of

9    software.  So you can download BitTorrent software that works

10   on the BitTorrent network.

11   Q    Is that publicly available?

12   A    Yes.  BitTorrent software is publicly available.

13   Q    And what is a torrent?

14   A    A torrent is just a text file.  A torrent has information

15   inside of it.  It has file names, hash values, file sizes.  It

16   has all the information about the files it's associated with

17   so that it can go out and get those files if you decide to

18   seed that torrent.

19   Q    And you mentioned hash value.  What is a hash value?

20   A    A hash value is described as a fingerprint of a file.

21   It's basically a mathematical algorithm and the result of that

22   algorithm tells you the exact content of a digital file.  It

23   can be a single file or a group of files.  And it's referred

24   to as a fingerprint.

25        The problem with file sharing is a hash value may be

1    a fingerprint of a completed file, but in a torrent you get

2    the hash value on your computer before you get the actual

3    file.  So you have a fingerprint of something you don't have.

4    Q    It's possible that you have a fingerprint of what you

5    don't have?

6    A    It's not possible, it's absolutely 100 percent.  When you

7    download a torrent, you have a fingerprint for a file you

8    haven't downloaded yet.

9    Q    Okay.  What -- what is your understanding how the torrent

10    works?

11    A    So when you decide to go get the files, which is called

12    seeding, or parsing --

13    Q    And the files -- the torrent itself does not contain

14    files; is that right?

15    A    The torrent only contains text.  There's no videos or

16    images or anything viewable like that inside of a torrent.

17    It's text.  It's instructions on where to go get that file.

18    Q    So if you have a torrent on your computer -- first of all,

19    can a torrent be on your computer and you not know it?

20    A    Oh, sure.  Anything can be on your computer and you not

21    know it.

22    Q    Can a torrent be on your computer and not have attached

23    with the files that are identified in the torrent?

24    A    Absolutely.

25    Q    And how many files can be associated with a torrent?

1    A    A torrent can be a single file.  Maybe you have a very

2    large file, like large video file, a torrent will break that

3    up and make it easy to download.  Or a torrent can have

4    thousands of files inside of it.

5    Q    And the torrent, how does it -- if -- okay.  Let's say

6    there's a torrent, okay.  And how do -- how does one go about

7    getting the files associated with that torrent?

8    A    So you download the torrent, and you might download a

9    bunch of torrents.  Let's say you're looking for a music

10   album.  You download a torrent and that torrent inside of it

11   says this music album has these 20 songs and here's the hash

12   value for each one of those songs, and it also comes with

13   lyrics and so you have the lyric files, and it also comes with

14   artwork, so you have the album's artwork and that also has a

15   hash value.  All of that information is inside the torrent.

16        If you decide to go get that album, you tell that

17   torrent -- you click a button and tell that torrent to go find

18   those files.  The instructions inside that file now go out on

19   the BitTorrent network and start grabbing data from everyone

20   who has any bit of that torrent and it brings it all in.

21        Now, that album may not completely download.  I may

22   only get one song and my torrent -- I can't get any more.  I

23   lose my internet connection, there's something wrong.  I may

24   get the entire thing.  So once you go out to get the files,

25   it's not 100 percent that you're going to get the entire

1    torrent.

2    Q    And what is it -- what is seeding?

3    A    That's telling the torrent to go obtain the files.

4    Q    So it's possible -- can you tell in a forensic examination

5    whether or not there's evidence that someone actually seeded a

6    torrent?

7    A    Yes.

8    Q    Okay.  So that could be determined from an examination,

9    forensic examination?

10   A    Correct.  When you actually seed the torrent -- so when

11   you get the torrent, it's saved on your computer.  It's

12   actually in a hidden location.  It's in a folder that is

13   hidden on the folder structure from a user.  So the torrents

14   all sit in the background.  A user may not even know they're

15   sitting in that folder.

16        When you seed it, what it does is it immediately

17   creates a folder by the same name as the torrent, and puts it

18   into your default download folder.  So I've seeded it.

19        My torrent's over here.  I've seeded it.  Now I get a

20   folder in my downloads folder.  This is the folder I'm going

21   in that I can see.  It starts downloading the files into that

22   folder.

23   Q    So can you stop it at any time?

24   A    Absolutely.

25   Q    And how many ways can a torrent get onto your computer?

1    A    I mean, I could e-mail you a torrent.  You could get a

2    torrent with -- you could just mass download torrents.  You

3    could get a torrent that came in with another file.  There's

4    all kinds of ways, just like you can any file on your

5    computer.

6    Q    What is Torrential Downpour?

7    A    Torrential Downpour is law enforcement's version of the

8    publicly available BitTorrent software.  So they took the open

9    source code, the public version of that software, and then

10   they made modifications to it.

11   Q    Okay.  But is it your understanding or do you know without

12   testing whether or not that software operates the same way as

13   a torrent?  In other words, obtaining files from different,

14   perhaps thousands of different, sources?

15   A    Well, that's actually one of my concerns.  They have

16   claimed that they have taken this protocol, which is to grab

17   files from everybody, and changed that protocol to only grab

18   files from one person.  So they've changed the actual

19   BitTorrent protocol by only getting a file from one person.

20   But that's what they claim it does.  But I have no way of

21   knowing that that's accurate or that it really is only getting

22   one file from one person without testing it and making sure

23   that that's what's really happening.

24   Q    Why does that concern you?

25   A    Because if I download that music album and I only get one

1    song and I decide, oh, this isn't what I want and cancel it, I

2    now have a torrent, that's a text file with all the hash

3    values, of that entire album.  Every song, every piece of

4    artwork on that album is on my computer.

5            What's in my download folder is just one song.

6            But there may be three other things on that album.

7    Let's say the artwork, the artwork in that album is illegal,

8    it's an illegal image.  I don't have it because all I got was

9    that one song.

10           Software, the way BitTorrent works, if BitTorrent

11   sees I have that torrent sitting here, it thinks I have the

12   whole album, artwork and all.  It doesn't know that I only

13   downloaded one song because it's just software code reading

14   software code.

15           So what it will do is it may get that one song from

16   me, or even part of that song, but it will get everything else

17   from other people.

18           So if you're only getting this much from me and that

19   much is not illegal in a child pornography case, that's huge.

20   If you have a torrent with a thousand legal files in it and

21   five of those are of interest to law enforcement because

22   they're illegal, and you didn't download those five out of the

23   thousand because you only got 400, you don't have child

24   pornography.  But their software may still believe you do

25   because it's only grabbing pieces from you and getting the

1    rest from other people.

2    Q    And that's based upon -- you think that's based upon just

3    seeing the torrent on the computer?

4    A    No, that's based upon years of testing publicly available

5    Torrent software and seeing exactly what it does and how it

6    reacts and doing forensic exams on thousands of devices.

7    Q    And did you see any evidence in your examination that

8    Mr. Gonzales seeded a torrent located on his computer?

9    A    Not the torrents in Counts 1 through 8.

10   Q    Okay.  What is an IP address?

11   A    An IP address is an address used in technology to identify

12   a router or a modem.  So if you have an internet connection at

13   your house, the IP address identifies that piece of hardware.

14   Q    So how easy is it for someone -- I'm sorry, it's related

15   to an address?

16   A    It's related to a piece of hardware.  So let's say you go

17   to Starbucks.  Everyone goes to Starbucks and they get on

18   their laptops and they get on the internet using Starbucks'

19   login.  Starbucks has an internet modem, a router, a device

20   that gets its internet connection.  That's coming through an

21   IP address.  That IP address is given to Starbucks' router.

22        If you get on the internet using Starbucks' internet

23   connection, you're using that IP address, as are all of the

24   other people in Starbucks using their internet.

25        So it's just the address for a device.

1    Q    Like a modem or router?

2    A    Correct.  It can also be an address for a computer if

3    you're on a network.  But in this particular case we're

4    talking about IP addresses on internet routers and modems.

5    Q    Okay.  And do you -- just because the government software

6    IDs a particular hash value at an IP address, is there any way

7    to know who received that hash value or downloaded it?

8    A    Not without forensics, no.

9    Q    Can -- as a general proposition, can sharing -- the

10   capability of sharing and distributing items be controlled by

11   the user?

12   A    Yes.

13   Q    And how is that done?

14   A    Many applications have settings where you can turn off

15   sharing.  You can limit your upload speed so that people can't

16   get files from you.  You can move files out of a shared

17   location and into a more private location that is not shared.

18   Q    So is it -- is it possible that there could be a torrent

19   that maybe has, how you said, maybe thousands of files on it

20   and maybe five are objectionable or contraband so it's

21   possible to have that torrent on your computer but not have

22   the objectionable images?

23   A    Correct.

24   Q    And how is a hash value received?  You said it's like a

25   fingerprint.  Is that the first thing that comes -- if you're

1  downloading something, is that the first thing that your

2  computer receives?

3  A    Yes.  So when you go do download a file, say a torrent, or

4  any file, again, inside that torrent is the file name of the

5  file you're going to eventually get if you seed it, and the

6  hash value of that completed file.

7        So if I have a torrent with just one ten-minute video

8  in it, I download the torrent.  I now have a text file that

9  has that file name of that video and the hash value of that

10  full ten-minute video in its completed state because as I'm

11  downloading it, the hash value needs to match when it's

12  finished so it can say yes, I got that whole video.

13        So as I'm downloading a video, that ten-minute video,

14  if I only get one second, that would be a completely different

15  hash value than the completed video.

16        As I'm downloading bits and pieces, it's not

17  rehashing.  So if I only end up getting ten seconds of the

18  ten-minute video, I don't have the complete ten-minute video

19  but I have the hash value that says I do.

20  Q    Okay.  And were any of the items in Counts 1 through 8

21  located on Mr. Gonzales's computers or any of the devices?

22  A    No.

23  Q    How do you -- can you forensically explain how it is that

24  this software that the government used claims that these

25  images are on the computer but two forensic exams, both yours

1    and the government's, determine that those images are not on

2    the computer?  How do you explain that?

3    A    There's many ways to explain it.  I mean, it's not likely

4    that all evidence of those files was just completely deleted

5    and overwritten and not found in a forensic exam, but that's a

6    possibility.  The other possibility is he never had those

7    files and the software's flawed.  I mean, again, we're talking

8    about software applications that we already know are flawed.

9    The publicly available version of BitTorrent is incredibly

10   flawed.  That's why they're fixing it all the time.

11         So if that read a different computer at that IP

12   address or it was getting that information from somewhere else

13   or it was getting that information from inside some other

14   torrent, I don't know.  There's a lot of different

15   explanations.  But there is nothing there that shows that they

16   were distributed from any of those computers.

17   Q    So if -- if the images they claim are on -- support

18   Counts 1 through 8 and the images are not on the computer,

19   what's your understanding of how it is that they have this --

20   they claim that it's child pornography?  In other words, if no

21   objectionable image is on the computer, how can -- how can one

22   distribute an image that is not on the computer?

23   A    Well, you can't distribute an image you don't have.  I

24   think that's why we're here today.  But the software could be

25   getting those objectionable -- objectionable images from,

1   again, bits and pieces of people all over the network.

2          The other thing --

3   Q   Let me stop you there.  Stop you there.

4          So what you're saying is that if the government

5   software identifies a particular torrent it believes has

6   objectionable images attached, and that torrent -- the

7   objectionable images could be from somebody else's computer

8   entirely?

9   A   Correct.

10  Q   That's what you're saying?

11  A   That's how the network works.  That's how it was designed

12  to work.  Yes.

13  Q   Okay.

14         So if it's not on his computer, if those images are

15  not on his computer, the Torrential -- the torrent is on his

16  computer but no offensive images are attached, can his

17  computer, maybe rhetorical, but can his computer distribute

18  it?

19  A   No.

20  Q   Is it -- okay.  You've -- if the software -- let's take

21  this hypothetical.  If the software were to access, say, a

22  nonshared part of the computer, is that -- is that person

23  distributing the image?

24         Let's assume the image is there, offensive image, but

25  it's not in a shared place, it's in a private part of the

1    computer.  Is that image -- can that image, if it's not in a

2    part of the computer that can be shared, is that image being

3    shared?

4    A   Well, it's not supposed to.  But, I mean, again, if their

5    software is getting onto the computer and reading beyond the

6    shared location, it sees the torrent -- because, again,

7    software code is reading software code -- and says, oh, I see

8    this torrent and actually he does have a couple of those

9    files, they're not in the shared folder, they're over here in

10   the private folder, but I can see them anyway so I'm going to

11   go ahead and download them.  That is 100 percent a

12   possibility.

13   Q   So, in other words, the government software -- because the

14   government software is getting into the computer beyond the

15   public part of that computer, the shared part of that

16   computer, that's the basis, would be the basis, then, for

17   their claim that this person shared.

18           Is that your understanding?

19   A   Yes.

20           MS. HULL:  That's all I have at this time,

21   Your Honor.  Thank you.

22           THE COURT:  Cross-examination.

23           MS. HELART:  Yes.

24

25

C R O S S - E X A M I N A T I O N

BY MS. HELART:

Q   Good morning, Ms. Loehrs.  I think I'm going to start with

the part that you just left with --

A   Okay.

Q   -- which is the hypothetical or your speculation that law

enforcement software could go into a non-public portion of the

defendant's computer and read a torrent but actually be

getting files from another person.

A   Kind of mixed that up.  But go ahead.

Q   It feels like that got mixed up in your testimony as well

so I wanted to clarify that.

        Are you alleging that the Torrential Downpour

software goes into non-public spaces?  It seems from your

affidavit and other prior cases that you are absolutely

alleging that it can do that?

A   I believe, based on forensic evidence in other cases,

that, yes, I think it may be going beyond what is publicly

available.  I do.

Q   And what forensic information did you see in this case

that would lead you to that speculation?

A   I don't think that that was my speculation in this case

because the files just simply weren't there.

Q   So in your -- in your report, and it is true, you have

said this several times, and your report focuses on Counts 1

1   through 8, none of the listed files in the indictment are

2   actually on Mr. Gonzales's tablet; is that right?

3   A   They're not on any of the items evidence seized; correct.

4   Q   Correct, but what we care about is the tablet.  But it's

5   important it's not anywhere else either.

6   A   Yeah, I care about all of them.

7   Q   Sure.  The actual images are not on there.  There were

8   other child pornography images on there, just not the ones

9   charged in Counts 1 through 8?

10  A   Correct.

11  Q   Okay.  Did you see forensic data from the torrent files

12  from which those images and video files came that were on the

13  tablet or any other of his devices?

14  A   I don't know where those videos came from because they're

15  not there, so I don't know how I --

16  Q   But are you aware of the torrent files from which they

17  came?

18  A   No.  There's no name of a torrent.  The files in Counts 1

19  through 8 have individual names.  They don't say which torrent

20  they came from.  I don't know which torrent they came from.

21  Q   Did you ask Agent Daniels from which torrent did these

22  come?

23  A   No, I did not ask Agent Daniels.

24  Q   You could have done that; is that correct?

25  A   That is not part of my job, no.

1    Q    Okay.  There are, in fact, torrent files that are forensic

2    remnants or artifacts that are on the tablet that are a

3    listing of torrent files on this tablet.

4           Would you agree with that?

5    A    There are torrent files on this tablet, yes.

6    Q    And there's, in fact, a list of 114 of them.

7    A    Correct.  I believe that's in my report.  Yes.

8    Q    And so if you knew that the files that are listed in

9    Counts 1 through 8 came from those -- came from ten of those

10   torrent files that are among the list of 114, would that

11   change your opinion in this case?

12   A    I don't believe they were in those torrent files.  I don't

13   believe that those files are listed in those 114 torrents.

14   But, again, just because the torrent was there doesn't mean

15   the file was downloaded so, no, it wouldn't change my opinion.

16   Q    All right.  So if you knew which ten torrent names were

17   there and you could see they were among the list of 114 that

18   were actually found on his tablet, would that change your

19   opinion?

20   A    No.  A torrent file is just a text file.  I need to see

21   it's been seeded.

22   Q    But would you agree that it's some forensic data that

23   corroborates that he did have this torrent file on his

24   computer at one time?

25   A    If it was there, I would agree.  I don't think it's there

1    is what I'm telling you.

2    Q    Okay.  If it were there, would you agree with that

3    statement?

4    A    If it were there, I would agree he has a torrent file with

5    one of those files names in it.

6    Q    I'd like to show you Exhibit 9 of the government's

7    exhibits.  It's in front of you and you can look at the hard

8    copy as well.

9         Do you -- I'm sorry.

10        First of all, I guess, is there an objection to

11   Exhibit 9?

12        THE COURT:  Are you moving it into evidence,

13   Ms. Helart?

14        MS. HELART:  I should do that before I start asking

15   Ms. Loehrs about it.

16        THE COURT:  Or before you ask Ms. Hull.

17        MS. HELART:  Out of order, I'm sorry.

18        THE COURT:  If you move it into evidence, I'll hear

19   if Ms. Hull objects.

20        (Counsel confer.)

21   BY MS. HELART:

22   Q    All right.  I'm going to back this up.  This is probably

23   better if I do it through the log files first.

24        Did you look at the log files in this case?

25   A    I don't believe they were disclosed in this case.  My

1    recollection --

2    Q    In fact, they were disclosed, but have you seen them?

3    A    I have not.  When I did my exam, they're not in my report,

4    so I don't know when they were disclosed.

5    Q    Are you familiar with log files?

6    A    Yes, I am.

7    Q    And are you familiar with the log files that are generated

8    from the use of Torrential Downpour?

9    A    Yes, I am.

10   Q    So now I'd ask you to look at Exhibit 1.

11          All right.  And, for Exhibit 1 I'm just going to put

12   up a copy of the indictment.  And you see there are two files,

13   two video files, that are in that.

14          Do you see Exhibit 1?

15   A    Yes.

16   Q    All right.  And what does Exhibit 1 purport to be?  What

17   does it look like to you?

18   A    Looks like the indictment.

19   Q    Sorry.  Exhibit 1.  The indictment is on the screen, but

20   the exhibit --

21   A    Oh.  I'm sorry.

22   Q    -- this is the log file.

23   A    These -- yes, this is a screen shot from Torrential

24   Downpour and then the details.txt log, which is a log created

25   by the same software.

1  Q   All right.  Are you familiar with the look of these

2  documents?  Have you seen documents like this before that are

3  log files corroborating and, I guess, correlating with

4  Torrential Downpour downloads?

5  A   Yes, I have seen the log files that Torrential Downpour

6  creates.

7  Q   So in this log file --

8         MS. HELART:  The government would move to admit

9  Exhibit 1 so we can talk about it.

10         MS. HULL:  Assuming foundation is laid.  I assume

11  Agent Daniels -- I'm sorry.  I assume Agent Daniels would be

12  laying that foundation.

13         MS. HELART:  Agent Daniels would be.

14         THE COURT:  All right.  Exhibit 1 is admitted.

15      (Exhibit 1 admitted.)

16  BY MS. HELART:

17  Q   In looking at Exhibit 1, do you see that the torrent file

18  named DD has associated with it five different files?

19  A   Yes, I do.

20  Q   And two of them are charged in the indictment, do you

21  agree with that?  Intro-DD and Lux-Leak4.  You can compare

22  that to the screen.

23         THE COURT:  The screen's covered.

24         MS. HELART:  Oh.

25         THE WITNESS:  I don't see --

1    BY MS. HELART:

2    Q   The two files at the top.

3    A   I see the two file names in the indictment; I don't see

4    the two file names in the log. I see the -- I see intro --

5    no. I see --

6    Q   Ms. Loehrs, look at just the very first page. Not the

7    first page of the log file but the very first page I've got up

8    on the screen with the color icons.

9    A   Okay, I see that screen shot.

10   Q   Okay. So do you agree that these -- there are five files

11   that appear to be in this DD torrent?

12   A   See, I didn't create this screen shot, so are you saying

13   the name of the torrent is called download?

14   Q   Name of the torrent is called DD.

15   A   Okay.

16   Q   And then there are five files associated with that

17   torrent.

18   A   I see those in a screen shot, yes.

19   Q   And then do you agree two of them are listed in Count 1

20   for charging?

