IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>ANTHONY ESPINOSA GONZALES,<br><br>Defendant. | Case No. CR-17-01311-PHX-DGC (BSB)<br><br>**AFFIDAVIT OF TAMI LOEHRS** |

I, TAMI L. LOEHRS, hereby declare as follows:

1. I am the digital forensics expert retained by the Defendant in this matter and my Affidavits previously filed with this Court set forth my background, experience and qualifications.

2. On May 10, 2019, this Court ordered Defendant to address questions 1 through 7 in its supplemental brief. This Affidavit is being prepared to assist in answering those questions that includes actual real-life scenarios known to occur with users who download and parse/seed torrents based on my own personal knowledge and experience. These scenarios are for explanation purposes only and are not meant to imply that they actually occurred on any of Mr. Gonzales' devices.

> **Question Number 1** – *Given the Court's finding that Torrential Downpour is not material to any Fourth Amendment challenge (Doc. 51 at 10), why are tests three and four – deleted torrent data and unshared torrent data – appropriate?*

3. The files that Mr. Gonzales is charged with knowingly distributing in Counts One through Eight were identified by Torrential Downpour as being available at Mr. Gonzales' IP address. Although the torrent files, containing only text, were located on Mr. Gonzales' tablet

1

computer, the charged files associated with those torrents were not found. In that regard, it is impossible to know if Mr. Gonzales ever downloaded the files associated with the torrents and, if he did, what he might have done with those files and whether Torrential Downpour and the ICAC COPS database reliably and accurately documented that activity.

4. For example, according to the Torrential Downpour log files produced by the government, the torrent responsible for the files charged in Count Two is broken into 6,115 pieces and Mr. Gonzales' IP address reported having only 4,385 pieces, meaning the torrent was not completely downloaded by Mr. Gonzales' IP address. That particular torrent is associated with a total of eighty-eight (88) files, at least one of which is of investigative interest and only three of which have been charged. That is, some of the eighty-eight (88) files associated with that torrent do not contain contraband and would therefore have been perfectly legal for Mr. Gonzales to possess. Further, many of the files associated with that torrent have innocuous names such as 006, 116pics, Adry Dance 2, which would not indicate to a user the content of those files. Since Mr. Gonzales' IP address reported having only part of the torrent, it is unknown how many of the eighty-eight (88) files he may have had, if any, and if any of those files actually contained contraband.

5. Considering a scenario where Mr. Gonzales started downloading the files associated with that torrent, viewed some of those files and realized one of the files contained contraband, immediately deleted those files and stopped the download process, it is important to know if Torrential Downpour identified those files before or after Mr. Gonzales may have deleted them. This scenario might account for the fact that the torrent was identified by Torrential Downpour as being incomplete at Mr. Gonzales' IP address and why the contraband files being charged in Count Two were not found on any of Mr. Gonzales' devices.

6. Tests three and four are specifically constructed to determine if Torrential Downpour is identifying a suspect who, in this scenario, received contraband files inadvertently

2

in a torrent with other non-contraband files but made a conscious choice to immediately delete the files with illegal content. The essential issue these tests resolve is whether Torrential Downpour is identifying files *after* a user has taken an affirmative action to delete them.

7.  Files that existed in any location on Mr. Gonzales' device other than the identified shared folder, which includes deleted files in unallocated space, are considered to be in *non-shared* locations and should not be identified by Torrential Downpour. Therefore, tests three and four would be pertinent to any files in these non-shared locations, including unallocated space, and are necessary to guarantee the accuracy of and confidence in the overall results.

**Question Number 2** - *Why is access to COPS necessary to conduct tests one through six?*

8.  The ICAC COPS database is how the investigation into Mr. Gonzales began. It is the ICAC COPS database that alerted law enforcement, in this case Special Agent Daniels, that Mr. Gonzales' IP address was sharing files of "investigative interest". SA Daniels then used Torrential Downpour in conjunction with the ICAC COPS database to identify and download those files of interest. In that regard, it is imperative to ensure the accuracy of and confidence in the overall results by cross-checking the outcome of each and every test of Torrential Downpour with information that is simultaneously being documented in the ICAC COPS database to confirm that information is reliable and accurate. For the purpose of all tests, the ICAC COPS database may be accessed in its native state, or cloned and moved to a separate server, providing the database remains complete.

**Question Number 3** - *How are tests five and six – non-investigative torrents and files of interest –material to the preparation of a defense?*

9.  Using a similar scenario to that discussed in paragraph 5 above, but this time consider Mr. Gonzales canceled the download process before obtaining any of the contraband files. In this scenario, Mr. Gonzales has a torrent associated with eighty-eight (88) files, only some of which he has actually downloaded, none of which contain contraband and are therefore legal to possess. If the ICAC COPS database has identified any of these legal files as files of

3

investigative interest, Mr. Gonzales' IP address would have been identified by Torrential Downpour as having contraband available for sharing when, in reality, no contraband existed.

10. Tests five and six are specifically constructed to determine if the ICAC COPS database and Torrential Downpour are identifying files that do not contain contraband, and are therefore legal to possess. The tests are also necessary to guarantee the accuracy of and confidence in the overall results.

> **Question Number 4** - *Assuming tests five and six are not allowed, does the COPS database still need to be cloned and moved to a separate server?*

11. This is addressed in paragraph number 8 above.

> **Question Number 5** - *To the extent a separate test database is necessary, does the entire COPS database need to be cloned or would a smaller or simulated database suffice?*

12. The results of these tests will be most complete and accurate if the Torrential Downpour software runs natively as it was used by law enforcement in the investigation of Mr. Gonzales. To guarantee the accuracy of and confidence in the overall results, Torrential Downpour needs to have access to the ICAC COPS database as it existed at the time Mr. Gonzales was identified. The reason for this is that we do not know the entirety of the information this database uses or what it collects so creating a similar or simulated database may exclude pertinent data that is currently unknown to the Defendant. For instance, if a similar database is created to simulate ICAC COPS but excludes tables for collecting additional user data such as user search history, unshared files, Internet history, packet captures, or other information beyond torrent info hash values (a known function of the ICAC COPS database) then the simulated database is grossly incomplete and will distort the accuracy of and confidence in the overall test results.

13. For very limited testing, a smaller or simulated database may be used as a substitute for the ICAC COPS database by manually entering hash values for files of interest to be used in the testing process.

**Question Number 6** - *Will the government's proposal to have an FBI agent load lawful torrent files into Torrential Downpour (see Doc. 54-5 at 4) work for testing purposes?*

14. Based on my personal experience on other cases involving ICAC COPS and listening to the testimony of Robert Erdely, the creator of ICAC COPS, as well as other law enforcement officers trained in ICAC COPS, the ICAC COPS database already contains lawful torrent files including textual stories, cartoons, erotica, adult pornography and images of children that are not nude or sexual in nature. In that regard, there is no obvious need to include additional lawful torrents, but Loehrs Forensics has no objection to doing so.

**Question Number 7** - *Would Defendant object to a protective order governing Loehrs's access to COPS similar to the one issued with respect to Torrential Downpour?*

15. Loehrs Forensics has no objection to any Protective Orders governing this process.

16. I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Dated: June 24, 2019

_____
Tami L. Loehrs, EnCE, ACE, CHFI, CCFE

SUBSCRIBED AND SWORN to before me this 24th day of June, 2019.

_____
NOTARY PUBLIC

JOANA CARRILLO
Notary Public - State of Arizona
MARICOPA COUNTY
My Commission Expires
June 17, 2020

5