21   A   Can you move that back up.

22   Q   Yes. So Lux-Leak4.

23   A   Yes.

24   Q   And Intro-DD.

25   A   Yes.

1  Q   Now, if you keep going in the pages, if you can look at

2  page 1 of this log file, do you understand how the Torrential

3  Downpour software -- you'll simply agree -- you've been told

4  how it works, but do you see that there was connection

5  acknowledgment by both computers with the extended handshakes?

6  A   Yes, I see that in the log.

7  Q   Okay.

8       And so if you go to the top of page 2 and the file

9  index 2 named Lux-Leak4.mp4 is in the torrent and it

10 acknowledges that it has it.

11 A   Well, are you talking about remote client acknowledge it

12 has certain pieces?

13 Q   Correct.

14 A   I see that.

15 Q   With remote client being Mr. Gonzales's tablet.

16 A   That's inaccurate.  There is nothing here that says remote

17 client is Mr. Gonzales's tablet.

18 Q   Okay.

19       Part of your testimony, I'm going to point you to

20 page 3, create uninitialized file 2 for Lux-Leak.4.  Is that

21 the placeholder that you speak of or that it looks like it

22 could have that file?  There was a portion of your testimony

23 where it could look like it had that file.

24 A   I'm not quite sure what you're asking, I'm sorry.

25 Q   Okay.

1          And, again, just one more reference here.  This is on

2    page 5 where file index 2 named Lux-Leak.4.MP4, which is one

3    of the listed Count 1 files, and how it says file 2 has been

4    completely downloaded.

5    A   I see that.

6    Q   All right.  Does it look like the software is operating

7    properly when you see these notations?

8    A   I have no idea because it's the very software that's

9    creating these logs.  So if the software is flawed, then it's

10   creating flawed logs.  This is the software.  This log is what

11   needs to be tested.  So I can't read this log and say, yep,

12   the software works, because the software made it.

13   Q    In looking at, again, this was all in attempt to go back

14   to Exhibit 9 because we can do that with all of the Counts 2

15   through 8 log files, but did you see a listing of 114 .torrent

16   files that were forensic data that was actually on

17   Mr. Gonzales's tablet?

18   A   I did see torrent files, yes.

19   Q   All right.  And did you, for example, see DD.torrent?

20   A   Again, I don't know the specifics.  It's very possible.

21   Obviously, if it's in there, it's in there.

22   Q   Would you agree with the premise that all ten torrent

23   files from which the Count 8, 1 through 8 files, would you

24   accept the premise that all of them were, in fact, on that

25   tablet?

1    A    I honestly don't know.  If I saw it, then I would say yes.

2    I don't know that all ten of those were on there.

3    Q    Okay.  Is there a reason why you wouldn't have looked for

4    that to corroborate the existence of the fact that those

5    torrents from which the very Counts 1 through 8 were there?

6    A    Because what I'm looking for are the images.  A torrent is

7    just a text file.  He could have had torrents all day long.

8    My question is, I found no evidence those torrents were

9    seeded.  So even if he has the text file, if he doesn't seed

10   it, he doesn't have child pornography.  That's what I'm

11   concerned about.  Not that he has a text file that has a bunch

12   of names in it.  If he didn't seed it, he didn't have child

13   pornography.  And what he didn't have were any of the images

14   inside that torrent that are being charged.

15   Q    Would you agree that someone, with the click of a button,

16   could easily delete an image?

17   A    Sure.  People delete things all the time.  Absolutely.

18   Q    And do you agree there might be very logical computer

19   forensic reasons why data might not be on a computer anymore?

20   For example, if an operating system got updated or they ran

21   out of space and something got written over.

22             Would you agree with those things?

23   A    Yes.

24   Q    Okay.  So are there logical reasons why several weeks

25   earlier files might not be on somebody's device, in this case

1    a tablet?

2    A    Sure.

3    Q    Okay.  But the fact that there are other forensic

4    remnants, would that not be helpful to you?

5    A    Again, I don't know how to stress this.  He's being

6    charged with knowingly distributing images.  If I can't find

7    those images, if I don't have any forensic evidence that those

8    images were downloaded, opened, looked at, saved, copied,

9    something, some activity occurring with those images, then I

10   have zero forensic evidence they were ever distributed.

11   They're just not there.  So, no, my opinion doesn't change and

12   I still believe the software is reading torrent files that

13   haven't been seeded.

14   Q    And so if it's reading torrent files, from where is law

15   enforcement getting their actual downloads?  Is that your

16   Person A/Person B analogy?

17   A    Correct.  That's exactly how the protocol is meant to

18   work.  If this guy has a torrent but he doesn't have the

19   files, get all the bits and pieces from the network.  That's

20   how the protocol is designed to work.

21   Q    But if law enforcement software is designed to be a

22   single-source connection and download, how is it that

23   Mr. Gonzales would be essentially the middle man?

24   A    Well, A, I don't know that the software is doing

25   single-source download.  I understand that's the claim.  That

1    is one of my issues.  I don't believe it always is doing

2    single-source download and it would be easy for him to be

3    identified if he has the text file but not the images.

4    Q    I want to hear your definition of seeding again,

5    especially as you've used it in this case.

6    A    Having the torrent go out and get the files that it's

7    associated with.

8    Q    You're equating seeding with the person's request?

9    A    Yes.  With getting the files.

10   Q    You agree you've seen demonstrations of Torrential

11   Downpour software?

12   A    I have seen the demonstration.  I've seen the same

13   demonstration multiple times, yes.

14   Q    That hasn't convinced you?

15   A    No.  He took one file in a shared folder, ran his software

16   in best case scenario and ended the demonstration.  That is

17   not testing, that is not validation, and that does not change

18   my opinion.

19   Q    You speak of an important concept of independent

20   third-party testing.

21   A    Yes.

22   Q    Are you claiming you would be that independent third

23   party?

24   A    I would rather not be.  I would much rather a firm that

25   has no stake in this, that that's all they do is validate and

1    test software, I would much prefer they do that.  I don't want

2    to do the testing.

3    Q    Yet you've requested the software.

4    A    That's my job.  And we have.  We've received it.  Various

5    software pieces on some of these cases, and we have run tests.

6    Q    But you also agree you would not be the right person to

7    put the software into the hands?

8    A    We could test it; I would prefer not to.  I have the

9    qualifications to test it; I would prefer not to.

10   Q    In this case you have already earned a sum of money; is

11   that correct?

12   A    Yes, the Court has paid me for my work.  Our firm's work.

13   Q    And in your work these days, like recently, are you mostly

14   hired by defense counsel?

15   A    On child pornography cases I'm only hired by defense

16   counsel because the prosecution won't hire me, with the

17   exception of one case in Georgia where they hired me on both

18   sides because evidence was being hidden.

19   Q    So in approximately what percentage of your cases have you

20   asked for the software, whatever the file-sharing network is?

21   A    I believe -- I have a spreadsheet of them.  I believe

22   we're up to between 60 and 70 cases that we've actually asked

23   for the software to be tested.

24   Q    And it's not just BitTorrent.  You have alleged that there

25   are flaws in the Ares and other kinds of file-sharing network

1    softwares; is that right?

2    A    Oh, it's the entire file-sharing network, absolutely, yes.

3    Q    Okay.  So no matter which law enforcement software is

4    being used for proactive work, you have alleged flaws and --

5    flaws in their softwares?

6    A    Well, I have asked to test it because it's the only

7    software that is not available for testing.  All of the other

8    publicly available software we've tested, found flaws, and we

9    know exactly what's happening.

10          So, yes, based on forensic evidence, when law

11    enforcement says we have this publicly available software

12    that's the same as what you've downloaded but we've made

13    changes, we're not going to show you what those changes are

14    and not let you test them and make sure those changes are

15    accurate and it works correctly, just trust us on that, no, I

16    don't -- I will ask for it every time I see evidence that

17    refutes what it claims it does.

18    Q    Approximately what percentage of the cases where you're

19    hired by the defense in a child pornography case have you

20    asked for the software?

21    A    Like I said, between 60 and 70 out of hundreds of cases.

22    Q    60 to 70 cases or percentage?

23    A    No, 60 to 70 cases.  I don't know the exact percentage

24    because I'd have to count every case that involved

25    file-sharing software.

1    Q   Is the main factor that drives your decision whether

2    images and videos are actually on the device?  Is that the

3    main decision that drives your analysis?

4    A   No, it's any forensic evidence that I find that refutes

5    the claim.  I have found evidence that deleted files were

6    identified by their software, files in private locations were

7    identified by their software, files that don't exist anywhere

8    were identified by their software.  There's many scenarios I

9    have found forensically that do not add up to what their

10   software it says does.

11   Q   In this case, one piece of very important forensic

12   corroborative data is jump lists and link files.  Did you look

13   at that information on this tablet?

14   A   I would disagree with you.

15   Q   Did you look at this that information on this tablet?

16   A   Yes.

17   Q   Okay.  What is your understanding of what jump lists and

18   link files are?  What do they tell us?  What's one thing they

19   tell us?

20   A   It's the name -- whenever you open a file or attempt to

21   open a file on a computer, it records that in your recent

22   documents.

23   Q   Okay.  What about that would be insignificant?  Because

24   wouldn't that be some data point about what the user was

25   actually viewing on the computer?

1   A    Oh, sure.  And for possession, that's very important.

2   Q    Why wouldn't it be important for the question of

3   distribution or receipt?

4   A    Because the files don't exist.  So what you're talking

5   about in a jump list, again, is text.  It's a text file.  It

6   means something was attempted to be opened.  I don't believe

7   these files were in that jump list.  So it's not -- it's not

8   pertinent to Counts 1 through 8.

9   Q    Would you please look at Exhibit 11.  And if you peruse

10  through it, would you generally agree this looks like a list

11  of jump list files that were actually viewed on this tablet?

12  A    Yes.  Well, when you say "viewed," these are files that

13  were clicked on.

14  Q    Okay.  Accessed.  And one reasonable inference is they

15  were viewed; is that right?

16  A    Yes, that's possible.

17  Q    In fact, is that a reasonable inference generally of link

18  files or jump lists, that these are files that somebody has

19  actually viewed?  A user has actually looked at these files?

20  A    Yes.  And the only -- just to clarify, the only reason I

21  say that is because with file sharing, a lot of times they try

22  to open a video or image that's corrupt and it doesn't work.

23  So it will still create a listing for a file that you weren't

24  able to open.  So that's why I'm making that distinction.

25           If the file was a complete file and it was able to be

1    opened, then, yes, our conclusion would be it was viewed.  But

2    a lot of files that cannot be opened will still result in

3    having items in your jump list.

4    Q    In looking at specifically the last three pages and

5    comparing them to a .torrent name, first I'm going to show you

6    from Exhibit 9, this is the second page of Exhibit 9 --

7    A    Okay.

8    Q    -- the torrent that starts with "2 Little Girls."

9    A    Okay.

10    Q    Then in comparing that to the third-to-last page of

11    Exhibit 11 in the jump list, do you agree that that same

12    torrent file was clicked on and recorded in the jump list as

13    having been clicked on?

14    A    Well, again, that's a torrent --

15    Q    Do you agree with that statement?

16    A    I agree that the torrent is in that list, yes, I do.

17    Q    All right.  And so this is some corroboration that that

18    file was clicked on, that torrent file was clicked on?

19    A    Correct.

20    Q    And as you go down, there's some other forensic pieces

21    because there's an actual file; is that correct?

22    A    I'm not sure what that is.

23    Q    You are making the distinction that up here it's a

24    .torrent, which is just a text file, but down below this is

25    actually an MP4 file.

1    A    Right.  But I don't understand the heading File

2    Selections.  I don't know if that is still part of that jump

3    list.  Again, I didn't prepare this so I'm just trying to make

4    sure the data makes sense.

5    Q    Okay.  Well, in your analysis where you had a lot of time

6    at your laboratory, did you do these kinds of comparisons?

7    A    No, ma'am.

8    Q    Why not?

9    A    Because I've only done my work for Counts 1 through 8 and

10   they don't exist.  So I have not gone beyond that with my

11   analysis.

12   Q    This is Counts 1 through 8 because it's Count 2.

13        Do you see in the indictment that's up on the screen,

14   the file that says 2 Little Girls?

15   A    That's a file name.  That's not an image.  Yes, I see

16   that.

17   Q    Right.  So in comparing that with Exhibit 11, the

18   third-from-last page, that's the same file name at the bottom

19   of the page, not just a torrent, but an actual file name.

20   A    I understand that's a file name.

21   Q    Did you do that comparison to see what might be in the

22   jump list that at least corroborates that someone has clicked

23   on that?

24   A    No, ma'am.

25   Q    Going to the second-to-last page, we're going to go back

1    to Count 1, which is part of Counts 1 through 8, looking at

2    Lux-Leak.

3    A    Yes.

4    Q    All right.  The second-to-last page, and I'll point to it,

5    Lux-Leak4.MP4.  That, again, would be an actual file that

6    shows up in the jump list.

7              Would you agree?

8    A    Again --

9    Q    Would you agree with just that statement?

10   A    No.

11   Q    Why wouldn't you agree with just that statement, that that

12   is a file that shows up in the jump list?

13   A    Because I didn't prepare that and I don't know if that's

14   what this is representing.  I don't know if this is

15   representing files that were in the jump list is what I'm

16   trying to tell you.  This isn't my work.

17             I get that that's a file name with a file path.  But

18   I didn't find that file and I didn't create these lists, so I

19   don't know.  I just don't know.  I haven't done that analysis.

20   Q    And you just said it, you didn't yourself do this; is that

21   right --

22   A    Yes --

23   Q    -- in your own analysis?

24   A    Yes, I did my own analysis.

25   Q    You could have done this and put it in your own format; is

1    that right?

2    A    Not at this particular time in our exam, no.  This is not

3    what I have done yet.

4    Q    Finally, in looking at the indictment, Count 6, this file,

5    MVI.

6    A    Yes.

7    Q    The last -- I believe this is the last page of Exhibit 11,

8    do you see MVI mpg .torrent?

9    A    Yes, I do.

10   Q    Does that corroborate that name of MVI mpg, that that was

11   clicked on?

12   A    That is the same name.

13   Q    Did you consider his statement in your report?

14   A    No.

15   Q    Did you listen to his statement or read the transcript of

16   his statement?

17   A    I don't believe so.

18   Q    Wouldn't that be an important fact to hear what the user

19   of this tablet says about his own computer usage in child

20   pornography?

21   A    His statement has nothing to do with law enforcement

22   software.  My report and my affidavit are strictly based on

23   images that the software claims were being knowingly

24   distributed.  That's it.  And people's statements have nothing

25   to do with that.

Q   But in the question of whether the software works
correctly, wouldn't it be important if Mr. Gonzales himself
said he sought child pornography out on BitTorrent, used
BitTorrent, used uTorrent?

A   It doesn't make the software work flawlessly, no.  It has
no bearing on how law enforcement software operates.

Q   You did say in your statement on direct, it may work,
meaning it, the law enforcement software, may work sometimes
but not other times.

A   Absolutely.

Q   So wouldn't it be an important feature to listen to
someone's statement or read it to hear whether maybe on this
occasion it was corroborated by the activities that person
actually said they did?

A   My job as a forensic expert is not to read statements
because statements can be false, they can be misleading.  My
job is in forensics.  I don't care what somebody says when
we're dealing with software.  He doesn't know how the software
works.  That has nothing to do with it.

Q   All right.  And you called the government -- the FBI
software usage here incredibly flawed.

A   I believe is flawed.  I do believe it's flawed, yes, I do.

        MS. HELART:  All right.  No other questions.

E X A M I N A T I O N

BY THE COURT:

Q   Ms. Loehrs, if an MP4 file name that's in the indictment is, in fact, on the jump list in the defendant's tablet, what does that mean?

A   It means a file by that name may have been there.  If that, in fact, is in the jump list, then, yes, it may be that a file with that name was there.  I don't know the content of that file, whether that is a video that was only one second was downloaded.  I know nothing about it other than the name exists.

Q   But if it's an MP4 name, it means there was at least some portion of a video file there?

A   Maybe.

Q   As opposed to a text?

A   Maybe.  Maybe not.  I mean, you can still get a file that's just -- you can't open.  So the only thing that tells me is that the file name was there.  We need more to go in and do any kind of analysis other than just a file name in a list.

Q   What does it tell you about what the user of the tablet did with respect to that?  Does it mean they clicked on it to open it?

A   That's probably what happened, yes.

Q   Is there some other meaning to its being on the jump list?

A   We have found files in jump lists that there's no activity

1    associated with them, but that's just software.  Typically it

2    means they clicked on it.  Absolutely.

3              THE COURT:  Ms. Hull, did you have additional

4    questions?

5              R E D I R E C T   E X A M I N A T I O N

6    BY MS. HULL:

7    Q    You indicated on cross-examination that you had attended

8    instructional seminars, or whatever you called it, for this

9    particular software.  And you mentioned something about a

10   limited examination where, in a perfect world, perfect

11   scenario, the software worked.

12             Do you remember talking about that?

13   A    Yes.  It was actually a demonstration by the person who

14   created the software.

15   Q    And have you ever come across a software that is flawless?

16   A    Never.  Never.  In the 20 years I've been doing this, I

17   have never seen a flawless piece of software.

18   Q    And this log file that the prosecutor was talking to you

19   about, that's actually generated by the software itself.

20   A    Correct.

21   Q    So the log file itself is being generated by the software

22   that's in question?

23   A    Correct.

24   Q    Okay.  And your examination only went to that portion of

25   the devices that were, number one, related to Counts 1 through

1    8; correct?

2    A    Correct.

3    Q    And did not go into any other possession or deleted files

4    or anything like that?

5    A    Correct.

6    Q    What's the difference between clicking on something and

7    obtaining the image?

8    A    Well, clicking on something is, again -- let's say the

9    video downloaded and I click on it but it doesn't play.  That

10   clicking on it creates that name in the jump list.  So there

11   has to be something there to click on it.  That I agree with.

12   If, in fact, that was a file that was clicked on.

13   Q    And if it's clicked on and the image is not there, I ask

14   you again, how can it be distributed?

15   A    It can't.

16         MS. HULL:  Nothing further.  Thank you.

17         THE COURT:  Mr. Ber, I didn't mean to overlook you.

18   Did you want to ask any questions of Ms. Loehrs?

19         MR. BER:  Real briefly, Your Honor.

20         THE COURT:  Go ahead.

21               D I R E C T   E X A M I N A T I O N

22   BY MR. BER:

23   Q    Good morning, Ms. Loehrs.  I'm Hershel Ber.

24   A    Morning.

25   Q    I know you're not the expert on our case.  I represent

1    Aaron Ordonez.  I know Michelle Bush from your firm is the one

2    who did the primary work on this case.

3    A    Right.  Our firm is not on this case anymore, but, yes,

4    she did the initial exam on that case.

5    Q    Okay.  Do you have any familiarity with Aaron Ordonez's

6    investigation?

7    A    No.

8    Q    Okay.

9         We're talking about the BitTorrent Torrential

10   Downpour program; correct?

11   A    Yes.

12   Q    And essentially this program, in order for it to work

13   right, has to be a couple things right.  Well, in the macro

14   sense.

15        Do you agree that if it's working right it has to

16   make contact with a single computer?

17   A    It has to make contact with a computer, yes.

18   Q    Well, in a BitTorrent, when you sign on for BitTorrent,

19   you're downloading software that, if you use the software and

20   log onto it, you make a connection with multiple computers;

21   correct?

22   A    Correct.  You're on the network.

23   Q    It could be one computer, it could be thousands.

24   A    Correct.

25   Q    And when you download a torrent, that provides you

1    software to do that; correct?

2    A    There is software for downloading torrents, yes.

3    Q    Oh, a different torrent -- what would be the software that

4    you need to download on your computer to be part of the

5    BitTorrent?  Or peer-to-peer BitTorrent?

6    A    So those are different.  So to be on the BitTorrent

7    network, you have to download BitTorrent software.  And

8    there's multitudes of BitTorrent software applications.

9    Q    And you would have to have that software on your computer

10   in order to communicate with those other computers; correct?

11   A    Correct.

12   Q    If you didn't have that software, then you couldn't

13   communicate with those computers on that torrent; correct?

14   A    That's correct.

15   Q    And, therefore, if you didn't have that software, you

16   couldn't distribute anything within that network; correct?

17   A    That's correct.

18   Q    Now, the BitTorrent Torrential Downpour, is the government

19   saying that their software has this BitTorrent on it but

20   somehow can only connect with one computer that they want to

21   focus on?

22   A    They're saying their software can get a download from only

23   one person, that they don't go out on the network to get bits

24   and pieces from other people.

25   Q    So is this a case where they took Torrential Downpour and

1   modified it so they could connect with only one computer and

2   not get -- they're saying get all the information from all

3   other computers?

4   A   Well, Torrential Downpour is law enforcement software.

5   That is proprietary to them.  That is the modified version of

6   the publicly available software.

7   Q   So in a normal publicly available software, a file could

8   be broken up into many pieces and saved in all these different

9   computers; correct?

10  A   Correct.

11  Q   And when you want to download anything you may be

12  communicating with multiple computers?

13  A   That's correct.

14  Q   But what the government is saying with their BitTorrent

15  Torrential Downpour is they have a way of communicating with

16  only one computer.

17  A   Correct.

18  Q   And it's your concern that that assertion may be flawed.

19  A   Well, it's not how the protocol works, so, yes, I'm

20  still -- I'm not sure how they're doing that because that goes

21  against the very protocol.

22  Q   On top of that, the normal publicly available torrent

23  instructions only allow each other's computers to go into that

24  space that's saved for the torrent files; correct?

25  A   Are you saying that shared space --

1    Q    Shared space.

2    A    -- shared folder?

3         Yes.  That's where they're supposed to be reading it

4    is the shared location.

5    Q    So if a file is not in that shared location on your

6    computer, it should not be sharing with the other computers in

7    the torrent?

8    A    That's correct.

9    Q    And is your second concern with the government's

10   Torrential Downpour program that it picks up files that are

11   not in that shared space?

12   A    That is a concern, yes.

13   Q    And that it might be even in unallocated or deleted space?

14   A    Yes.

15   Q    And have you in any of the cases ever been supplied with

16   validation tests or any expert opinion as to true validation

17   tests that this software does what it says it purports to do?

18   A    Never.

19   Q    So you're saying in all of the other cases you've been

20   exposed to that the only thing you have seen is a single

21   performance on one occasion?

22   A    I think I've seen that same demonstration several times by

23   the same person.

24   Q    Would you be concerned if this Torrential Downpour program

25   picked up a torrent from a computer and that torrent wasn't

1    found on that computer?

2    A    Yes, that would be -- yes, that's a concern.    Absolutely.

3    Q    Would that show that the Torrential Downpour program was

4    not operating the way that the government alleges it can?

5    A    Yes.

6            MR. BER:    I have no more questions, Your Honor.

7    Thank you.

8            THE COURT:    Any cross on this issue?

9                C R O S S - E X A M I N A T I O N

10   BY MS. HELART:

11   Q    So specific to Mr. Ber's points, in the typical user space

12   of BitTorrent, only what is in someone's shared folder should

13   be being shared out.

14   A    Correct.

15   Q    Okay.    But that is, you would agree, a specific point in

16   time.

17   A    Yes.

18   Q    Okay.    So we can't say just generally because someone

19   could easily -- a user could easily move a piece out of their

20   shared folder almost immediately upon receiving it and move it

21   out of there and then it's no longer available for sharing.

22            Would you agree with that?

23   A    That's right.    Yes.

24   Q    Okay.    And, therefore, if a search warrant is served, as

25   in both of these cases, sometime later, it is difficult to

63

1    always tell what a user has done on their computer in those

2    time periods between the distribution and the possession.

3    A    Yes.

4    Q    Because it doesn't take very long for a user to move

5    things around or delete.

6    A    Depends on the user.

7    Q    Okay.  Not their will to do it, I'm saying the actual

8    mechanics of it doesn't take very long.

9    A    Oh.  Correct.  Yes.

10   Q    And it's just as possible to delete an entire reference to

11   a torrent as it is to delete a file; is that right?

12   A    When you say reference to a --

13   Q    Meaning Mr. Ber's question was if you don't find a

14   torrent -- and so I'm following up.  If you don't find a

15   torrent file, the text file, could it be because somebody

16   deleted that?

17   A    Oh, sure.

18   Q    Have you heard of the term "download and delete people"?

19   People who download off of BitTorrent because it's so quick

20   and easy, look at what they want to, delete it?

21   A    Sure.

22   Q    Reobtain it next time.

23   A    Yes.

24   Q    That's not that odd in the BitTorrent usage in the sense

25   that you get a large volume of files fairly quickly?

1    A    Most people keep their collections, but we've certainly

2    seen it.

3    Q    Some people do have collections.  But would you agree it's

4    easy not to keep a collection, too, because it's easy to

5    obtain on the BitTorrent network?

6    A    Sure.

7              MS. HELART:  All right.  Thank you.  No other

8    questions.

9              THE COURT:  Anything further?

10             MR. BER:  Just briefly.

11               R E D I R E C T   E X A M I N A T I O N

12   BY MR. BER:

13   Q    If the government program picked up a torrent that later

14   was not found on a defendant's computer, would you be able to

15   find that it did exist at one point?

16   A    We may, yeah.  That's kind of what forensics is for, to

17   find all this deleted stuff.  Yes, we find it all the time.

18   Q    Is it like any other file where if you delete it, it goes

19   into unallocated space from the delete folder?

20   A    Yes.

21   Q    So it would be likely found in those folders unless it was

22   written over; correct?

23   A    Correct.

24   Q    And written-over files, unless you have very limited

25   space, in your experience do you see that a lot?

A    I mean, sure, files get overwritten.  As hard drives get
bigger we find more and more in deleted space because files
aren't getting overwritten as much as when the hard drives
were smaller, but it's kind of -- it's up in the air as to
what gets overwritten and what doesn't.

     MR. BER:  No more questions.

     THE COURT:  All right.

     Thanks.  You can step down.

     We'll take a ten-minute break and resume at 20
minutes to the hour with the government's witness.

    (Recess taken from 10:29 to 10:39.)

     THE COURT:  Ms. Helart, you may proceed.

     MS. HELART:  Thank you.  The government would call
Jimmie Daniels.

     THE COURT:  Before we proceed, marshals, I think we
should take the handcuffs off Mr. Ordonez so he can write more
easily, if you don't mind.

     MR. BER:  Thank you, Your Honor.

     THE COURT:  Let's go ahead.  Ms. Helart.

               **JIMMIE J. DANIELS,**
called as a witness herein, after having been first duly sworn
or affirmed, was examined and testified as follows:

        D I R E C T   E X A M I N A T I O N

BY MS. HELART:

Q    Good morning, sir.  Can you introduce yourself.

1    A    Yes.  I'm Jimmie John Daniels.  I'm a special agent here

2    with the FBI in Phoenix, Arizona.

3    Q    How long have you been with the FBI in Phoenix?

4    A    About the -- next month will be nine years.

5    Q    Were you an FBI agent before that?

6    A    Yes, I was in the Las Vegas division of the FBI.

7    Q    How long?

8    A    About three years.

9    Q    How long?

10   A    Three years.

11   Q    Three years.

12          Is the current focus of your work here in the Phoenix

13   office child exploitation?

14   A    Yes.

15   Q    And are you familiar with the federal definition of child

16   pornography and illegal images?

17   A    I am.

18   Q    Are you also a computer forensic examiner?

19   A    I am DexT trained, which allows me to make forensic images

20   of digital items as well as place -- process those digital

21   items or images into forensic software.

22   Q    So that took a training to go to the DexT class --

23   A    Yes.

24   Q    -- is that correct?

25          And since about what time period have you been doing

1    your own forensic examinations?

2    A    Since 2012.

3         MS. HELART:  At this point, the government would ask

4    to short-circuit this.  Ask to put in Agent Daniels's CV,

5    Exhibit 13 in Mr. Gonzales's case, Exhibit 10 in Mr. Ordonez's

6    case.

7         MS. HULL:  No objection.

8         MS. HELART:  I don't know if there's an objection

9    that Agent Daniels is not an expert.  We could short-circuit

10   that too.

11        MS. HULL:  Agreed.

12        MS. HELART:  Okay.  All right.

13        THE COURT:  All right, we'll admit Exhibit 13.

14       (Exhibit 13 admitted.)

15   BY MS. HELART:

16   Q    You're certainly familiar with Ms. Loehrs and her firm and

17   the different people who you meet with in order to set up time

18   for them to do examinations?

19   A    Yes.  Due to contraband being on some of the digital

20   images, typically either Ms. Loehrs or one of her associates

21   will come to our office here in Phoenix to do -- conduct a

22   review on a stand-alone machine.

23   Q    In Mr. Gonzales's matter, they reviewed the computer

24   evidence March 13th and 14th, 2018; is that right?

25   A    That sounds right.

1   Q    And in Mr. Ordonez's matter, they also came to view the

2   computer evidence on July 5th and 6th, 2018?

3   A    That sounds correct.

4   Q    They were able to take back with them to their office

5   anything they wanted, except contraband; is that right?

6   A    Yes.  Typically at the end of the review, I would just

7   check the report, not for evidence but for more to make sure

8   they didn't accidentally copy over a file of child

9   pornography.

10  Q    Can that inadvertently happen sometimes?

11  A    Sometimes, yes.

12  Q    That if you're in that kind of setting where they're

13  bringing in a computer, you want to check to make sure they're

14  not getting something they shouldn't have at the end.

15  A    Well, they don't bring a computer, they just bring their

16  own internal drive and they use a computer we set up for them

17  with the digital images.

18  Q    All right.  Do you personally, in speaking of your time as

19  an agent, do you personally have specific experience with

20  file-sharing networks?

21  A    Yes, I do.

22  Q    There's an abundance of them, is that right, not just

23  BitTorrent?

24  A    Yes.

25  Q    Are you also familiar with the various client softwares

1    they have to access them?

2    A    Yes.

3    Q    And is this whole activity that people do out on the

4    internet commonly called peer-to-peer file sharing?

5    A    Yes.

6    Q    Peers meaning the computers.

7         And about how many file-sharing or peer-to-peer

8    investigations have you done?

9    A    It would have to be in the hundreds.

10   Q    When we're talking about that, we're talking about

11   proactive investigations where you as an agent are trying to

12   detect others who are sharing illegal files?

13   A    That's correct.

14   Q    Can you explain just briefly what a file-sharing program

15   is, whether it's Napster, Share Zot, BitTorrent?

16   A    Yeah.  They all kind of have the same backbone, if you

17   will.  They're an ad hoc network which means -- or

18   decentralized ad hoc network, which means there's not a

19   central computer that is providing the information, it's being

20   provided to one peer on the network by another peer or by

21   other peers.

22         There's multiple different facets.  Some of the

23   file-sharing or peer-to-peer software trade in only single

24   files.  Then there's other files, in this case BitTorrent

25   network, that actually you can either share one file via a

1    torrent file or you can share thousands of files.

2    Q   Is it true that for each of these files-sharing networks

3    you need a particular kind of client software that will

4    actually work with it?

5    A   Yes.

6    Q   So if I'm a person on a computer at home and I don't have

7    any of these softwares, I'm not going to be getting any

8    torrent files or any other files from Ares or Napster?

9    A   You should have no activity, yes.

10   Q   Once a user has usable software, does this then allow them

11   to share files, supposing that they are in the shared space of

12   their software, via whatever that file-sharing network is?

13   A   Yes.  There's several factors they have to have.  They

14   have to have internet.  Without internet they're not going to

15   be able to communicate with anybody.

16         They have to have a device, a computer, tablet, that

17   has ability to run the software.  They have to have files that

18   are publicly available to share and their software actually

19   has to be activated or up and running for them to share that.

20   Q   Generally speaking, as we're talking about all

21   file-sharing networks, do they encourage sharing and not just

22   receiving?

23   A   Yes.  If everybody only received on network and did not

24   share, then the network would die because nobody would be

25   sharing on that network.

1    Q    So are there ways to penalize users who are not sharing?

2    A    Yes.  Typically, for most software, the way to penalize

3    somebody, either through the software itself, turn off sharing

4    or if they're making steps to not share they actually throttle

5    them down or decrease their download speed.

6    Q    When we see in a log file the choke message, as it

7    pertains to the law enforcement side, are you familiar with

8    that in BitTorrent?

9    A    Yes, it's usually referring to that we are basically at a

10   limited communication with that person.  Once we get an

11   unchoke message, that's when communication can happen freely

12   and we can obtain pieces from that IP address.

13   Q    And is it true that law enforcement does not share out

14   child pornography?

15   A    That is one of our mandates, yes.

16   Q    For a typical user just buying a computer off the shelf,

17   they obviously must go out and download some kind of client

18   software?

19   A    Yes.

20   Q    Then once they have this client software, then they're

21   free to share and receive any file that's on that network?

22   A    Yes, if they're actually requested.

23   Q    Right, if they're requesting it.

24        All right.  Specifically in these two cases, are you

25   familiar with BitTorrent?

1    A    Yes.

2    Q    Can you explain BitTorrent and how it has maybe some

3    similarities, but also some major differences, with other

4    file-sharing networks?

5    A    Yes.  It has -- once again, it's a decentralized ad hoc

6    network, so it's -- the content is being provided by other

7    users of the network.  There's not a centralized computer,

8    like in Netflix.  It's similar in that respect as all

9    peer-to-peers kind of follow that same kind of path or mode of

10   sharing files, as opposed to having an actual centralized

11   computer that's sharing this stuff.

12        The other -- the one difference that BitTorrent kind

13   of gets into, as opposed to some of the other peer-to-peer

14   software, A, you can share more than one file.  I think most

15   every other peer-to-peer software that I know of is a single

16   file sharing.  So you select a file and download that file,

17   and then once you have it completed, you're sharing it.

18        And BitTorrent, they did something a little

19   differently.  They basically encapsulated files in what is

20   known as a torrent file.  A torrent file, like Ms. Loehrs said

21   was, is a robust text file.  It's a recipe file that describes

22   the files you're trying to obtain.  There's not a search

23   function like in typical other peer-to-peers to obtain these

24   torrent files within the software that you download yourself,

25   so you have to go on a Web browser and download the torrent

73

1    itself.  Do a search for it, find it, locate it, and download
2    it to your computer.
3    Q    Even on the main internet, like Google, what we would all
4    be familiar with, people can go out and try to find torrent
5    file names that have names that seem like what it is they want
6    to find?
7    A    Yes.  They can do a simple Google search and Google will
8    provide them with different websites they can now go to and
9    actually try to obtain those torrent files.
10   Q    Once somebody has their software, their client software
11   that will access plus a torrent file name that they're
12   requesting, that's when they can load that into their software
13   and that becomes the request out to the network?
14   A    Typically using like a Windows-based computer, as soon as
15   that's downloaded, it usually gets downloaded to the default
16   location, which is, in a Windows computer, usually the user
17   profile's Downloads folder.  Windows acknowledges that the
18   .torrent file should be opened by this particular software and
19   gives them an option, would they like to actually run it
20   within this software.
21   Q    The log files are going to show a word call "pieces."  Can
22   you explain "pieces" and whether it equals files.
23   A    Pieces are the way that the payload or the content of the
24   torrent file is broken up into.  It does not directly
25   correlate to files.  If the torrent file only describes one

video file and, say, the torrent file consists of 730 pieces,
each one of those pieces would have to be present to have that
complete file.

Q   In the world of BitTorrent, as we're talking about in this
hearing, did you hear Ms. Loehrs describe the word "seeding"?

A   Yes.

Q   Did you agree with that definition of the word "seeding"
as it applies to BitTorrent?

A   No.  Seeding is usually a term reserved to once you have
the complete torrent file, you are now a seeder, which means
you are no longer getting pieces, you are seeding out that
information to the network.

Q   If a torrent file has 737 pieces, it's only when you get
all 737 that you then become a seeder?

A   Yes.

Q   And is it the person who originally created the torrent
who decides how this is chunked out into its pieces?

A   They're able to size -- determine or specify the piece
size, they're not able to specify the number of pieces.
That's done automatically by the software.

        So if they wanted to, I think it ranges from
kilobytes up to a piece being four megabytes in size.  So they
have that -- they have that control, but they don't control
the number of pieces.

Q   With the sometimes many number of files that can be within

1    a torrent, you, as law enforcement, might not get the entire

2    torrent, not all the pieces, but you might get several of the

3    complete files?

4    A    Yes.  A piece, if it's a video file, may not -- a single

5    piece may not encapsulate or have that entire video file.  But

6    if it's a large enough piece, and we're talking about image

7    files, that one piece, if we only get one piece of that

8    torrent file, that can encompass completed image files.

9    Q    Bottom line is you have to look at what you've actually

10   downloaded to visually verify what it is you have?

11   A    Yes.  On the law enforcement software that we utilize, we

12   are only monitoring certain torrent files that we suspect have

13   child pornography.  Once we actually get a completed download,

14   we actually review those to make sure they actually meet the

15   definition of child pornography.

16   Q    We're going to transition now into Torrential Downpour to

17   explain that and other concepts.

18            In the world of proactive investigations that you do

19   often for many cases, do you do proactive investigations with

20   a software called Torrential Downpour?

21   A    Yes, I do.

22   Q    And what was it that you had to have in order to start

23   using Torrential Downpour?

24   A    We had to have I think it was either a two- or three-day

25   class to teach us the ins and outs and features of the

1    software, and upon completion we were given a license for the

2    software.

3    Q    Are you free to give out an installable copy or source

4    code to anybody else?

5    A    No.  As part of the end user license agreement for that

6    software, I'm simply a user of it.  I don't actually even have

7    access to the source code.

8    Q    In your class that you took to operate Torrential

9    Downpour, did it teach you about the software and how it had

10   been modified in important ways to fulfill mandates like not

11   sharing out child pornography?

12   A    They first taught us about the BitTorrent network itself,

13   and then they taught us how the software works within that

14   network.

15   Q    So how does it work, like in a 60,000-foot view so that we

16   understand it?

17   A    It has several modifications that kind of differentiate it

18   from different software that you can get just off the

19   internet.  First one is it does not allow for us to download.

20        Typically when a communication is started between two

21   clients on the peer-to-peer -- or the BitTorrent network,

22   there is acknowledgment, there's a TCP handshake, and in that

23   handshake information is provided by both parties, one of

24   which is they spell out the number of pieces that they have in

25   that particular torrent file that you're having a dialogue

1    about.  The -- our software always sends a "has none" message

2    no matter if we have this in our library in its entirety just

3    so we do not share out child pornography.

4           Another feature is that, as opposed to a typical end

5    user on the BitTorrent network where to increase your download

6    speeds you want to get as many pieces from as many different

7    users on the network as possible.  Our software is modified

8    such that it's to only do a single source.  So we're only

9    having communication with a -- one particular IP address and

10   port number at that time.

11   Q   I want to get to the third important point of geographical

12   pinpointing, and then we'll go back to single-source

13   downloads.

14          Does it have a feature of modification that you're

15   looking for offenders generally in your geographical area?

16   A   Yes.  I can set filters as I deem fit to include --

17   usually I run, because of where the few agencies run in the

18   state of Arizona, I usually run for the entire state of

19   Arizona.  That is not fail proof in the sense sometimes we get

20   downloads from IP addresses that do not geolocate to the state

21   of Arizona just because of IP addresses and their dynamic and

22   they can and will change.  I've had times where they gone to

23   different states and I've sent leads to those different

24   divisions.

25   Q   So generally speaking, though, it's so law enforcement can

1   act efficiently and not be investigating Germany offenders?

2   A   Or Russian or Iran or something like that where they're

3   not friendly with us.

4   Q   I want to go back to the single source download ideas that

5   you were taught in the class and how you've seen it work.

6           Have you read the defense motions to compel in each

7   Mr. Gonzales's and Mr. Ordonez's cases?

8   A   I have.

9   Q   And the idea that we would anticipate in Mr. Ordonez, but

10  certainly has been alleged in Mr. Gonzales's case, that it's

11  not really person A, even though that's the person you

12  connected with, it's really person B who's giving you the

13  things, what would you say to that?

14  A   It would be a little bit difficult because our connection

15  is with a particular IP address.  So for that to work, my

16  only -- and this is just hypothetical, that Person A is

17  conducting, I don't have any piece of this, but contacts

18  Person B and is a go-between and lets -- since everything's

19  routed through them -- because we're in a direct contact with

20  her IP address.  So if we're getting it from a different

21  person, it should be coming from a different IP address

22  because -- unless it was somebody else within that same

23  network, another computer that it's not on this device, you

24  need to actually go to this other compute within this same

25  closed network at this residence.

1    Q    But the general idea that you're connected to Person A,

2    but someone else out there on the network is actually routing

3    their images to you and you don't know that, is that what's

4    happening?

5    A    Yes.  Oh.  It's not -- I don't see it feasible in that we

6    have a connection established with this one IP address and

7    then somehow, unbeknownst or some other way, that -- another

8    person is sending us that information.

9    Q    And were you trained in this class that this has been

10   specifically modified to be a single-source download to

11   prevent the very harm that Ms. Loehrs talked about, that you

12   don't want to just download a legal piece of a file, maybe a

13   picture of a drape in a bedroom but not the unlawful part?

14   A    That's another reason why we review everything we

15   download.  So if we download -- in her instance there was a

16   thousand files and only five contain contraband.  First off,

17   that probably wouldn't be a torrent of interest for us because

18   they have plausible excuses, like they're there for the other

19   995 files and not these particular five files.  So we wouldn't

20   typically look for those.

21            But just like I said, torrents of interest just mean

22   that, they're torrents of interest, you have to look at the

23   actual content you download.

24            Another feature of our software is because a typical

25   end user wouldn't immediately, like, just request, hey, you

1    have 675 pieces of this torrent file, give me all 675 pieces.

2    That's not what a typical end user does.

3            Our software kind of mimics a typical end user where

4    it makes a request for five of the 675 pieces and then

5    disconnects from that person, makes a request, gets those five

6    pieces in, disconnects, waits a randomly generated amount of

7    time, reconnects to that person, does the exact same thing,

8    does an extended handshake, exchange information about the

9    number of pieces they have.  And typically what we see is if

10   they're in the -- kind of in the mode of downloading, in the

11   log we can see that first time they reported they have 300 of

12   the 675 pieces, then the next time we connect they have 400

13   pieces and we kind of see as we're getting it they're also

14   getting it.

15   Q    In the numbers of peer-to-peer file-sharing cases you have

16   worked, have you received or looked at log files in the

17   majority of those?

18   A    Yes, I have.

19   Q    Do you ever see two IP addresses confirming this Person

20   A/Person B phenomenon?

21   A    The only thing I can say to that fact, there have been

22   times in logs where we have seen two IP addresses but that was

23   more somebody was using, I'm going to mispronounce this, a

24   Teredo IP address.  It's an IPv6 that a computer assigns in

25   case you're using IPv4 and the software can only use IPv6.  So

1   it's actually the IPv4 that we're interested in, they just

2   have a route through this IPv6.

3   Q   So there's also internet service providers that will

4   quickly maybe give a customer a different IP address versus

5   Cox, who will probably keep somebody's for a while, but it's

6   the person's internet service provider who's providing that;

7   is that right?

8   A   Yes.  Yes.  So most residential accounts, unless you pay

9   extra money, have a dynamic IP address, so where your IP will

10  and -- can and will change over time.  What typically -- like

11  CenturyLink has a smaller bank of IP's to share, so theirs

12  transfer over quickly.  The normal lease period for any kind

13  of dynamic IP address is 24 hours, and at the end of 24 hours

14  you do a renew release and you can get a new -- you basically

15  request a new IP address.  Cox a lot of times will kind of

16  give you the same IP address you previously had.  So you can,

17  in some instances, maintain in Cox Communications the same IP

18  address for months, if not years.

19  Q   In each of these two men's cases, was it the same IP

20  address that was getting recorded on the log files back to

21  you?

22  A   Yes.

23  Q   So you always follow up to the internet service provider

24  who owns that IP address to see who the subscriber is?

25  A   That is correct.

Q   We're going to look at the log files soon, but log files, can you explain what those are and how important they are in your investigations?

A   They're basically a generated text file of what is happening on my computer within that software for that particular torrent file and that IP address.

Q   And do they give out your IP address as the law enforcement computer as well as where they're coming from?

A   To communicate over the BitTorrent network you need several pieces of information to establish a connection with someone.  You need to know the info hash for the torrent file.

Info hash is a hash value similar to the normal hash values that Mrs. Loehrs referred to.  Info hash is a hash value that takes several of the contents of a torrent file and hashes them out.  Similar to like if you were using -- I always like to use Napster.  If you were using Napster or one of the other peer-to-peer systems that only deal with single-file transfers, when the network communicates with itself it talks in hash value.  It doesn't care if you're looking for Neil Diamond or whatever music you're looking for, it talks in these hash values.

On the BitTorrent network, everything is in communication via these info hash values and the -- so you need that to know what info hash you're seeking, you need to know the info hash on the torrent file.  You also need to know

1    the person's IP address and their port number to establish

2    communication, and they need to know the exact same thing for

3    us as well.

4    Q   The 2300 number that you referred to earlier, those are

5    the number of info hash files that have been identified as

6    having suspected child pornography?

7    A   Yes.  Yes.

8    Q   So you, as law enforcement, you're not using Torrential

9    Downpour to find people who are maybe pirating movies or not

10   paying for books?

11   A   No.  There's millions of torrent files out there and we're

12   only monitoring a small portion of those.  And even some of

13   those that we monitor, they're added and if we look at them

14   and they don't appear to actually contain contraband or

15   something, they're removed from the list.  So that list is

16   kind of constantly in flux.

17   Q   It is also true that a particular torrent file that is one

18   of these approximately 2300, more or less, could have some

19   child erotica and also some child pornography?

20   A   That is correct.

21   Q   Is the log file capturing all publicly transmitted data?

22   A   Yes.  The information -- it's catching some other internal

23   information, but the communication between the remote client

24   and our computer is what would happen on a normal general end

25   user, except we actually capture that where a typical end user

1   doesn't care who they're connected to and how many pieces that

2   particular individual has.

3   Q   So explain the analogy of now you have your law

4   enforcement info hashes that you care about for child

5   pornography and you're seeking that out on the network and you

6   come across a computer that is offering that.  How does it

7   work now that you get a single-source download?

8   A   The first thing we do is we have to query the network.

9   The network is built on trackers.  Trackers are just computers

10  that do exactly what that says.  They're tracking who has what

11  on the network.  So the very first thing to do is we query for

12  the particular info hashes that we're looking for.  We query

13  for those and we get responses from the trackers that these

14  particular IP addresses and port numbers are -- have pieces or

15  have been known by the network to be questioning about that

16  same torrent file.

17        The next thing our software does is we actually go

18  and contact those peers and see who else they're contacted to.

19  And that generates basically a lead list.  So that lead list

20  then gets processed into Torrential Downpour it -- based on my

21  feature or the filters that I have set up.  So if I filter for

22  the state of Arizona I should only get IP addresses that

23  geolocate here.  They'll be brought in and it will attempt to

24  establish connection with that IP address and that port

25  number.

1   Q    And then what do you do after that happens?  That you

2   geolocated it to you?

3   A    It gets loaded into the software and they attempt to make

4   communication and it starts -- there's an extended handshake

5   where the TCP connection is established and then they -- then

6   our software starts requesting pieces from that user.

7   Q    When typical users of the BitTorrent use client software,

8   we did use hear Ms. Loehrs refer to BitTorrent, in fact, there

9   is a BitTorrent software, but there are many that are called

10  different things?

11  A    Yeah, just to make it really confusing, there is the

12  BitTorrent network and then there's a software that actually

13  operates on the network, as well as multiple different

14  softwares that all work on the same network.

15  Q    In this case with Mr. Gonzales and Mr. Ordonez, were they

16  each using a version of uTorrent?

17  A    Yes.  UTorrent, or sometimes it's referred to as

18  MuTorrent, or the Greek letter for micro.

19  Q    Is that recorded on the log file?

20  A    Yes.

21  Q    Is that a remnant you look for on computer devices if this

22  turns into an investigation where there's a search warrant?

23  A    Yes.

24  Q    In these two cases, did you find the same version of

25  uTorrent as you had seen on the log files?

1    A    Yes.  I believe on Mr. Gonzales's tablet it was -- the

2    downloads were uTorrent 3.4.9 and we saw that version of that

3    client on his tablet.  And for Mr. Ordonez it was uTorrent

4    3.4.5.

5    Q    In -- and they were about a year apart, the

6    investigations?

7    A    A little longer than a year, yes.

8    Q    So uTorrent and all these other softwares, just like any

9    other software, gets updated.

10   A    Yes.

11   Q    So each man was using what you think was about the latest

12   copy of that software --

13   A    Actually, no.  In Gonzales's case the uTorrent 3.4.9 was

14   the most current version for the type of operating system he

15   was running.  Mr. Ordonez was actually -- that warrant was

16   executed about a year and a couple of months afterwards and

17   that was actually an older software that just hadn't been

18   updated.

19   Q    So he hadn't updated his?

20   A    Yes.

21   Q    Okay.

22          With uTorrent is there a typical place usually where

23   downloaded files will go to?  The default location if somebody

24   doesn't change it?

25   A    Yes.  The typical download location is within the user

1   profile that is accessing uTorrent.  It will be their

2   downloads folder.

3   Q   Do you look for that during the computer forensic

4   examination to see if, in fact, that's where the download

5   default is pointed to still?

6   A   Yes.  There's a file or configuration file within the

7   uTorrent folder in the user's app data that specifies where

8   that default download location is.

9   Q   In Mr. Gonzales's case did that still remain his download

10  location?

11  A   Yes.  It was under a user account Chris, and then the

12  downloads folder.

13  Q   What was the name Chris?

14  A   That's the user name for that device.

15  Q   Correct.  Did you know somebody in his house named Chris?

16  A   Yes, his stepfather.

17  Q   Did you have a context as to why he was using a tablet

18  with the name Chris when that wasn't his name?

19  A   Yes.  The tablet was purchased by his stepfather.  It

20  had -- there had been an accident where it had fallen and it

21  was in a state of disrepair, there was some damage done to the

22  screen where the screen would kind of flicker in and out and

23  so it was basically placed on a shelf.  And I believe

24  Mr. Gonzales then started using that device to access this

25  type of material.

1    Q   So you want to know things like that to be able to include

2    or exclude other users, especially in the house; is that

3    right?

4    A   Exactly.

5    Q   For Mr. Ordonez had the default download location been

6    changed?

7    A   Yes, it had.

8    Q   Where had it been changed to?

9    A   He had a solid state drive as his operating system so

10   typically in that case they're relatively smaller so

11   there's -- they have a regular hard drive inserted into the

12   desktop as well and so this one had been changed to a location

13   on that, a folder I think the -- it was Root/Eye of the

14   Hawk/Movies, Shows, TVs, and then Torrential dumps -- or

15   torrent dumps, excuse me.

16   Q   And what is E generally used for?

17   A   Just another letter that windows will give to internal

18   drives.

19   Q   So with you and the law enforcement software, someone had

20   pointed to a different space on the computer, that then

21   becomes the shared location from where you, as the law

22   enforcement computer, will get from, that's the authorized

23   place by the user?

24   A   Yes.

25   Q   And even that can change moment by moment; is that

1    correct?  Like one day you might get it from a downloads

2    folder, then the person points it somewhere --

3    A   It can actually change from torrent to torrent.  In some

4    of the programs you can actually designate where you would

5    like this torrent to download.  So you could technically have

6    a folder for every different torrent file that you downloaded

7    if you are so inclined.

8    Q   On each man's computer device, that is the tablet for

9    Mr. Gonzales and the computer for Mr. Ordonez, did you find a

10   separate collection of child pornography different than your

11   downloads?

12   A   Yes, I did.

13   Q   No matter where a user points the download default

14   location, is it a true statement, because of the BitTorrent

15   network, that as a person gets a piece, a complete piece, it

16   is immediately available for sharing?

17   A   Yes.  That's one of the things that the developers of the

18   BitTorrent network did is to increase download speeds.  Most

19   old peer-to-peers would wait until you had the completed file

20   before it was available for share.  In the BitTorrent they

21   wanted to expedite that so they would, as soon as you had one

22   piece of the torrent file, you now were a sharer of that piece

23   and so if anybody who didn't have that piece requested it, you

24   could -- your software could easily share it out to them.

25   Q   Have you experienced or do you know of from other agents

1  who do this same kind of work or have you heard in your

2  trainings of any officer who does the same work as do you

3  where they've been using Torrential Downpour and obtained any

4  file of child pornography from anything other than the shared

5  authorized location on a user's computer?

6  A    No, I haven't heard of that.

7  Q    Have you ever experienced that yourself?

8  A    No, and I haven't experienced getting files that are not

9  associated with the torrent file as part of that download.

10 Q    Say that again.  You also haven't experienced?

11 A    Files that are not included in that torrent file but

12 getting them as part of that download.

13 Q    So, for example, if the default location is downloads and

14 there's a million other child pornography files in that

15 download space, if all that is detected is one of those 2300

16 files that law enforcement knows about and is requesting, it

17 won't grab the other million?

18 A    No, it won't.  It's very specific that we're making a

19 request for the contents of that particular torrent file.  And

20 so we don't know what else is there.

21         And it's not like we're accessing his computer.  It's

22 more -- the moral of it is there's communication happening

23 back and forth between my computer and his computer and I'm

24 making requests better in line with what he has stated in his

25 connection with me he has.  I make a request for those pieces

1    and then those pieces are sent to me.  We're not accessing his

2    computer or any part of his computer to see what's there.  We

3    don't do a browse -- there's not even a browse function in the

4    BitTorrent network where you can browse or see what else he

5    has that's available to share.

6    Q   In fact, browse has been a feature of other things like

7    GigaTribe, you could browse whatever a user set up to browse?

8    A   Yes, or on the Gnutella network you could browse

9    everything else that was in his share folder.  There's no such

10   functionality in the BitTorrent network.

11   Q   So if we think about computers on the BitTorrent network

12   like houses, and as any owner of the house kind of stands at

13   the doorway, you make a request.  Do you ever go inside the

14   house to get the request?

15   A   No.  I make a request and then pieces are sent from that

16   computer.

17   Q   They're handed to you.  You never go in to sweep the room

18   that holds the contraband?

19   A   No.

20   Q   All right.  We're going to talk about the specific

21   evidence in each of the men's cases.

22         Are you familiar with all of the exhibits, Counts 1

23   through 13 in Mr. Gonzales's case, 13 being your own CV, and

24   also Counts 1 through 10 of Mr. Ordonez's case?

25   A   I am.

1    Q    And in some of these, did you create the look of the

2    exhibit itself?

3    A    Yes, in some of them I did.

4    Q    And is that because they're part of a large file that

5    would just be way too much to print out?

6    A    Yes.  And some of them are just printouts of either our

7    forensic report or further analysis report.

8    Q    On Mr. Gonzales's case, Exhibits 1 through 8, including

9    2-1 and 2-2, and 6-1 and 6-2, do you recognize those?

10   A    I do.

11   Q    And what are they?

12   A    The first page is actually just a screen capture, which is

13   one of the features that Torrential Downpour allows.  The

14   torrent files are not in human friendly -- are not written

15   human friendly, so this kind of gives us a little bit better

16   indication of what's going on.

17          The next subsequent pages, pages 1 through 15, are

18   the details log which the software creates during a download

19   that happened on December 13th, 2016.

20          THE COURT:  What exhibit are you just referring to?

21          THE WITNESS:  Exhibit 1, sir.

22          MS. HELART:  And so this will be Exhibit 1 of

23   Mr. Gonzales's case.  We'd ask that Exhibits 1 through 8,

24   including the 2-1 and 2-2 and 6-1 and 6-2, be admitted.

25          THE COURT:  Any objection?

1              MS. HULL:  No objection.

2              THE COURT:  All right.  Those are admitted.

3         (Exhibits 1 through 8 admitted.)

4    BY MS. HELART:

5    Q   We just looked at Count 1 here.  Can you tell if this is

6    just page 1 of the Exhibit 1?  What are we looking at here and

7    what's important to you?

8    A   This is a screen capture I created off of E software.

9    Once the download is completed it tells several things.  It

10   tells the location where the download was, so typically the

11   folder that is created is in regards to the IP address in

12   question.  So in this case it was 24.255.44.200.

13             It also tells me the info hash, which is that

14   mathematical algorithm that calculates a unique set of things

15   for that particular torrent file.  It tells me kind of

16   geographically where it thinks it's located.  It tells me the

17   client that was reported by the -- the version of the client

18   that was reported by the remote client.  It has a start date

19   of the download and an end date of the downloads, and it

20   basically tells us the total number of pieces of this torrent

21   file was 370.  I received 176.  The total number of files in

22   this torrent file were five files and we only had two

23   completed.

24   Q   So in your work in downloading this, this info hash is one

25   of those groupings of 2300 that law enforcement searches for?

1  A    Yes.

2  Q    And this computer offered that it had it and the torrent

3  is called DD?

4  A    That is what the folder is called.  We don't know what the

5  torrent is called until we go and execute a search warrant.

6  Q    And then these icons, there look to be five files

7  corroborated by that up there, and there's also a listing of

8  five files that are theoretically as part of this torrent?

9  A    Correct.

10  Q    And then you got two of them?

11  A    Yes.  So the green check says I got all of the pieces that

12  encompass those two files.  The plus means I got portions of

13  those but I did not get a completed file.

14  Q    And the two that you did get a complete one have a

15  checkmark by them?

16  A    Yes.

17  Q    And those are the two that are charged in Count 1 of the

18  indictment?

19  A    Yes.

20  Q    All right.  I'm going to show you what is page 1 at the

21  bottom of the log file.  Is it true these log files can be

22  very lengthy?

23  A    Yes.  Depending on, A, the torrent file that it is.  In

24  this case it was only -- the torrent file only described five

25  files.  Where other ones, they can describe thousands, so that

1  would increase the length of it.  As well as there's constant

2  communications that's happening back and forth.  So in some

3  instances the details log can get very lengthy.

4  Q   So we'll just go through this first one as an example.

5  What pieces of information were important to you?

6  A   At the very beginning it tells what version of the

7  software we're using, so Torrential Downpour version 1.33.

8        We have a start time and that's in Arizona or MST

9  time.  The GMT minus 700.  It tells us the IP address that we

10  are trying to communicate with.  It tells us the info hash for

11  the torrent file.  It tells us the number of files that are

12  contained within this torrent file, the number of pieces, the

13  actual size.  And then we attempt to connect with the remote

14  client.

15        There's several attempts to make a request until we

16  finally get down near the bottom half of the page where we see

17  an extended handshake.

18  Q   Two important features.  Anytime we see a time, we have to

19  be careful that we're looking at local time and not Greenwich

20  Mean Time?

21  A   That is correct.

22  Q   So we have to account for, like, seven hours of difference

23  if that's what we were looking at.

24        But, also, remote client, who is that?  The remote

25  computer?

1    A    That would be the device at this IP address, the

2    24.255.44.20 -- or --

3    Q    Remote is not the law enforcement computer?

4    A    No.  That's correct.

5    Q    All right.  And then we see a lot of messages about

6    handshakes.  Tell us again what that is.

7    A    There's two types of communication over the internet.

8    There's TCP and UDP.  UDP is more like streaming videos, like

9    Netflix or something like that, or something on YouTube.  You

10   make a request of it and the person, whoever, will send you

11   information and you don't care if you're -- I don't care if

12   you're actually getting it.  I don't care if there's any

13   collisions, I don't care if it's coming to you corrupted, I'm

14   just pushing it out.  So that's UDP.  And that's how come

15   sometimes as you're watching a video on YouTube it can

16   pixelate or something like that.  You've got a corrupted bit

17   of information, but you're not doing some sort of

18   acknowledgment.

19        The other type is TCP where there's acknowledgment.

20   So there's extended handshake.  He acknowledges the extended

21   handshake and then I acknowledge his acknowledgment.

22   Q    Okay.  And is that important to you from looking at this

23   log file?

24   A    Yes.  It gives us -- a lot of information is provided in

25   the extended handshake.  It tells us his IP address version 4.

It also tells us his IP version 6.  It tells us what core he

is using, because we need that to actually have communication

with him.  And it also provides us with the type of client, as

well as he reports what my IP address is and what my core

number is.

Q   The remote client acknowledges it has all 370 pieces of

this torrent, and then you do you start making requests for

it?

A   Yes.  And you can see just right above the extended

handshake, you can see our software sent a "have none"

message, which is part of our obligation to not distribute or

share child pornography.  And our software will always have

that statement.

        The other thing -- so what he does is he tells us

exact- -- that he has all 370.  So typically in a normal

listing of this you would see, like, say he only had a portion

of the torrent file downloaded, so he only had it half

downloaded, so instead of the 370 he only had 120 of it.  Not

only would he say, I only have 120 of the 370, he would also

specify individually which pieces he has.  So I have piece 1,

I have piece 12, I have piece 14.  And that way, so if I was

to go in User, I could compare what pieces he has that I don't

have and make requests for those.

Q   In fact, in Mr. Ordonez's case can you make some, I guess

some reasoned opinions about whether somebody is for the first

1    time down- -- not for the first time, but downloading it anew

2    versus whether this was something that was already in their

3    default location and they already had it?  Did you see

4    evidence of that in --

5    A    Yes, because typically if we see somebody that we're

6    connected to them the same time that they're actually

7    receiving pieces, they wouldn't have it in its entirety.

8    Typically when we connect and they've already had it and they

9    would be what's known in the BitTorrent language is -- because

10   he has all 370 pieces and he's not making a request for

11   pieces, he is now a seeder of that torrent file.

12   Q    All right.  So in this case, to compare Mr. Gonzales's

13   computer, let's say we've resolved it all back to him, is a

14   seeder because he's got all of the pieces?

15   A    Yes.

16   Q    That doesn't mean you'll get them all; it just means he's

17   got them all?

18   A    Yes.

19   Q    Okay.

20        And so at the top of page 2 of that same torrent

21   file, referring to one of our charged files, the name

22   Lux-Leak4, it acknowledges that that is in that torrent?

23   A    Yes.  And it also acknowledges which of the pieces

24   encapsulate that file in its entirety.  So pieces 253 to 338.

25   You would to have -- download all of those pieces to have that

1    completed file.

2    Q    All right.  And this is now page 3 and I'm going to point

3    you to the middle.  Created uninitialized file 2 for that same

4    file.

5         Do you see that?

6    A    Yes.

7    Q    What is the significance of that?

8    A    What happens is prior to starting download to make sure

9    the -- I have storage space on my computer to actually

10   download this, BitTorrent will create an uninitialized file,

11   which is just a shell file that is the same size as the file

12   that you're trying to download.  So it creates this

13   uninitialized file and then once it starts getting pieces it

14   starts sliding them into the file until you have the entire

15   thing.  It's a way to make sure that if you're downloading

16   thousands and thousands of torrent files that you're not

17   trying to download something and not have the space on your

18   system to do it.

19   Q    So this is not to be confused with an idea that Ms. Loehrs

20   talked about, this is not creating this shell location on

21   Mr. Gonzales's computer, this is creating it on yours because

22   you're attempting to get it?

23   A    Yes.  Yes.  We made requests of pieces that are part of

24   that file so my computer has created a shell file for that to

25   spatially slot those pieces in if we start receiving them.

1    Q    And then over here on page 5, when we look at Lux-Leak4,

2    that .MP4 file 2 has come been completely downloaded?

3    A    Yes.

4    Q    In fact, when you went to view it did you get a complete

5    download?

6    A    Yes, I was able to play that file.

7    Q    That is basically some key information.  I won't pretend

8    that is all the information you get from a log file, but are

9    those some important --

10   A    There's additional things.  Within the torrent file

11   itself, there's no hash value for the files described.  So

12   there's not a hash value included in the torrent file that is

13   for Lux-Leak4.mp4.  What it instead does is that each piece is

14   encapsulated in the torrent file its hash value.  So there's a

15   verification at the end of our log that where each piece that

16   we did receive, we do a hash comparison to make sure it has

17   the correct piece.  And that's a way to double-check and make

18   sure we didn't get any corrupted pieces.

19   Q    I'm just picking randomly a page.  Page 12.

20        After you've received what you've received, it's now

21   verifying the software, meaning is now verifying each of those

22   piece --

23   A    Yes.  You can see, like, for piece 207, it has an expected

24   SHA-1 hash value of that.  I'm not going to read it out.

25        MS. HELART:  I have asked that the log files from

1    Mr. Gonzales's case have been admitted.  I would ask the same

2    thing for Exhibits 1 through 5 corresponding to Counts 1

3    through 5 of the log files for Mr. Ordonez's case to be

4    admitted.

5         MR. BER:  No objection.

6         THE COURT:  Those are admitted.

7       (Exhibit 1 through 5 admitted.)

8         THE COURT:  By the way, Exhibit 10 in Mr. Ordonez's

9    book, is also admitted.  That was, I think, the corresponding

10   exhibit to Exhibit 13 in Mr. Gonzales's book, and I only said

11   13 was admitted.  Those are both admitted.  That's the CV, I

12   think.

13      (Exhibit 10 admitted.)

14        MS. HELART:  Okay.  Thank you.

15        Oh, I understand what you're saying now.  Yes, in

16   Mr. Ordonez's case, yes, 10; and 13 in Gonzales's case.  Thank

17   you.  I got it.

18   BY MS. HELART:

19   Q   Okay.  So after you get your downloads that you do, is

20   that the end of your question and you go seek a search

21   warrant?

22   A   No.  We do several things.  Typically we always check to

23   make sure the completed files that we got actually meet the

24   federal definition of child pornography.  We do a lookup of

25   WHOIS of who actually owns that IP address.  We serve an

1    administrative subpoena on the internet service provider,

2    either on Cox communication or CenturyLink.  We --

3    Q   And stop right there.

4           Is it an important fact of your subpoena that you ask

5    for the date and time that you see in the log file that you

6    get the offending material that is also in the subpoena?

7    A   Yes, because IP addresses can change and will change.  We

8    are limited to only the dates and times that we actually have

9    gotten contraband from that IP address.

10   Q   And is it also a case that in Mr. Gonzales's case, where

11   you have eight different downloads of ten different torrent

12   files on these different days, you subpoena each and every IP

13   address for that date and time?

14   A   Typically, in Cox -- I don't know why this keep changing

15   my voice level -- typically in Cox we do one subpoena because

16   usually by the time they respond, which can be upwards of 30

17   days, it encapsulates that entire time zone.  Usually we just

18   do our first request and then they will reply back with us

19   saying for like this last six months this subscriber had this

20   IP address.

21   Q   So in practical terms you are able to get the information

22   about all of the downloads?

23   A   Yes.

24   Q   And in this case did you do that in Mr. Gonzales's case

25   and Mr. Ordonez's case?

1    A    Yes.

2    Q    Do you do other investigative steps too?

3    A    Yes, we try to learn as much about the individuals who

4    might be living there.  We do a wireless scan of the residence

5    to make sure they don't have open WiFi because we'd hate

6    somebody to be accessing their wireless network, using their

7    internet IP address and doing this kind of stuff and having a

8    search warrant executed on their residence inappropriately.

9    Q    After you've done all of the investigative steps that you

10   do, maybe check license plates and other kinds of things to

11   see who's living there, do you then obtain a federal search

12   warrant with all of those pieces of information?

13   A    Yes, I do.

14   Q    And so it's not just a matter of looking at the log file,

15   suspecting it's child pornography, and going to get the search

16   warrant?

17   A    No.

18   Q    In this case, on February 8th, 2017, did you serve a

19   search warrant at Mr. Gonzales's residence?

20   A    I did.

21   Q    And is that when the tablet plus some other computer items

22   were seized?

23   A    Yes.

24   Q    Did you look at the tablet back at your lab?

25   A    Yes, I did.

1    Q    When you looked at the tablet, you already explained the

2    name Chris as one of the user names, were there other of the

3    computer items that had Anthony on them?

4    A    Yes.  We seized most of the devices, A, out of Anthony's

5    room, Mr. Gonzales's room, are also -- there was one computer

6    he had identified as his, and from our preview had his user

7    account that we also did seize.

8    Q    And then Mr. Gonzales admitted to using the tablet with

9    the user name Chris on it.

10   A    I don't know if he admitted -- he admitted to using the

11   tablet.  I don't know if he knew he was using the user account

12   Chris or not.

13   Q    Okay.  Fair enough.

14        He admitted that item, that he had used that item?

15   A    Yes, and it was located under his bed within his room.

16   Q    During the forensic examination of the tablet, because

17   that's the item charged, did you look for forensic data

18   corroborating the information from Counts 1 through 8?

19   A    Yes, I did.

20   Q    Did you see any of the files, as Ms. Loehrs has referred

21   to, in any of the video or the image files from your

22   downloads?

23   A    No, I did not.

24   Q    Did you see other child pornography that was located in a

25   particular location?

1  A   Yes.  And per his conversation, he said that he had saved

2  child pornography to the program's file within the tablet.

3  Q   Did you talk to him about how he obtained this child

4  pornography and whether the BitTorrent network was even part

5  of how he did it?

6  A   Yes.  He said he had obtained it using uTorrent.

7  Q   Did you find uTorrent installed on the tablet?

8  A   Yes, the same version, the 3.4.9.

9  Q   In fact, had he updated it a couple of times?

10  A   Yes.  Different build numbers, yes.

11  Q   With the operating system involved here plus your

12  knowledge of uTorrent and what it stores, did you look for any

13  forensic artifacts showing whether any of these torrent file

14  names, even if the actual image and video files weren't on his

15  computer, whether the torrent names had ever been on his

16  computer?

17  A   Yes, and they had all had been.

18  Q   I ask you to look at Exhibit 9.  And there are several

19  pages here.

20        Do you recognize Exhibit 9 and its several pages?

21  A   Yes, these are printouts of the forensic report involving

22  the different counts.

23  Q   So, in fact, you found all ten torrent -- first of all,

24  I'll ask you:  Were there ten torrents involved in the eight

25  counts?

1    A    Yes, there was ten separate torrent files.

2    Q    Two counts had two torrent file downloads.

3    A    Yes, on the same date.

4    Q    So -- all right.  So Count 2 and Count 6 had two torrent

5    files --

6    A    On the same date.

7    Q    The pages we've printed out, is this a created exhibit by

8    you because --

9    A    Yes, this is a printout of our forensic software which we

10   use AccessData Forensic Toolkit.

11   Q    Does uTorrent keep track of what torrents it has

12   downloaded or requested?

13   A    Once you do -- once you obtain the torrent file,

14   however -- whatever means you do -- go onto the Web, do a

15   Google search, go to a particular website -- once you download

16   that torrent file and you kind of actualize it into the

17   software.  So once Windows says, hey, this DD.torrent file,

18   once you've downloaded it into your downloads folder, this is

19   responsive to this uTorrent program, do you want to run it in

20   that?  If you click yes, uTorrent then takes it and saves it

21   in this app data.

22         So it doesn't naturally -- anytime you download a

23   torrent file off the internet, it doesn't automatically go to

24   this location.  It's only after you've clicked on it and it's

25   been processed into the uTorrent software does it actually --

uTorrent -- and it maintains a copy here just on the off chance if you turn off the uTorrent software before it's completed, it still has the torrent file and can refer back to it to continue your download once you've reestablished connection with your software.

Q   Does it do it for efficiency?  Or do you know why it does it?

A   It does it just so -- there's several different files. The actual executable for uTorrent is actually located in this location, as well as the log configuration files.  There's a resume.dat file in there that is kind of the thing that it does.

If you shut down or you close the torrent program prior to it completing a download, it will basically append that log or that database, and next time it loads it will attempt to -- basically it knows where your starting point, kind of like a bookmark in a book.  It puts a bookmark where you were on that torrent and then it can refer back to the torrent file to make sure everything is correct that it's getting, including, like, piece hashes and such.

Q   Did I understand correctly for it to be in this app data folder there had to be another affirmative action by the user to have gotten it into that location?

A   Yes.  He'd either have to click on it and have it run, uTorrent run it, or just as it was downloaded Windows

1    sometimes tries to help guide you, hey, this .torrent file

2    would be run in this program, would you like to run it now.

3    Q    Looking at the next page of this, it has 2 Little Girls in

4    the middle of the page.  Is that one of the torrents to

5    Count 2?

6    A    Yes.

7    Q    And Adry Pack, is that another torrent for Count 2?

8    A    Adry or Adry Pack, I don't know how to pronounce it.  Yes.

9    Q    And so those were also artifacts on Mr. Gonzales's tablet?

10   A    Yes.

11   Q    This has -- you and I, have we been referring to these as

12   Russian characters, what I'm pointing to here?

13   A    Yes, I believe so.

14   Q    Okay.  And does that correspond to Count 3?

15   A    Yes, that is the torrent file for Count 3.

16   Q    And, again, this is -- some of the files that are charged

17   in Count 3 came from this torrent?

18   A    That's correct.

19   Q    Okay.  And asi se mama?

20   A    Yes.  We actually have the same torrent file in there

21   twice.  So Windows cannot have two files in the same folder

22   with the exact same file name, so what happens is the software

23   pins a .1 before the .torrent.  So these are the exact same

24   torrent files, they describe the exact same file.  It's just

25   they were -- the same torrent file was downloaded twice.

1    Q    Is that the significance of that?  If you see it twice, it

2    was downloaded twice?

3    A    Yes.

4    Q    And a torrent called TrueAnal.  Does that correspond -- I

5    may have gotten my counts mixed up here.  Does that correspond

6    with Count 5?

7    A    That is correct.

8    Q    Russian characters corresponded to Count 4.

9         Corresponding to Count 6 there are two torrents here.

10   Are those one -- excuse me.  Are those torrents that you

11   downloaded in the same day?

12   A    Yes.

13   Q    And we charged each of those files in Count 6.

14        And then Count 7 with cpack1 being part of the name,

15   you found that on Mr. Gonzales's tablet?

16   A    Yes.

17   Q    And finally Count 8, there are two torrents.  And are

18   those the two torrents from where the charged counts came?

19   A    It's actually still once again just one torrent file.  It

20   was just a torrent file that was downloaded twice.  So it was

21   downloaded the first time on December 20th, 2016, and then it

22   was downloaded again January 9th, 2017.

23   Q    Is that one piece of data that might indicate that

24   somebody deletes things they've looked at and then goes out

25   and reacquires the torrent?

1    A    It could be.  It could be just that he doesn't remember

2    what he downloaded and so he sees something that piques his

3    interest or in this case the file names are kind of obscure so

4    he just clicks it again to download it again.

5    Q    Those ten names that we just looked at, I've asked you to

6    look at Exhibit 10.

7              MS. HELART:  If I haven't asked that Exhibit 9 be

8    admitted, I'm asking that now.

9              MS. HULL:  No objection.

10             THE COURT:  Admitted.

11         (Exhibit 9 admitted.)

12             THE COURTROOM DEPUTY:  As to Mr. Gonzales?

13             MS. HELART:  Correct, as to Mr. Gonzales.  I should

14   have made that clear.  We're just on Mr. Gonzales right now.

15   BY MS. HELART:

16   Q    And do you recognize Exhibit 10 of Mr. Gonzales's case?

17   A    Yes.

18   Q    And what is that?

19   A    It is a printout of the 114 torrent files that were found

20   on the Microsoft tablet.

21   Q    So this is the listing that you saw and retrieved from

22   your forensic software in the forensic analysis; is that

23   right?

24   A    That's correct.

25   Q    So 114 torrent files would indicate to you what as a

1    forensic --

2    A   Well, A, that this person has used this software for a

3    while or has some understanding of the software, understands

4    the workings, understands how the files are obtained, but also

5    just based on the file names a lot of them are very indicative

6    of child pornography, somebody WHOIS actively seeking this

7    type of material out.

8    Q   You have been doing this work for a while.  Are you

9    familiar with some of the key phrases and acronyms that are

10   used by people --

11   A   Yes.

12   Q   -- who were seeking child pornography?

13          And sometimes do you see some of those words like

14   "preteen" and "ptch" and other kinds of indications?

15   A   Yes, there's several of those.  There's including ages, so

16   there's one that's BabyJ5yo, which my understanding is that it

17   stands for 5-year-old.  There's also an 8-year-old,

18   9-year-old, 11 yo.

19          MS. HELART:  We'd ask Exhibit 10 be admitted.

20          MS. HULL:  No objection.

21          THE COURT:  Admitted.

22      (Exhibit 10 admitted.)

23   BY MS. HELART:

24   Q   And on Exhibit 10, and we can just look here at the first

25   page, I'm going to point to Adry Pack.

1          Do you see that as one of torrents as you had stated?

2     A    Yes.

3     Q    The next page, it looks like these are generally

4     alphabetical order, but we see DD torrent, for example?

5     A    Yes.

6     Q    And then this Deadpixel, does that corroborate with

7     something associating with Mr. Gonzales personally and

8     especially where you found his child pornography?

9     A    Yes.  The Deadpixel is the location where he said that he

10    was -- or the folder that he was -- said he was saving child

11    pornography to within the program's file on the Microsoft

12    tablet.

13    Q    And, in fact, did you find it there?

14    A    Yes.

15    Q    So it confirmed his own statement?

16    A    Yes.

17    Q    And I think I've asked this maybe the third time, I'm

18    sorry.  All ten of our torrent files from the charged counts

19    are in this list of 114?

20    A    That's correct.

21    Q    Was that an important forensic piece of data to you?

22    A    Yes.

23    Q    Why?  You didn't find files, is what I --

24    A    It just shows that the torrent files that were basically

25    being advertised on the BitTorrent network were actually

1    located on this device.  There's not a device we were missing.
2    This was the device more likely than not that had downloaded
3    those files.
4    Q   And so how confident were you after looking at the
5    forensic data that this was the device that you had connected
6    to and that had distributed child pornography to you?
7    A   Very.
8    Q   So I'd ask you to look at Exhibit 11 and explain what is
9    Exhibit 11.
10   A   Exhibit 11 is deferring to either link files or jump lists
11   where some of the files that are in the charged indictment
12   were located.  Being accessed.
13   Q   So when we see what are some key words that we know are
14   important to you as a forensic examiner, like automatic
15   destinations, what does that mean?
16   A   That is a jump list.  Starting in Windows 7 they came up
17   with -- instead of -- they had link files to kind of help
18   speed up Windows.  If you clicked on a file, it created a
19   connection with that file in case you needed to access it
20   again so it could access it a little bit faster, speed up
21   Windows.
22          Windows 7, they created a jump list that was actually
23   kind of a link file but where it was associated with a
24   particular software.  So instead of a link file just saying,
25   hey, this is where the file is, and if you want to access it

1    again Windows has to kind of discern what program you want to

2    open it with, this one, based on what this -- the beginning of

3    the automatic destinations, that hexadecimal number is

4    actually a software.  It describes the software.

5            So similar to like in Microsoft Word, if you want to

6    go back to a previous document you had been working on, you

7    can click Open and there's a listing of your recent links.

8    That is very similar to a jump list.

9            MS. HELART:  We'd ask Exhibit 11 be admitted.

10           MS. HULL:  No objection.

11           THE COURT:  Admitted.

12       (Exhibit 11 admitted.)

13   BY MS. HELART:

14   Q   And this was data that was actually on the tablet that

15   we've been referring to in Mr. Gonzales's case?

16   A   Yes.

17   Q   This is page 1, the first page of this exhibit, and I

18   would -- it's probably a lot of interesting pieces of

19   information, but on this first page, can you look at that.

20   A   So that is one of the torrent files that, A, was on the

21   device but also was part of the charged downloads.  One of the

22   files in question within that was -- if we can look at the

23   file selections, you can see that it was accessed at C/Users,

24   the user account Chris, Downloads, which, in this case, based

25   on the uTorrent settings, that was the default location.

1          Because he didn't have a language pack that could

2    understand the Russian characters, it just gives us four

3    question marks.  It creates a folder within it when you

4    download this torrent file, and then we have this jpeg,

5    360298.jpg.

6    Q    All right.  And the next -- in looking at this exhibit,

7    what's maybe one more example of something significant?

8    A    Just that the location where he was saving child

9    pornography was a folder that was created from downloading the

10   Deadpixel torrent file.  We can see that files within the

11   Deadpixel folder were accessed, but when they were accessed in

12   this particular jump list they were accessed from the -- on

13   two occasions from Chris's Downloads folder, and then on

14   another location they were then accessed in the location where

15   we found them at the time of execution, which was under

16   Program files, the folder Deadpixel, and so on.

17   Q    What would that be consistent with you knowing?

18   A    That the files were downloaded to the downloads location

19   and then they were moved into this location.

20          And per his interview with us, Mr. Gonzales said that

21   he moved files that he wanted to keep to this location under

22   the programs file to evade detection by family members.

23          MS. HULL:  I'm sorry, I couldn't hear the last -- to

24   what?

25          THE WITNESS:  To evade detection by family members.

1          MS. HULL:  Thank you.

2    BY MS. HELART:

3    Q   So sometimes he's -- he's, I guess, clicking on it from

4    the downloads folder perhaps as it's downloading.  Is that

5    consistent with that?

6    A   I can't make an assumption on that, that -- they were in

7    the downloads location, he accessed the file there and then at

8    a later time, or maybe not later time but shortly thereafter,

9    he downloaded another file within that Deadpixel location and

10   it was now within the programs file.

11   Q   And so is it a for certain that at the snapshot of time

12   where this tablet was seized and now you're now looking at it,

13   some affirmative action had to be taken for them to get to the

14   Deadpixel folder path because that's not the downloads

15   default?

16   A   Yes.  And also if we look at the third data program file,

17   Deadpixel, this [[cpack 3 little joys is actually its own

18   separate torrent file and its own file created from that

19   torrent file.  So the pixel was moved and then another torrent

20   file download was placed within it.

21   Q   All right.  I'd like you --

22          THE COURT:  Christine, would you clear the screen,

23   please.

24   BY MS. HELART:

25   Q   I'd like to go to the third-to-last page.

1   A    Okay.  I -- third-to-last.

2               MS. HULL:  Ms. Helart, are we still on 11?

3               MS. HELART:  Yes, we're still on 11.  And I'm sorry,

4   I thought I saw something on here that I wanted to point out.

5               Maybe it was the fifth-to-last page.

6   BY MS. HELART:

7   Q    All right.  And, again, there were some Adry Pack files

8   charged.  Did you see reference to Adry Pack also in the link

9   files, just as another example?

10  A    Yes, I did.

11  Q    Okay.

12  A    Actually, the jump list files.

13  Q    The jump list files.

14              All right.  Are jump lists significant to you to see

15  what a user has been doing on their computer, what they've

16  actually looked at?

17  A    That and link files are one of our key indicators of if

18  the file has been accessed or if a particular, like I know

19  RealPlayer will actually keep a running log or library of what

20  files have been accessed.  It's to see that -- to show that

21  people aren't just blindly downloading stuff and just leaving

22  it there and not looking at it.  We want to actually see it

23  there.  There's intent behind it.

24  Q    All right.  And, finally, with respect to Mr. Gonzales's

25  case, you're familiar with his interview in Exhibit 11 --

1    excuse me, Exhibit 12 is the transcript of that?

2    A    Yes, I am.

3    Q    But you were there and did the interview, and are you

4    familiar with your interview with him?

5    A    Yes, I am.

6    Q    Did he talk about going out to websites and going out to

7    find torrents?

8    A    Yes.  I can't remember the exact website.  I think he gave

9    us -- instead of just Googling it, he had found a website that

10   he could go to directly and query for torrent files.

11   Q    Does Pirate Bay sound familiar?

12   A    I believe it was Pirate Bay or [[VT Video.  One of those

13   two.

14   Q    And those are both sites that people who want torrents can

15   go look for torrents on a number of subjects?

16   A    Yes.

17   Q    He obviously talked about the tablet and how he had taken

18   it and fixed it even of after it had dropped?

19   A    I don't think he said he fixed it.  I think he said that

20   it was still functional.  Occasionally the screen would lock

21   up on him but he was still able to use it.

22   Q    Did he talk about search terms that he had used to seek

23   out child pornography?

24   A    Yes.  I don't recall at this time exactly what those

25   search terms were.

1   Q   I will direct to you page 35 of the exhibit.

2           MS. HELART:  Actually, the government would ask

3   Exhibit 12 be admitted into evidence.

4           MS. HULL:  Your Honor, at this point I'm going to

5   object because I think we're beyond the scope of the hearing.

6   This officer has not indicated that -- and he's not an expert.

7   Ms. Loehrs has said that the statements are not relevant.  On

8   that basis I would object.

9           THE COURT:  What's your response, Ms. Helart?

10          MS. HELART:  Well, my response is that they may not

11  be relevant for Ms. Loehrs, but they're incredibly relevant

12  when we look at the totality of what a user's been doing on

13  their tablet.

14          THE COURT:  Why is that relevant to your software

15  question?

16          MS. HELART:  Because it shows that the software's

17  operating as it looks like it does by the log files, it's

18  downloading child pornography.  In fact, when they get to the

19  house they find an item which Agent Daniels says with

20  confidence that he's got the right item, and now putting it

21  into context with the user of the item, who says he uses

22  words, in the middle of page 35, child porn, for example.

23          I think that's a huge context to see whether this

24  is -- it is a big totality and it does matter whether the

25  software is working correctly.

1          THE COURT:  The relevancy objection is overruled.

2    Exhibit 12 is admitted.

3          (Exhibit 12 admitted.)

4          THE COURT:  We are seven minutes to noon, Ms. Helart.

5    Tell me how much longer you have.

6          MS. HELART:  I will quickly transition into

7    Mr. Ordonez's case.

8          THE COURT:  How long will that take?

9          MS. HELART:  Well --

10         THE COURT:  I mean, isn't it essentially the same

11   evidence?

12         MS. HELART:  It's the same evidence.  I would ask

13   that the exhibits be admitted.  It is the same evidence.

14   There's probably two of the exhibits that I'll explain because

15   he had moved his collection into the recycle bin, but

16   especially as to Count 2 we showed some dates that were

17   important as to the date he had downloaded and then dates that

18   the user of that -- so I can transition right to that.

19         THE COURT:  Do you need more than five minutes for

20   that?

21         MS. HELART:  I will not take more than five minutes.

22         THE COURT:  All right.

23         MS. HELART:  Okay.  So wrapping up, we have

24   Mr. Gonzales Exhibits 1 through 13 admitted.

25         And that confirms that all of those 13 have been

1    admitted because I don't think I asked Exhibit 11 -- okay.

2    Thank you.

3    BY MS. HELART:

4    Q   All right.  So quickly, Agent Daniels, for Mr. Ordonez's

5    case, did the log files in Mr. Ordonez's case, were they so

6    lengthy we could not print out all of them but just printed

7    out some examples of the files getting initialized and then

8    actually downloaded?

9    A   Yes, that's correct.

10   Q   And Exhibit 6, if anybody wants to look at the entire log

11   file, that would be Exhibit 6, on the disk; is that right?

12   A   That's correct.

13          MS. HELART:  We'd ask Exhibits 1 through 6 be

14   admitted.

15          MR. BER:  Your Honor, I'd just object to Exhibit 6

16   that there's no testimony attached to Exhibit 6.  I don't know

17   its relevance.

18          MS. HELART:  Let me lay a little bit of foundation.

19          THE COURT:  I'm not going to look at it.

20          MS. HELART:  Okay.  Well, for the record I wanted it

21   in as a complete -- because it looks strange we have three

22   files but I just wanted it for completeness.

23          THE COURT:  I'll admit Exhibits 1 through 5.  He can

24   testify that it's all on Exhibit 6, but nobody's going to

25   actually look at it.

1          MS. HELART:  All right.

2     BY MS. HELART:

3     Q    So Exhibit 7, are you familiar in Mr. Ordonez's case,

4     Exhibit 7?

5     A    Yes, I am.

6     Q    Is there one torrent file that was involved five times for

7     the five downloads in Counts 1 through 5 in Mr. Ordonez's

8     case?

9     A    Yes, it was the awe ptch videos .torrent.

10    Q    And what is Exhibit 7 and are you familiar with it?

11    A    Exhibit 7 is a printout of the forensic report documenting

12    the torrent files that were located on the -- on Mr. Ordonez's

13    computer.

14          MS. HELART:  We'd ask Exhibit 7 be admitted.

15          MR. BER:  No objection.

16          THE COURT:  Admitted.

17       (Exhibit 7 admitted.)

18    BY MS. HELART:

19    Q    In the middle of Exhibit 7 on the first page, did you see

20    corroborating data that awe ptch was --

21    A    We have it downloaded to the uTorrent folder within the

22    user account AAO's app data on two separate occasions.

23    Q    In fact, in your downloads did it look like he had

24    reacquired awe ptch because sometimes he had a greater number

25    of pieces than on other times?

1    A    Yes.   The first time we connected to him he -- his

2    computer reported that he had 644 pieces of the 685 pieces

3    that encapsulate the torrent file.   The second time we

4    connected he only represented that he only had 611.   And I

5    think the third time said he only had 12.   So it seemed like

6    each time he was getting it anew.

7    Q    Could be consistent with download, delete, enjoy, then

8    delete it and then reacquire it?

9    A    Possible, yes.

10   Q    Exhibit 8, do you recognize Exhibit 8?

11   A    Yes.   It is a recycle bin file.

12   Q    And this corresponds with the date of December 6th for

13   Count 2.   This was an exhibit that you created.   What was the

14   significance of this exhibit?

15   A    It shows, A, where the file was deleted from, which in

16   this case it was the E drive and folder band of the hawk,

17   within a subfolder called movie, music, TV within a subfolder

18   called torrent dump, and then within a subfolder in the back

19   called awe ptch videos.   There was a file that was deleted at

20   approximately -- I have to do my math really quick --

21   approximately 6:07 p.m. on December 6th, 2017.

22   Q    And is that roughly the date and time you were downloading

23   from him?

24   A    Yes.   And I had just downloaded a minute or two before

25   that.   The other significance is the location where the file

1    was deleted from, from the settings of that file within its

2    uTorrent program.  That file path up to torrent dump is his

3    default download location.

4    Q   So these corroborating data points were important to you?

5    A   Yes.

6    Q   Okay.

7            MS. HELART:  The government would ask that Exhibit 8

8    be admitted.

9            MR. BER:  No objection.

10           THE COURT:  Admitted.

11       (Exhibit 8 admitted.)

12   BY MS. HELART:

13   Q   All right.  And, finally, the jump list for Mr. Ordonez's

14   computer, looking at Exhibit 9.

15           Do you recognize Exhibit 9?

16   A   Yes.

17   Q   What do you -- what is Exhibit 9?

18   A   Similar to in the Gonzales case, these are jump lists of

19   files being accessed on Mr. Ordonez's computer.

20   Q   Did they include some of the files from Counts 1 through 5

21   that are charged?

22   A   Yes.

23   Q   As well as are you familiar with that awe ptch torrent

24   file?

25   A   Yes.  It's a file that contains approximately 2,809 mostly

1    image files containing or depicting minors young as five.

2              MS. HELART:  Significantly, we'd ask that Exhibit 9

3    be admitted.

4              MR. BER:  No objection.

5              THE COURT:  Admitted.

6         (Exhibit 9 admitted.)

7    BY MS. HELART:

8    Q    And, again, the jump list file significance is that these

9    are things that a user has affirmatively clicked on?

10   A    Yes.

11   Q    And knowing that you've downloaded this same torrent from

12   awe ptch five different times, parts of it, is that important

13   to you that he had actually accessed it as well?

14   A    Yes.

15   Q    In talking with Mr. Ordonez, did he talk about child

16   pornography activities?

17   A    Yes, he did.

18   Q    What did he say?

19   A    He said that he had been seeking it, I think approximately

20   since the age of 13 or 14, and he -- the last time he

21   remembered seeking out child pornography was approximately

22   August the year prior to the execution of the search warrant.

23             But he also did make statements on the fact that he

24   would get either blackout drunk from imbibing alcohol or air

25   canisters and then would black out but still be able to use

1    his computers based on comments that he received from his

2    online friends.

3    Q    So he was still able to function on the computer even when

4    he was intoxicated?

5    A    That's correct.

6    Q    As a final question for the whole hearing for you, if the

7    software, either the source code, which you don't have for

8    sure, or installable copy, were turned over to anybody else,

9    how detrimental would that be to law enforcement work?

10   A    It would be very detrimental because if it ever got into

11   the wrong hands, the -- somebody could develop measures to

12   countervent law enforcement from actually monitoring this

13   network, so it's essentially a network where there's no law

14   enforcement monitoring and people are free to download and

15   share child pornography as much as they will.

16          And it could also impact -- just moving forward, we

17   had something similar happen in the Ares Galaxy, not by

18   malicious standpoints, but they changed their entire way they

19   coded their network and the law enforcement software that was

20   utilized to monitor that network was now defunct.

21   Q    Even with a protective order you would still find those

22   same detriments?

23   A    Yes, because it's not in custody of law enforcement so

24   there's -- I mean, it's -- Ms. Loehrs has several associates

25   at the firm, not to say that they are not trustworthy or

1    anything like that, but somebody within the firm could easily

2    provide it to somebody who would use it for nefarious

3    activities.

4    Q   So just having it on someone else's computer is the

5    problem?

6    A   Yes.  And I mean just -- I assume that Ms. Loehrs keeps

7    her network very secure, but it would be on her network, it

8    would be within her server and her file systems, and if

9    somebody was to hack or -- there would be undue access as

10   opposed to it maintaining law enforcement custody.

11   Q   And you are prohibited by your license from even turning

12   it over?

13   A   Yes.  And I don't have source code.  And the only thing I

14   have is a user copy.  I'm not -- I'm prohibited to provide

15   that.

16           MS. HELART:  All right.  Thank you.  No other

17   questions.

18           THE COURT:  All right.  Hold on just a minute.

19           Counsel, I want to keep pushing into the noon hour,

20   but we need to take a break for the benefit of the court

21   reporter.  So we'll take a ten-minute break, come back and

22   then do the cross-examination.  So please be back, if you

23   would, by a quarter after.

24       (Recess taken from 12:01 to 12:13.)

25           THE COURT:  Thank you.  Please be seated.

1           Ms. Hull, you may proceed.

2               C R O S S - E X A M I N A T I O N

3    BY MS. HULL:

4    Q    Good afternoon, sir.

5    A    Good afternoon.

6    Q    So you're simply an end user of the software Torrential

7    Downpour; correct?

8    A    That's correct.  Yes.

9    Q    So what you know about this software is what you were

10   told; correct?

11   A    What I was told and what I was -- I've also seen through

12   my investigations.

13   Q    Okay.  So what you were told is that it targets a single

14   user; correct?

15   A    Yes, and at the end of our training on it we did a

16   validation of the software to show that it did, in fact, only

17   download from one end user.

18   Q    Who did that validation?

19   A    The instructor who was leading class.  I don't remember

20   exactly which one.  There were several instructors for that

21   class.

22   Q    Okay.  But people from the software company; correct?

23   A    I do not believe it was from the software company.  I

24   think the company that actually manufactures the software

25   or -- actually it's at the University of Massachusetts at

1    Amherst is the one who does the coding and develops the

2    software.  I think it is Pennsylvania State Police who are the

3    trainers of the software.

4    Q    Right.  So they tell you how it works; correct?

5    A    Yes.

6    Q    And what it does?

7    A    We go through step by step how it works.

8    Q    Okay.  So all you know about that you learned from their

9    training; correct?

10   A    That is correct.

11   Q    Okay.  Have you seen the source code?

12   A    No, I have not.

13   Q    Would you know how to determine from the source code what

14   alterations were made between Torrential -- BitTorrent and

15   Torrential Downpour?

16   A    No, that would not be my field of expertise.

17   Q    Okay.  So you can have a torrent on a computer and not

18   have the file associated with it; correct?

19   A    Yes.

20   Q    And you can have a torrent on your computer and not share

21   the torrent; correct?

22   A    How do you mean share?  Do you mean actually broadcast it

23   on the network?

24   Q    Have it accessible.  It can be in a non-shared location;

25   correct?

1    A    It's not so much the torrent file.  The torrent file is

2    used by the software.  So if it's actuated by the software, no

3    matter where it's at, it's accessible to the network because

4    his software's reaching out in regards to that info hash.

5    Q    But if he's just got the torrent, we're not talking about

6    the files associated with it, we're just talking about that

7    text, because that's all a torrent is, right, is a text file?

8    A    Yes.

9    Q    Okay.  And you are -- you are assuming it's a single user,

10   you said, because you were taught that, and you're assuming

11   that what it locates is in shared -- a shared location because

12   that's what you were instructed; correct?

13   A    And also the workings of the network.  The network does

14   not allow for it to pull in users to go into unshared space.

15   And we -- software does make some liberties and some of the

16   kind of rules of the protocol, but there are some that are

17   nonnegotiable.  We have not developed a software that would

18   allow anybody, let alone law enforcement, to actually

19   relatively hack your computer through their software.

20   Q    And you know that because of what you were taught by the

21   software developers?

22   A    That, and from other, like, investigations, as well as

23   just my understanding of the BitTorrent network itself.

24   Q    Okay.  And so you're aware that there have been cases

25   where this software does access other than shared public areas

1   of computers?  You're aware of that?

2   A    No, I'm not aware of any of those.

3   Q    All right.  And if you said that a torrent file located on

4   a computer -- but is on a computer but the image, like the

5   images in Counts 1 through 8 are not on any of the devices,

6   how do you know the image is contraband?

7   A    Because we received it.

8   Q    You received what?

9   A    The file.  We don't -- we don't go under the assumption

10  that, hey, the network is reporting that this person has this

11  torrent file, and we stop and we do our search warrant.  We

12  actually make a connection with them and we download that file

13  and review that file before we go and execute a search

14  warrant.

15  Q    And you're assuming that's only from -- can only be from

16  that target computer because you're assuming that it's a

17  single-user target?

18  A    Yes.

19  Q    That's how the software works.  Okay.

20           MS. HULL:  That's all I have, Judge.  Thank you.

21           THE COURT:  Mr. Ber.

22                D I R E C T   E X A M I N A T I O N

23  BY MR. BER:

24  Q    Agent Daniels, as we discussed, you were trained to use

25  the software; correct?

1    A    That's correct.

2    Q    You didn't develop the software?

3    A    That's correct.

4    Q    And you don't make any modifications to the software?

5    A    No, I do not.

6    Q    And you're not familiar with the source code that makes

7    this software do the things you believe it does?

8    A    No, I do not have access to that.

9    Q    As you testified to, you're not aware that any validation

10   studies or anything like that have been done with the

11   software?

12   A    No, I did not testify to that.  My understanding that --

13   is that the software has been validated.  If you were to ask

14   me the actual entity or organization that actually validated

15   it, I do not know that.  But I have been told it has been

16   validated.

17   Q    You have been told that, but you've never seen any kind of

18   documents or anything like that that back that up?

19   A    No, I have not.

20   Q    So you're not aware there was any independent testing of

21   the software to see if it was accurate?

22   A    Not from like a firm that actually reviews software.  It

23   does get validated almost on a daily basis by the law

24   enforcement who are using it and are confirming it's doing

25   what it says it's doing.

1   Q    Part of your testimony here was that the Torrential

2   Downpour software indicated that a file was being shared from

3   each of the defendants' computers.  And then when you issued

4   your subpoena and found the -- in some cases found the files,

5   that it felt like a corroboration of the software working.

6            Is that fair to say?

7   A    Yes.  Yes.  If we download from somebody, it comes back to

8   a particular IP address, we go to that and they do have the

9   file or the torrent file, then yes, I do consider that

10  validation of the software.

11  Q    So I presume you know that the philosophy behind this idea

12  of charging people for distribution because they join a

13  networking site is the idea that they contain these files in a

14  portion of their computer that can be shared with the rest of

15  the people who are in that network; correct?

16  A    Yes.

17  Q    And it's not about the person adding or providing files

18  that they did not get, in this particular -- get from the

19  network.  Meaning its distribution is because of them actually

20  joining the network and thereby their computer being used in

21  the network; correct?

22            MS. HELART:  Objection to any degree that this is a

23  factual question for a jury at a jury trial.

24            THE COURT:  Overruled.

25            THE WITNESS:  Let me kind of spell back I think what

1    you're trying to get at.

2              For somebody to be, as you say, on the network,

3    they -- several things have to happen.  They have to have the

4    software, they have to have downloaded a torrent file and

5    actualized or initiated it through their software, and then at

6    that point they're known from their own attempts at

7    downloading these files, they're known to the network as

8    somebody WHOIS interested in that particular torrent file.  So

9    all those steps have to happen before someone can share on the

10   BitTorrent network.  They can't just download software, have

11   some files sitting in their downloads folder and those files

12   get shared out.  Because it's only files that are responsive

13   to -- in this case to a torrent file that are shared out over

14   the torrent network.

15   BY MR. BER:

16   Q    I appreciate that.

17            Would it be fair to say that any files that you

18   believe were shared in the torrent in either of these cases

19   came from other computers in the torrent?

20   A    No, I believe they came from the computers at the

21   residence.

22   Q    But that they --

23   A    Oh, the way that they actually obtained these files?  Yes.

24   I do not think that they created or manufactured any of these

25   files.  I think that they were downloaded similar to a typical

1    end user would.  They would find this torrent file, they would

2    download it, it would download to their computer, and as they

3    were downloading it or while it was still in that shared

4    location it was shared back out to the network and shared to

5    us in law enforcement.

6    Q   So a concern would be here that if your computer using the

7    Torrential Downpour is picking up that it's receiving a file,

8    one of these child pornography files to your computer, and

9    then later you find that file on that computer somewhere, that

10   that doesn't necessarily mean, if your software is working

11   right, that that file itself came from that computer if

12   there's an error in your programming?

13   A   I think I understand your question.  So what you're saying

14   is how do we know that the file I got is the same file that is

15   on the defendant's computer?

16   Q   Well, I know you don't understand -- know how the software

17   actually works or what errors may or may not be there, but how

18   do you know that the software that you later -- I'm sorry, the

19   files that you later find on the defendant's computer may have

20   been in error and that file actually came from one of the

21   other computers on the network if there -- if we don't know if

22   the software is working in the right way?

23   A   Minus our validations of the software, I don't know

24   actually how to answer your question because it -- beyond that

25   there's no real way.  Like, what you're trying -- to make sure

1    I have this correct -- you are trying to say that how do we

2    know that the file that we downloaded was not from another

3    computer even though the exact same file was located on the

4    defendant's computer at the IP address?

5    Q    That's right.  Peer-to-peer, there's sharing going on.

6    A    That's one of the ways that -- I apologize, sir.

7              That's one of the ways that our software is

8    manufactured, is to alleviate that of -- because if it did

9    that, then we wouldn't want to use the software anymore.  If

10   there was the possibility of that, it's kind of getting it

11   from somebody else and it's not pointing us to the correct

12   house, we'd never want to execute a warrant on somebody that

13   we don't think is actively seeking this type of material.

14   Q    I understand.

15             MR. BER:  I have no more questions.

16             THE COURT:  Any redirect?

17                R E D I R E C T   E X A M I N A T I O N

18   BY MS. HELART:

19   Q    As to the validation question, at least some

20   circumstantial evidence that it has been validated, FBI

21   agents, only those who are actually licensed, are authorized

22   to use this; is that right?

23   A    Yes, it is.  You have to have gone through some sort of

24   training on the software before you're authorized to have a

25   license and use it.

1    Q    And the FBI is a nationwide organization that isn't just

2    allowed to use any kind of software, you have to be given

3    permission?

4    A    Typically in these cases when we're using software that is

5    not developed by in-house research and development with the

6    FBI, there's some sort of validation that the FBI does to make

7    sure that it does, in fact, do what it says it does.

8    Q    And to your knowledge, does HSI also use this software,

9    Torrential Downpour?

10   A    Yes.

11   Q    And so not every agent has this license, only really a

12   couple of you in the Phoenix office do; is that --

13   A    That's correct.

14   Q    And to Ms. Hull's question about single user, more

15   accurately you're looking at single IP address in the log

16   files; is that right?

17   A    That's correct.

18   Q    Okay.  And is that what you saw each time of Counts 1

19   through 8 downloads and Counts 1 through 5 downloads was a

20   single IP address?

21   A    Yes.  There was only one IP address and it was -- as we

22   would connect and disconnect, we were always connecting with

23   the same IP address and doing the same TCP extended handshake.

24   Q    There was just no other data anywhere in the

25   investigation, including the log file or in the forensics,

1    that would indicate you weren't getting it right from that

2    source that you were connected to?

3    A   Yes, no information.

4             MS. HELART:  Thank you.  No other questions.

5                E X A M I N A T I O N

6    BY THE COURT:

7    Q   Agent, were the video files that are charged in the

8    distribution counts in the Ordonez case found on his computer?

9    A   Yes.  What happened was it -- from the best I can

10   understand of that forensics is the files would be downloaded,

11   they would be placed --

12   Q   No, let me ask the question differently.

13   A   Okay.  Sorry.

14   Q   When you obtained the computer and you searched the

15   computer of Mr. Ordonez, did you find the video files that are

16   charged in the indictment on his computer?

17   A   Both images and video files, sir.

18   Q   So everything charged in the indictment was found on his

19   computer?

20   A   Yes.  Just in the recycle bin.

21   Q   Unlike the Gonzales case, where you didn't find any of the

22   video files on his tablet?

23   A   Oh, we didn't find any of the files of distribution on the

24   tablet.  We just found artifacts, forensic artifacts.

25   Q   What you've been talking about today.

1          But Ordonez is different.  The actual video files

2     were on the computer?  Is that what you're saying?

3     A    Yes.

4          THE COURT:  All right.  Go ahead and step down.

5     Thank you.

6          THE WITNESS:  Thank you, sir.

7          THE COURT:  Counsel, I have a number of questions

8     that I'd like to ask before I hear any argument from you to

9     make sure I get answers on these questions, if that's all

10     right.  And we'll -- I can go for about another 30 minutes,

11     but then I've got afternoon hearings I need to prepare for so

12     we can't really go longer that in questions and argument.

13          My questions initially are directed to you,

14     Ms. Helart.

15          Rule 16(a)(1)(E) allows the defense to obtain

16     information material to preparing the defense in subpart (i).

17     And in subpart (ii) it allows the defense to obtain

18     information that will be used in the government's case in

19     chief.

20          I believe Ms. Hull's motion argued that this

21     information is discoverable under both.

22          Nobody talked about the case law on 16(a)(1)(E)(ii).

23     But we've done some research.  A leading case appears to be

24     the *Countryside Farms* decision out of the Federal District

25     Court in Utah, where it said -- well, where it interpreted the

1   phrase "documents to be used by the government in its case in

2   chief," and the rule has since been amended to say "items to

3   be used by the government in its case in chief," quote,

4   "include, documents, which will be marked and offered in

5   evidence by the government, plus documents which will be

6   relied on or referred to in any way by any witness called by

7   the government during its case in chief," close quote.

8         Now in 1977 this rule referred to documents.  Now it

9   refers to items.  And items includes data.

10         And there are a number of cases that have adopted

11   that interpretation of 16(a)(1)(E)(ii), which would suggest

12   that any item which will be relied on or referred to in any

13   way by a witness called by the government during its case in

14   chief falls within (a)(1)(E)(ii).

15         It's very clear, I believe, that when the government

16   presents its case, the Torrential Downpour software will be

17   relied on and referred to throughout the testimony of

18   Agent Daniels.  It will be the entire basis for that

19   testimony.  And, in fact, the entire basis for the government

20   suggesting the jury should find that these videos were

21   distributed.

22         Doesn't that then mean that Torrential Downpour is an

23   item that must be disclosed under 16(a)(1)(E)(ii) regardless

24   of the materiality test in 16(a)(1)(E)(i)?

25         That's my question to you, Ms. Helart.

1          MS. HELART:  That is a -- that is a question I

2     might -- I don't know if the Court would indulge more time,

3     but I'd really like to look at that *Countryside* case and

4     especially look at it in its interplay between the privilege.

5          But to answer the question, while it's certainly true

6     in presenting a case like this, I've done one just last June,

7     the log files that are so heavily relied on in a hearing like

8     this would certainly be admitted as evidence, or excerpted

9     pages from them, but really that's the starting point.  Much

10    more of the evidence that would be, I guess, emphasized and

11    focused on at a jury trial is the actual evidence and data on

12    the computer, including the child pornography images

13    themselves, including where they are.

14         So for us that's a starting point.  This proactive

15    law enforcement software is a starting point.

16         I can see the Court's --

17         THE COURT:  Let me interrupt, if I can, Ms. Helart.

18    I'm sorry to interrupt, but just in the interest of time.

19         MS. HELART:  That's fine.

20         THE COURT:  It seems to me the only evidence -- the

21    only direct evidence of distribution -- well, let me start at

22    an earlier place.

23         The distribution charged in each of these counts is

24    the sharing of the video from the defendant's computer to the

25    government's computer.  That is the act of distribution that's

1    charged; correct?

2              MS. HELART:  That is correct.

3              THE COURT:  It's not distribution with anybody else,

4    it's that distribution.

5              MS. HELART:  Correct.  Yes.

6              THE COURT:  The only direct evidence that the

7    defendant's computer shared the video with the government's

8    computer is the Torrential Downpour software and the logs it

9    produces.

10             Or stated differently, if you didn't have that

11   evidence, if you didn't have the Torrential Downpour to

12   testify from or the logs, all you had what was what you found

13   on the defendant's computer, you couldn't prove distribution

14   as alleged in those counts, could you?

15             MS. HELART:  It's true that if we were just at a

16   defendant's house, and sometimes this happens, where we'll get

17   information a different way, and maybe it's a spouse who's

18   told on their partner, whatever.  And so we get there and we

19   can see the computer has some BitTorrent activity but, the

20   Court is correct, we wouldn't know who -- in those instances

21   who it had distributed to.  So that's correct.

22             But I -- I really want to make this accurate because

23   I don't want to fall into what the defense has kind of put the

24   tone of is just because of the log files going to the law

25   enforcement computer, there's still a big step there.  It

wasn't just that it was suspected child pornography, it's that

Agent Daniels actually received something and actually viewed

it.  So we're not doing an indictment just on a, this was

suspected, oh, look at the name, it has a very explicit name.

You can see some of these names are quite benign.  It's huge,

it's a big step because Agent Daniels actually did view --

THE COURT:  I understand that.  And I'm assuming that

at trial you're going to actually have the videos that he

downloaded --

MS. HELART:  Correct.

THE COURT:  -- and you're going to show them to the

jury --

MS. HELART:  Correct because we have to --

THE COURT:  -- and you're going to show them the

names.

MS. HELART:  We have to and we will because that's

the trial.

THE COURT:  Yeah.  But, again, the only evidence you

have that that video that you will be showing the jury came

from the defendant's computer is what Torrential Downpour and

its logs tell you.

MS. HELART:  It is true --

THE COURT:  Corroborating evidence, I understand --

MS. HELART:  Yes.

THE COURT:  -- but the actual evidence of

1    distribution is Torrential Downpour and its logs.

2          MS. HELART:  Yes, in that that's how the

3    investigation started because it's a proactive work --

4          THE COURT:  Well, it's more than how the

5    investigation started.  It's the act of distribution --

6          MS. HELART:  Correct.

7          THE COURT:  -- right?

8          MS. HELART:  Yes.

9          THE COURT:  So how can I conclude that Torrential

10   Downpour and its logs are not part of your case in chief to

11   the jury for purposes of 16(a)(1)(E)(ii), setting aside for a

12   minute the privilege issue, which is different.

13         MS. HELART:  If I could have 30 seconds.

14         THE COURT:  Sure.

15         MS. HELART:  So without looking at -- without having

16   looked and studied the *Countryside* case --

17         THE COURT:  I understand.

18         MS. HELART:  -- what we have already and have

19   disclosed are a very important piece of the distribution,

20   which has already been disclosed to the defense, is the log

21   files.  It's the -- it's the -- how the software is made,

22   built, how it functions, its source code, giving an

23   installable copy, that is the heart of what we do not wish to

24   give over and that we're fighting so hard.  But as far as the

25   log files, those have been given over and, yes, those would be

1   part of.

2          So Rule 16, I guess I would argue we have complied

3   with that already because the whole computer is open to the

4   defense to look at, the defendants' computers.

5          THE COURT:  The defendants' computers.

6          MS. HELART:  Correct, the whole defendants' computers

7   and all those artifacts that we then find too.

8          But those log files are huge because they -- they are

9   the evidence of the distribution and those have been given

10  over and those are documents, as the Court has construed them.

11         THE COURT:  But they are 100 percent a product of

12  Torrential Downpour.

13         MS. HELART:  They're generated by Torrential

14  Downpour.

15         THE COURT:  They purport to show what Torrential

16  Downpour was doing.

17         MS. HELART:  It's what Torrential Downpour captured

18  in the public space.

19         THE COURT:  That -- well, they -- yeah.  They purport

20  show what the software that created the logs was doing at

21  those times that are reflected in the logs.

22         MS. HELART:  Correct.

23         THE COURT:  So I have a hard time separating the logs

24  from Torrential Downpour.  They may simply be a written

25  manifestation of what it was doing, but the thing that found

1    the defendant's computer, shook its hand, requested the

2    download, took the download, stored the video, is all

3    Torrential Downpour and will be the basis for Agent Daniels

4    testifying, we got this video from that guy.

5            So I have a hard time seeing how Torrential Downpour

6    is not part of the government's case in chief.

7            MS. HELART:  I would only agree with that -- I'm not

8    fully agreeing with that, obviously.  And I would agree if

9    something about the log files were just not in alignment with

10   what we were seeing forensically.

11           But we've heard Agent Daniels testify that he's never

12   heard of any other getting it from the Person A/Person B

13   analogy, nor have we heard of any, like, sweep of the

14   defendant's downloads folder, the place where it would be

15   authorized to take from.

16           This software is only modified in some certain

17   specific ways so we never share out any pieces that we get,

18   like other users would, you know, have those available.

19           But that log file, there's nothing about it in these

20   men's cases that show anything amiss as to how the software --

21   and if that's the question that's at this hearing, is did the

22   software operate as it's designed, then everything about the

23   log files and Agent Daniel's experiences are that, yes, it

24   operates as it is designed and it did in this case as well

25   with several downloads.

1          THE COURT:  I assume you agree that the log files are

2     accurate only if the software is accurate.

3          MS. HELART:  Well, I know that's the defense

4     statement.

5          THE COURT:  Don't you think that's true?

6          MS. HELART:  Well, because it's capturing public

7     data, that means data from the defendants' computers, it's all

8     out there in the public, but, yes, I mean, it's -- I don't

9     want to parse words.  Yes, it is a log file generated by the

10    Torrential Downpour software.  That is a true statement.  It

11    is publicly available data.  We're not going into someone

12    else's computer.  It is publicly -- it's what's out there

13    anyway.  If you're a BitTorrent user, it's just simply what

14    your computer's transmitting.  It is transmitting the port, it

15    is transmitting the IP address, it is transmitting its tracker

16    and what you've got available for sharing and what you're

17    willing to share because it's --

18         THE COURT:  I understand that, but it is all as

19    reported by Torrential Downpour.

20         MS. HELART:  As recorded in the log files that we

21    see, yes.

22         THE COURT:  Let me shift to the materiality issue for

23    a minute.

24         The software in this case went, in my non-technical

25    description, went to the defendant's computer, said, can I get

1    this file.  The defendant's computer said, yes, here it is,

2    gave it to the software.  The software recorded it, put it in

3    a file, and we've now got it as evidence of distribution.

4         In a drug-dealing case, if a government agent hired a

5    confidential informant to go to a drug house and buy an ounce

6    of heroin and the confidential informant went to the house and

7    said, can I have some drugs, and the person said, yes, here it

8    is, gave it to them, and the confidential informant brought it

9    back to the agent and the government is now prosecuting the

10   person in the house for drug distribution, could the

11   government keep confidential the identity and background of

12   the confidential informant?

13        MS. HELART:  If the confidential informant went to

14   the house, bought drugs, came back, and we were going to --

15   we'd have to have -- let me think back to my narcotics

16   prosecution days, because sometimes we would use that event as

17   a reason to get a search warrant and then independently --

18        THE COURT:  Let's assume this event is the act of

19   distribution being charged.

20        Or asked differently, would the government have to

21   turn over the identity -- let me ask it even differently.

22   Would the identity of the confidential informant and that

23   person's background be material for purposes of

24   Rule 16(a)(1)(E)(i)?

25        MS. HELART:  Can I have 30 seconds?

1        THE COURT:  Yep.  Yep.

2        MS. HELART:  When I do think back to doing those

3    cases, there was a lot of corroboration, as there would be

4    here, as an analogy.  For example, we'd be checking the

5    informant's pockets, so that would be an independent piece of

6    corroboration.  And presumably we're not sending a

7    confidential informant in to buy drugs without some eyes on

8    the confidential informant.  So that is that independent

9    corroboration.

10       So whether it's law enforcement saying, I'm familiar

11   with so-and-so, I checked his pockets, he went up to the

12   house, he bought, and I watched him come back, I searched his

13   pockets again, he handed over heroin.

14       In that case, I don't know if I've ever charged that,

15   but I believe we could charge that.  I can't imagine that we

16   couldn't charge that with that eyewitness testimony and that

17   direct evidence that watched the person go up, we know he has

18   nothing else on his person, we watched the sale happen and we

19   could even see who was doing it.

20       THE COURT:  Let me assume in the hypothetical he

21   wasn't watched.  The agent didn't have eyes on the

22   confidential informant.  He trusted the confidential

23   informant, but that person went and came back with the heroin

24   and said, I got it from John Doe.  Wouldn't the identity of

25   the confidential informant be material to the preparation of

1    the defense?

2           And the reason I'm asking this is obvious, that's

3    what Torrential Downpour did in this case.  It went and got

4    the very thing that these defendants are charged with

5    distributing.  And I'm having trouble with the notion that

6    information about Torrential Downpour can be kept confidential

7    unless I conclude that in my hypothetical the identity of the

8    very person who did the drug buy could be kept confidential.

9    And I just don't see that as at all possible.

10          MS. HELART:  I guess what's is imperfect about the

11   analogy -- I truly, respectfully, don't mean to pick on the

12   Court's analogy --

13          THE COURT:  I don't care if you pick on it.  I'm

14   trying to figure out the right answer.  It's not going to

15   offend me.

16          MS. HELART:  Torrential Downpour is an objective

17   piece of software that is used time and time and time again.

18   And so it -- I guess for a better phrase, it self-validates

19   itself.

20          I understand what you're saying, it's a very trusted

21   confidential informant, but you've still got the human

22   inadequacies.  And so a defense counsel would want to know

23   things, and they're probably entitled to them.  Things like

24   the criminal history of the confidential informant and other

25   kind of bad things, like bias, what is it that the

confidential informant gets out of it.  Money?  Do they work

off a deal?  I mean, those are important factors that a

defense attorney needs to know while assessing their case.

Torrential Downpour, we have -- yes, we have this log

file.  Yes, it is generated by the software itself.  But it's

so just the beginning of the case that we -- again, it's not

just that we look at the tracker information that this person

has requested it before may have it, we actually get pieces of

it and see what it is we got.  And so just like the

confidential informant will come back with the heroin or not,

we actually see what it is we got.  And then that is the basis

for the search warrant.

And it feels different.  I do understand why the

Court's making that analogy, but it just feels different when

we've got so many corroborating facts like the computer itself

when we get to the search warrant.

And in this case, all of these log files and the

computer, when they actually get to it on the date of the

search warrant, certainly enough for probable cause, but when

they actually get to the computer, it's corroborating in a

sense Torrential Downpour itself.  It corroborated what the

software did.

There's nothing to indicate that some mythical

Person B gave it, and there's just nothing about -- it's just

speculation and in its wildest sense, and that's what we think

1    doesn't comport with why to turn this over.  This is very

2    sensitive software and to give over a copy is very detrimental

3    to law enforcement, especially when it's just the beginning

4    and especially when we have to corroborate everything about

5    the case.  It literally is just the beginning.

6         THE COURT:  Let me -- let me ask -- I understand what

7    you've said.  Let me ask you a different hypothetical.

8         I think the case law is pretty clear that if a drug

9    dog alerts to a vehicle and that's the basis for a search

10   warrant and drugs are found in the car, that when the

11   defendant wants to challenge the search warrant and say there

12   wasn't probable cause, the defendant is entitled to get the

13   testing and validation information about the drug dog, the

14   proof that this dog really does alert just to these drugs.

15        I know there's cases that say that.

16        If that's true, why is it that the defendants in this

17   case cannot get the testing and validation information about

18   the software that alerted to them and said they have child

19   pornography and I just got it from them?

20        MS. HELART:  A, I'm not sure, standing here, who has

21   the validation.  We did hear testimony, though, through

22   Agent Daniels that validation certainly has been done.  He got

23   it at the end of his training.

24        THE COURT:  I'm assuming there's been some.

25        MS. HELART:  Sure.

1          THE COURT:  So assuming there's been some, my
2     question is why shouldn't defendants be able to get that just
3     like they can validate the drug dog that pointed the finger at
4     them?
5          MS. HELART:  The request as we've understood -- one
6     part of the answer is the request as we've understood it is to
7     turn over an installable copy to Ms. Loehrs.
8          THE COURT:  Well, they say at the end of the motion
9     "Or, alternatively, turn over the testing and validation
10     information."
11          MS. HELART:  If I can have one second just to talk
12     with Agent Daniels.
13          THE COURT:  Yeah.  Fine.
14          MS. HELART:  I think the simplest 60,000-foot-view
15     answer is the software's been validated, certainly.  We just
16     don't know exactly by who and we don't know what those records
17     look like.  I've never known -- I've just personally never
18     known, maybe they're given out all the time, but I don't think
19     they are, I've not heard of that.  So I don't know what that
20     would entail, to turn over validation logs.
21          I don't know that it's the same people who created
22     the software as then would do the validation or whether they
23     have, in fact, turned it over to an unbiased third party.  I'm
24     sorry, I just don't know.
25          THE COURT:  All right.

1          MS. HELART:  I know that Agent Daniels doesn't have

2     it in his possession.  That's for sure.  And that validation

3     that I speak of is on a practical case-by-case kind of thing

4     and his training.

5          THE COURT:  I understand that.

6          Let me ask you a couple of questions about the

7     sensitivities you've identified.  And I don't know -- I'm not

8     trying to signal something I'm going to do, I just want to

9     understand what you believe is sensitive.

10          The defendants have said clearly, at least Ms. Hull

11     has, I assume Mr. Ber is of the same view, they're not asking

12     for source code.  That's not what they're after.

13          Is that true for you too, Mr. Ber?

14          MR. BER:  Yes, sir.

15          THE COURT:  In the *Crow* case in New Mexico, what

16     Chief Judge Vasquez did is order that the government allow the

17     expert, I think it was Ms. Loehrs, to come to a secure

18     government facility and use the software on a computer there

19     without taking a copy of the software out.

20          I don't know if that's something the defendants are

21     requesting, but I guess my question to you is what's the

22     problem with that?  I think all of the concerns I heard from

23     Agent Daniels was if a copy of the software gets out of the

24     government's hands, it might get into the hands of people who

25     would use it to thwart government investigations.

1          Do you have an objection to Ms. Loehrs coming to your

2    facility on your computer and running the software and looking

3    at the software and doing what she can with it on the

4    computer?

5          MS. HELART:  So I believe -- and I'm looking to

6    Agent Daniels, for the record, for an accurate answer for

7    this.  Because of the licensing, I -- I don't know how that

8    would practically work.

9          May I get some input from him whether the FBI could

10   actually even do that?

11         THE COURT:  I'm assuming I can order it.  Let's just

12   assume that hypothetically.  And if I order it, the government

13   has to do it.  I'm not saying I'm going to.

14         My question is if that were what I ordered, what's

15   the security risk?  What's the concern you have?

16         You can talk to him.

17         MS. HELART:  Is it okay if Agent Daniels would help

18   answer this question to the Court because I don't want to be

19   the middle man and I want to get this right.

20         THE COURT:  That's fine.

21         MS. HELART:  And there's licensing considerations and

22   also how much he's authorized to even --

23         THE COURT:  That's fine.

24         MS. HELART:  So he's here, he's heard the question.

25         AGENT DANIELS:  I think it would probably be more a

1       question to Loehrs & Associates if that would be more of their

2       ability to test because ideally, from their testimony in this

3       case and other cases, they want multiple copies of it and they

4       would want to set up a internal network, closed network, and

5       test -- like she said, test it till it fails.

6               I don't know by giving her simple access and letting

7       her run and possibly run, like, a network analyzer or

8       something like that, that's monitoring what she's doing and we

9       can do a capture analysis and show that as this software is

10      running, we're getting the pieces for this case from this IP

11      address, which is what's being reported in the thing.

12              I don't know if that would suffice the -- the

13      requirements of what they think their validations -- I don't

14      know --

15              THE COURT:  Okay.  I understand that.  And maybe

16      they'll say it's not going to help them.  But if I were to

17      order that, is there a security risk to the government?

18              AGENT DANIELS:  The only thing I would see, I would

19      have to check and see if my license -- because we'll probably

20      have to use my license because I don't think they'll be giving

21      Ms. Loehrs a license to use in our space.

22              THE COURT:  Right.

23              AGENT DANIELS:  I don't know license-wise if I

24      could --

25              THE COURT:  Assuming I could make it happen, is there

1    a security risk?

2         AGENT DANIELS:  You mean besides national security --

3    no, I'm just joking, Your Honor.  No.

4         THE COURT:  Okay.

5         All right.  One of the things that was requested were

6    user manuals.  Is there a security risk in turning over user

7    manuals?  And if so, what is it?

8         AGENT DANIELS:  Actually, I don't think I have any

9    user manuals.  The only user manuals that I am aware of are

10   off of a website.  So I don't know.  I don't know -- I don't

11   know the contents of that, so I don't know if it spells in how

12   the software works or not, Your Honor.  I don't know.

13        MS. HELART:  But I do believe that I would definitely

14   want to check on that because I think I've seen user manuals

15   as being part of what might be objected to by the government.

16   I want to see how sensitive those are because I think it would

17   be depend what kind of information is contained in them.

18        THE COURT:  All right.  Let me ask you another and

19   then I have some questions for the defense, and we're running

20   really short on time.

21        The *Roviaro* case is not very clear, and its progeny,

22   in my view, are not very clear as to exactly when I balance

23   and what I balance.  But clearly *Roviaro* talks about

24   balancing.  *Roviaro* also says helpful and relevant information

25   trumps the privilege.  Those are inconsistent in my view.  But

1    it talks about balancing.  And there's lots of case law since

2    *Roviaro* was decided in 1957 that says there is a balancing

3    that goes on, assuming the information is discoverable,

4    between the defendants' interest and the government's

5    interest.

6         In your view, what is the tipping point where the

7    defendant gets the information?  What does the defendant have

8    to show for its interest, his interest, to outweigh the

9    government's interest in *Roviaro* balancing such that I say the

10   privilege doesn't protect this information?

11        MS. HELART:  Factually is probably the best way I can

12   say where the balance would be tipped if our -- if our

13   forensic review of the computer data and the log files were

14   just wildly inconsistent.  And maybe not even wildly

15   inconsistent, but very inconsistent.  That might be a tipping

16   point to say is this software really doing what it says it's

17   doing.

18        But in these two cases, as the cases that

19   Agent Daniels has brought to our office before, everything is

20   so consistent with what he's done and with what the computer

21   forensics have borne out, and a lot of times, and it includes

22   these two defendants, with their statements.  So their

23   statements confirm their forensics confirm the log file.  It

24   all -- it all is a totality.

25        I don't know what the tipping point is, whether -- if

1    we'd see another IP address.  Well, maybe we could explain

2    that by sending out another subpoena and seeing that it was

3    the internet service provider who provided a separate IP

4    address 20 minutes later.  I don't know that that would be the

5    tipping point.  But that's not anything that we have here.

6         There's just nothing here except for speculation that

7    this software doesn't work right.  They don't even point to

8    any facts --

9         THE COURT:  Well, there is the absence of eight video

10   files on Mr. Gonzales's tablet.

11        MS. HELART:  Well, that -- that's a product of him

12   possibly deleting -- it's a habit.

13        THE COURT:  Possibly.

14        MS. HELART:  Sure.  Possibly.

15        THE COURT:  I agree.  Possibly.  Possibly that they

16   weren't there?  I know you don't agree with that given what

17   you find in the jump list and --

18        MS. HELART:  And in the torrent files.

19        THE COURT:  I understand that.  But, I mean, it's not

20   as though they're purely speculating.  There is an issue

21   because those files weren't found on his tablet as to whether

22   he really distributed them.  And they're saying in fairness we

23   should be able to query the very thing that claims it

24   downloaded them and committed the distribution.

25        MS. HELART:  But as to that latest point, I still

1  contend that that is not an issue for whether the software

2  worked.  That might be an issue as to factual innocence, a not

3  guilty verdict, an argument to the jury.  I have no doubt

4  they're going to argue there's no files there.  He might have

5  looked at them, not liked them, didn't even want to distribute

6  them; it goes to the knowing distribution.

7          That is a very different question to a fact finder

8  than it is for the specific question of did this software

9  function the way it says it functions, and the way

10 Agent Daniels has normally used it.

11         In fact, finding those torrent files on there is

12 huge.  And that corroborates.

13         Everything else, what you just said, that is

14 definitely what the defense will argue to a jury.  Definitely.

15 We're expecting that.  But that's not whether the software was

16 working.

17         THE COURT:  All right.  I understand what you've

18 said.

19         Ms. Hull, to get information under

20 Rule 16(a)(1)(E)(i) as material, as you know, the case law

21 says you have to come forward with facts to show there's a

22 reason to believe that the information in the government's

23 possession would be helpful.

24         What facts have you given me in this case to suggest

25 that Torrential Downpour looked into any non-public space on

1    the defendant's computer for purposes of your Fourth Amendment

2    violation argument?

3            MS. HULL:  Because the images were nowhere on any of

4    the devices.

5            THE COURT:  Well, that doesn't say -- and if they'd

6    been in the private space and not in public space, your

7    argument might make sense.  But what is there to say that this

8    software ever looked in a non-public space on Mr. Gonzales's

9    tablet?

10           MS. HULL:  Well, they don't know -- this is part of

11   the problem, Judge, is that if -- okay.  They're saying that

12   this torrent, they located the torrent, but the image is not

13   attached because the image is not -- if, for example, and I

14   can only use an example, if they're saying, for example, that

15   he had it and he deleted it, that's why it's not there, and

16   that's why they can't find it, that's why no one could find

17   it, is because it's deleted and it's out of the shared space

18   on that computer.  And it could have been instantaneous, it

19   could have been -- they keep saying, well, maybe it was

20   deleted.  Well, if that's the case, then it had to have gone

21   not only beyond the shared function of the computer, beyond

22   the private function of the computer, but as we talked about

23   initially, the three types of evidence -- Judge --

24           THE COURT:  Why did it have to go beyond?

25           MS. HULL:  I'm sorry?

1          THE COURT:  Why are you saying Torrential Downpour

2     had to go beyond?

3          MS. HULL:  Where else would they have gotten it?

4     Because it wasn't --

5          THE COURT:  If it was on a shared file they would

6     have gotten it.

7          There's nothing that says to accomplish what

8     Torrential Downpour claims to have accomplished in this case

9     you had to look in private space.  That's what I'm wrestling

10    with.  I don't see any facts in this case that suggest the

11    Fourth Amendment problem.

12         I know Ms. Loehrs said she's seen it in other cases,

13    but she's not asserting in this case that there is some hard

14    evidence that the government software looked in a non-public

15    space.

16         MS. HULL:  Can I have a moment?

17         THE COURT:  Yep.

18         MS. HULL:  Okay.  That's true.

19         THE COURT:  Okay.  Well, let me ask this question,

20    then.  It seems to me that given the fact that we have the

21    logs representing what Torrential Downpour told them to

22    represent, given the fact that we have at least torrent names

23    on the tablet, we have at least some of the file names in the

24    jump list, if you were to find the smoking gun after I give

25    you the software to test, what you would have to be finding is

1    that Torrential Downpour got the videos that the government

2    has from a different computer.

3           MS. HULL:  Disagreed.  It would have -- it could show

4    that it wasn't in shared folders.  Because Counts 1 through 8

5    are relying entirely on the Torrential Downpour and they can

6    only get --

7           THE COURT:  Well, but if you don't have a Fourth

8    Amendment problem and it got it out of a private folder,

9    they've still got it from him and he distributed.  You can

10   distribute from a private folder if you choose to.

11          My point is it seems to me the only argument that --

12   the only flaw that is consistent with all of the evidence in

13   this case is that their computer got the video somewhere else,

14   or at least got pieces of it somewhere else.

15          MS. HULL:  Correct.  From another source.

16          THE COURT:  Right.

17          MS. HULL:  Correct.

18          THE COURT:  I just want to make sure I understand

19   what is at the heart of the problem you're seeing.  It seems

20   to me that's the problem, is you're saying we just have to

21   take the government's word for it when they say it came from

22   our client's computer.  Under BitTorrent it might have come

23   from somewhere else and just because BitTorrent's log says it

24   didn't doesn't mean we have to trust it, we want to test it to

25   find out.

1              Isn't that the heart of what you're arguing?

2              MS. HULL:  Correct.  And, again, if that's the

3    distribution and if this is not a single target that it's

4    going after and these other pieces are coming from elsewhere,

5    my client's not the one distributing.

6              THE COURT:  Okay.  I understand that argument.

7              What about the relief that Chief Judge Vasquez

8    ordered in New Mexico saying Ms. Loehrs can go to the

9    government facility and use the program?

10             MS. HULL:  She has done that, Your Honor.

11             THE COURT:  Is that -- would that be helpful?  Would

12   that assist in the defense?

13             MS. HULL:  Can I ask her to respond?

14             THE COURT:  Sure.  Go ahead, Ms. Loehrs.

15             MS. LOEHRS:  We have done that and, in fact, in

16   New Mexico we tried but they -- when we got there they simply

17   wouldn't let us use the software.

18             But we have done that with law enforcement's other

19   versions of software that they use in file sharing.  We've

20   done that several times at their facility.  We are -- they're

21   there with us, they supervise it, and our tests are very

22   limited, but they have worked to get us a start and get us

23   some conclusions which we have done with testing that way.

24             So while it's a start, it's not thorough testing and

25   validation but it may get us to a point where we can say, hey,

1    here's a problem, it needs further testing.

2              THE COURT:  All right.

3              Okay.  We are short of time.  I don't have questions

4    for you, Mr. Ber.

5              But what I want to do is give you each two or three

6    minutes, if you would, to summarize what you think -- unless

7    you think we've got it.  I want to make sure I give you a

8    chance to point out what you think are the most important

9    points as I take this under advisement.

10             Ms. Hull, let's start with you.

11             MS. HULL:  Judge, I think you've hit the points.

12             I think the agent, Agent Daniels nailed it when he

13   said, we wouldn't even want to get a search warrant if the

14   software wasn't working properly.

15             So, yes, absolutely I think that we've established

16   everything we need to establish, that any purported privilege

17   must fall from the fact if for nothing else other than

18   Counts 1 through 8 on the face of the indictment.  That if

19   this software is what -- and it's all -- and they say, well,

20   that's the beginning.  No, that's the beginning and end of

21   Counts 1 through 8.  We have to have it and we have the right

22   to it under the law and we ask that you order that.

23             Thank you.

24             THE COURT:  Mr. Ber.

25             MR. BER:  Yes, Your Honor.  I think you hit the

1      points and we've discussed all the points.

2              To understand how Torrential Downpour works there's

3      an element of a crime here, distribution, and to close the

4      door and not being able to verify, to not be able to

5      cross-examine on it, would be unjust in this case.  I think

6      there's a duty to do that and there's ways to do it that

7      address, as we've discussed here, the government's concern.

8              In my case, this case involves -- allegedly involved

9      the user of the computer in my matter erasing, so that when

10     they came to the computer it wasn't those files found on

11     the -- on the -- on the available, the sharing portion of the

12     computer.  And so that again begs the question as to whether

13     it did come from my client.

14             THE COURT:  Okay.  Thank you.

15             Ms. Helart.

16             MS. HELART:  Just a couple of highlights.  One is

17     that in the Court's taking this under advisement, one concern

18     that the government would have is to validate would the

19     defense actually want to download child pornography to make

20     sure that the testing is all fine, and that becomes a problem

21     when we have Ms. Loehrs being part of that chain.  So that is

22     a big thing to think about, at least from the law enforcement

23     side of things.

24             To the question or to the point that Mr. Ber just

25     made, I really think the question of knowing distribution as

1    an element of the crime of 2252 is a different question than

2    whether the software works appropriately.   In fact,

3    Agent Daniels could get ten downloads from someone but we

4    wouldn't end up charging with knowing distribution because

5    maybe they were new to the software.

6         There's other factors involved in how we charge and

7    why we charge.   We don't just -- you know, just because he

8    gets a download and it was, in fact, distributed, that isn't

9    the end of the question whether it's knowing distribution,

10   because the knowing is mens rea element specific to the

11   defendant.

12        So we take a lot of things under consideration when

13   we charge a case.   Again, bottom line, that is for his point

14   to the jury, not for a point of whether the software's

15   working.

16        And my third highlighted point that probably has been

17   said in another way, but, really, the defendants' own

18   activities on each of their computers show how easy it is to

19   move files and do things on the computer.

20        Mr. Ordonez moved everything to his recycle bin.

21   Maybe he didn't understand he had to take one more step in

22   order to completely empty that recycle bin or maybe he's

23   somebody that knows it's very easy to restore from the recycle

24   bin, but that it easily hides it from other family members,

25   because in the recycle bin it's not gone and you can go right

1     back into it, click on it, and it restores.  So I don't know

2     what he would say to that.  But he -- the point is, for me,

3     that he's moved it to another location, all of the files

4     charged in the Counts 1 through 5.

5           And so to the point of Mr. Gonzales's case, just the

6     fact that his files aren't there, that's a usual situation.

7     We'll go oftentimes to houses, find other remnants of child

8     pornography, find other child pornography files, not find what

9     Agent Daniels has downloaded.  That's -- that, to me, is,

10    respectfully, a big so what.  There's other -- if there's

11    other artifacts about these torrents, which there were for all

12    ten torrents in Mr. Gonzales's case, then it doesn't matter as

13    much that the files weren't there.  The fact that those

14    torrents are there, he probably didn't realize that uTorrent

15    kept track of his torrent file listing, and so it kept track

16    of 114.  I don't know if it's a rolling file log list that

17    writes over itself, but at least there's 114.  The Court can

18    look at those names.  They are indicative of child

19    pornography.  So he isn't new to this activity.

20          And we just don't think that the defense has survived

21    the challenge of materiality in these two cases with respect

22    to it looked like everything the law enforcement software was

23    designed to do, it did it appropriately, it didn't overreach,

24    didn't overextend, and it didn't get it from Person B, WHOIS

25    mythical.

1          THE COURT:  Okay.  Thank you.

2          Mr. Ber, one question.  Ms. Loehrs said on the stand

3    that her firm is no longer your expert in this case.  Do you

4    have an expert at this point?

5          MR. BER:  I do intend to engage an expert going

6    forward.  I just haven't got with her about continuing on with

7    the representation.

8          THE COURT:  Okay.  All right.

9          Thank you all.  I'll take this under advisement.

10       (End of transcript.)

11                            *  *  *  *  *

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          **C E R T I F I C A T E**

2

3          I, PATRICIA LYONS, do hereby certify that I am duly

4    appointed and qualified to act as Official Court Reporter for

5    the United States District Court for the District of Arizona.

6

7          I FURTHER CERTIFY that the foregoing pages constitute

8    a full, true, and accurate transcript of all of that portion

9    of the proceedings contained herein, had in the above-entitled

10   cause on the date specified therein, and that said transcript

11   was prepared under my direction and control, and to the best

12   of my ability.

13

14         DATED at Phoenix, Arizona, this 14th day of February,

15   2019.

16

17

18

19

20                         s/ Patricia Lyons, RMR, CRR
                          Official Court Reporter
21

22

23

24

25