MICHAEL BAILEY
United States Attorney
District of Arizona

GAYLE HELART
California State Bar No. 151861
Email: Gayle.Helart@usdoj.gov
BRETT A. DAY
Arizona State Bar No. 027236
Email: Brett.Day@usdoj.gov
Assistant U.S. Attorneys
Two Renaissance Square
40 N. Central Ave., Suite 1800
Phoenix, Arizona 85004
Telephone:  602-514-7500
Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | CR-17-01311-PHX-DGC |
| Plaintiff, | **RESPONSE TO THIS COURT'S ORDER DATED MAY 10, 2019** |
| vs. | |
| Anthony Espinosa Gonzalez, | |
| Defendant. | |

The United States of America, by and through its attorneys, hereby files this Response to this Court's Order dated May 10, 2019, directing the government to answer four questions.

1. Why are tests one and two—non-parsed torrents and partially-parsed torrents—not material to the defense?
2. How is access to COPS not necessary to conduct tests one through six?
3. To the extent COPS is material to the defense, why would the *Roviaro* privilege not give way as it did for Torrential Downpour?  Why would a protective order not suffice?
4. What specific resources would be needed to clone and move the COPS database to a separate server?  Is it feasible to clone and move only a portion of the database or to create a simulated database?

# DISCUSSION

Prior to answering the questions posed by this Court, the government starts with an explanation about the testimony it expects to elicit regarding the ICAC COPS database and how Torrential Downpour interacts with it. The government will then answer this Court's questions in reverse order-4, 3, 2, and 1.

**The ICAC COPS database and its interaction with Torrential Downpour**

The "Torrential Downpour" software is really a suite of software whose components include: (1) Torrential Downpour Receptor (not involved in this case); and (2) Torrential Downpour (involved in this case). Both Torrential Downpour Receptor and Torrential Downpour in the software suite interact with the ICAC COPS database.

Torrential Downpour Receptor and Torrential Downpour are associated with the BitTorrent network, and not any other file-sharing network. The ICAC COPS database contains information from investigations that law enforcement officers conduct on approximately 5-6 file sharing networks, including BitTorrent.

**Torrential Downpour Receptor**

Torrential Downpour Receptor looks for IP addresses that have made public requests for specified .torrent files[1] that are of interest to law enforcement officers who investigate child exploitative file sharing activities. This is accomplished by Torrential Downpour Receptor querying publicly available BitTorrent network indices. Torrential Downpour Receptor's results act as "tips" or "leads" for law enforcement officers to use. Torrential Downpour Receptor does not seek user activity regarding any other type of illegal or legal .torrent file on the BitTorrent network. Examples of other possible illegal .torrent files include adult pornography, movies, books, photographs, music videos, and music, all of which may have copyright protections. Examples of legal .torrent files include updates to computer software that are pushed onto the network by companies as a way for their

---

[1] The number of .torrent files can vary depending on the ongoing reviews of the contents of .torrent files involving child exploitative material, and includes, but is not limited to, child pornography per the federal definition under § 2256.

2

customers to easily access updates.

Once Torrential Downpour Receptor has detected a publicly available IP address associated with a .torrent file(s) of child exploitative material, it reports the information to the ICAC COPS database including an IP address and networking port, both being basic information transmitted with all standard BitTorrent communications. The ICAC COPS database, therefore, is a repository. It is not gathering information itself, but instead is merely receiving tips and leads from Torrential Downpour Receptor's query of public indices. Putting it another way, the ICAC COPS database is a "dumb" database, only keeping and organizing the tips and leads provided by investigators who run Torrential Downpour Receptor, similar to a hotline set up to receive tips and leads from the community about criminal activities.

Further, ICAC COPS is updated by the minute from the work of the officers using Torrential Downpour Receptor. The data contained in ICAC COPS does not represent *all* computers sharing child exploitative files on the BitTorrent network; rather it is a "snapshot" of those sharing child exploitative material as detected by officers using Torrential Downpour Receptor.

Torrential Downpour Receptor was not used by Agent Daniels in this case.

**Torrential Downpour**

Torrential Downpour, the other part of the software suite, has no search or query function. Instead, officers use Torrential Downpour to initiate an investigation in one of two ways: (1) Torrential Downpour can interact with ICAC COPS in an automated fashion to get a tip or lead consistent with any parameters an officer has set (such as geographic location and/or the specific .torrent file they want to investigate) and load a .torrent into the software; or (2) the officer can manually input an IP address, port, and .torrent file into the Torrential Downpour software. Either initiates the software's function to connect to the suspect computer's IP address to request a download.

Torrential Downpour was involved in this case. Agent Daniels set parameters in his Torrential Downpour software to request, from the tips and leads in ICAC COPS, the IP

address(es), networking port(s), and particular .torrent file(s) for his investigation per 18 U.S.C. § 2256.  Based on these settings, the information about Defendant's IP address, the networking port of his computer, and the child exploitative .torrent files publicly shared by the IP address associated with him, were returned to Agent Daniels' Torrential Downpour software as an investigative starting point.  As an automated process, Agent Daniels' software then connected with Defendant's IP address and downloaded child pornography on the eight occasions charged in the Indictment.  Agent Daniels independently reviewed the download results before seeking the federal search warrant.

Loehrs Forensics appears to believe that the ICAC COPS database itself holds a search function, but this is not accurate.  In its 18-page testing protocol that seeks to "test and measure" the ICAC COPS database, Loehrs Forensics explains the database is a "web-based component of Torrential Downpour and its operation *including retrieving information* about torrents of investigative interest and reporting historical data back to law enforcement for further investigation." (Emphasis added) (Loehrs Forensics Testing Protocol, p. 6). Torrential Downpour is the software that connects to ICAC COPS, the repository, to find tips and leads from the information placed there by the officers using Torrential Downpour Receptor.  It is important to note that the search results received by Torrential Downpour Receptor from the public indices were not used as probable cause for the search warrant nor are they being offered as part of the government's prosecution in this case.  Instead, Agent Daniels (using Torrential Downpour) directly connected to Defendant's IP address and networking port, where he received downloads of child exploitative files from Defendant's IP address, essentially confirming the tip or lead on ICAC COPS.

Nothing about the ICAC COPS database is necessary or relevant for the limited examination of Torrential Downpour.  The testing that Loehrs Forensics seeks to run can be conducted by manually inputting a lawful .torrent, port number, and IP address into the Torrential Downpour software.  Indeed, manual inputting would be necessary anyway since the contemplated testing involves lawful .torrent files, something that ICAC COPS does not contain.

**ICAC COPS database**

The ICAC COPS "database" is comprised of several Microsoft Windows servers. In simple terms, some servers hold the "records in" data, *i.e.* the information from officers using Torrential Downpour Receptor. Other servers hold the "records out" data that has a webpage interface with officers. Several servers are necessary due to the volume of data.

ICAC COPS contains other tools and functions used by the officers doing proactive investigations on approximately 5-6 file sharing networks (BitTorrent being one). ICAC COPS also contains data relating to officers' identities and IP addresses who are conducting investigations, officers who have conducted investigations in the past, the IP addresses of those trading in child exploitative material, and the infohash (unique identifier) of the child exploitative related .torrent(s) being investigated by law enforcement officers around the world.

**QUESTION 4: WHAT SPECIFIC RESOURCES WOULD BE NEEDED TO CLONE AND MOVE THE (ICAC) COPS DATABASE TO A SEPARATE SERVER? IS IT FEASIBLE TO CLONE AND MOVE ONLY A PORTION OF THE DATABASE OR TO CREATE A SIMULATED DATABASE?**

**Cloning and moving ICAC COPS database to separate servers for testing**

To clone and move the database, presumably for Loehrs Forensics to access and interface with, requires considerable (re)programming of computer code because the code is not organized in a compartmented form, thus making it difficult to retrieve the portion dedicated to BitTorrent. ICAC COPS is designed to receive tips and leads regarding child exploitative activity occurring on several different file-sharing networks and the code to handle the data for all of these file-sharing networks is intertwined. Thus, it is not easy to "just move" the BitTorrent portion. Since Torrential Downpour and the BitTorrent network are the only software and file-sharing network relevant in this case, those would be the only relevant features to clone and move. Currently, the database is spread across several computer servers with each requiring software licensing.

To attempt some rough estimate for this Court, undersigned counsel has been in communication with an attorney from the Office of General Counsel for the Federal Bureau

of Investigation. She, in turn, has researched the question with professionals familiar with IT development, to attempt answers for difficult questions, including: (1) how many resources in manpower hours it would take to extract the limited portions of code required for Torrential Downpour to interface with ICAC COPS because ICAC COPS has many features beyond those used in this investigation; (2) how the extracted portion would actually interact with Torrential Downpour; (3) how many hours it would take to remove the law enforcement sensitive data; and (4) how many hours it would take to clone and move the BitTorrent portion.

The rough estimate is between $75,000-$100,000. This is broken into the following categories: (1) Hardware (cost of a server)-$15,000; (2) Software licenses-between $10,000-$50,000; (3) Labor cost--$50,000 (9 weeks x 40 hours per week x $125 – $150 per hour).

Three additional points of caution were made by the professionals: (1) This is a software project procured by the federal government; as such, the procurement effort itself will add an extra level of complexity and maybe more cost and time. (2) For the test to be a true test, then the software version on ICAC COPS in place at the time of Defendant's investigation should be the extracted version created now; however, it is unknown if a version of that software is preserved since this testing has not been anticipated. (3) Even if all of this work was completed, the final extracted version of the BitTorrent ICAC COPS code would result in a product that is anticipated to be substantially different than when Agent Daniels conducted the download from Defendant's IP address; thereby making any defense testing futile.

**Creating a simulated database**

It is not feasible to create a simulated database for at least three reasons: (1) it could be extremely complicated to replicate; (2) something has to populate the database; and, (3) there would not be enough data for meaningful testing in a truly simulated fashion.

**Complicated to replicate**

First, the ICAC COPS database design includes features complicated to

replicate such as several database instances,[2] tables, and programming for accessing and retrieving the data. Here, recreating what has taken approximately eight years to develop would require modification to the programming that receives the search results, and to the programming that displays the results to the investigator. These tasks could involve several dozens of hours programming and other costs difficult to estimate (see above).

**Something has to populate the simulated database**

A simulated database must contain or receive information from some source. A true simulation means that the database would receive information from Torrential Downpour Receptor. Torrential Downpour Receptor would necessarily have to be reprogrammed with lawful .torrent files to work with and to point to the simulated database to deposit its results. The scenario, however, of a simulated database receiving information from a newly (re)programmed Torrential Downpour Receptor program is well beyond this Court's order, irrelevant, and immaterial since Torrential Downpour Receptor was never at issue in the current case.

**[Proposed Solution:** The other way to populate a simulated database is to do so manually. But, if this were ordered, then the government avers there is never a need to have a simulated database since a simulated database is just a repository, something that can be accomplished a different and equally effective way for the defense testing; specifically, a local log file on Loehrs Forensics' own computer (explained below).]

**There will not be enough data for meaningful testing**

Optimal testing in a simulated environment requires something vastly beyond

---

[2] A database instance can mean a very specific thing particular to a database; generally, though, it describes a database environment including its set of memory structure and processes, software, table structure, stored procedures and other functionality for the users.

7

this Court's order to include running Torrential Downpour Receptor that is newly configured to search for the lawful test .torrent files and point them to the simulated database. While the legal implications are unclear,[3] it would be an extraordinary thing for a federal court to order the government to gather a database of IP address data of individuals who request and/or trade lawful files on the network using a software written to gather data on illegal file-sharing. Indeed, it is like the FBI setting up a camera in any public space simply to record and archive people's lawful activities.

Further, the government is skeptical that just one computer running Torrential Downpour Receptor will mimic what the ICAC COPS database does now; *i.e.* receive information updated frequently from hundreds of law enforcement officers from a software like Torrential Downpour Receptor, and have it available to Torrential Downpour whose parameters are set by the law enforcement officers proactively looking for persons in their geographic area for jurisdiction and venue reasons. There simply would not be enough data in a simulated database because it needs to be continually populated by numerous computers, something not realistic in this testing scenario.

**Proposed Solution – Manual loading and local log file**

The ICAC COPS database and the need for access to Torrential Downpour Receptor can be readily bypassed and still result in a valid testing scenario for the Loehrs Forensics testing this Court has ordered.

If the Court adheres to its order of Loehrs Forensics only testing Torrential Downpour,

---

[3] Undersigned counsel has spoken with an attorney from the Office of General Counsel, Federal Bureau of Investigation. She advises that the Federal Bureau of Investigation position on collecting such information would be prohibited by The Privacy Act, which prevents the government from collecting First Amendment information unless it is rationally related to an authorized law enforcement purpose. It is questionable, therefore, in this case whether establishing a database of First Amendment information in order for a defense expert to test the government's software would be an authorized purpose.

then this can be done with *no need* for Torrential Downpour Receptor and with *no need* to use ICAC COPS or any simulated database. Since ICAC COPS was simply the source for Agent Daniels' "lead" in this case, and one function performed by ICAC COPS was simply to automatically load the .torrent files, IP address, and port, into Agent Daniels' Torrential Downpour software, this can all be done manually. Indeed, law enforcement officers did this manually prior to the automation functionality of ICAC COPS, and can still do this manually.

Accomplishing this is readily feasible. To manually direct the Torrential Downpour software Loehrs Forensics should bring a list of any number of lawful .torrent files for testing. The government will purchase the extra three IP addresses necessary for the testing (the FBI computer preloaded with Torrential Downpour, and the two computers being supplied by Loehrs Forensics). The .torrent, IP address, and port of Loehrs Forensics' computers would be manually loaded into the law enforcement's computer for testing. Loehrs Forensics will presumably have loaded packet capture software (*i.e.* software that captures or obtains the data that is traveling through the computer network) onto their test computer. The Torrential Downpour software single-source download functions can be effectively tested during the process without any connection or input from Torrential Downpour Receptor or ICAC COPS.

The government is not in agreement with allowing Loehrs Forensics to test or use Torrential Downpour Receptor. Hypothetically, however, if this Court broadened the scope of its order and allowed Loehrs Forensics to test Torrential Downpour Receptor, then there is *still no need* to connect to ICAC COPS database, or a simulated database. This is because the exact data that is sent by Torrential Downpour Receptor to ICAC COPS could be sent to a local log file. In other words, the exact data which is normally sent to the ICAC COPS database can be sent and stored in a local file which can be viewed locally as an Excel spreadsheet. The functionality of "pointing" the deposit of the data to a different location (the local log file) already exists within Torrential Downpour Receptor. Loehrs Forensics, therefore, gets the data they request regardless of whether it comes from a database or local

log file.  Again, the government is not in agreement with testing Torrential Downpour Receptor since this testing necessarily involves lawful .torrent files, something Torrential Downpour Receptor does not currently do, as discussed above (also see answer to Question 3 below).

> **QUESTION 3:  TO THE EXTENT (ICAC) COPS IS MATERIAL TO THE DEFENSE, WHY WOULD THE *ROVIARO* PRIVILEGE NOT GIVE WAY AS IT DID FOR TORRENTIAL DOWNPOUR?  WHY WOULD A PROTECTIVE ORDER NOT SUFFICE?**

**The ICAC COPS database is not material**

The ICAC COPS database is not material to the defense because ICAC COPS keeps information related to IP addresses that have requested, received, or shared *child exploitative* .torrent files, not any other kind of lawful or non-lawful .torrent files, and it is populated by Torrential Downpour Receptor, which searches only for child exploitative files.  Neither ICAC COPS, nor Torrential Downpour Receptor, are at issue in this case.

What has been ordered by this Court is examination of Torrential Downpour for the focused purpose of the defense testing the functionality of the Torrential Downpour software in response to the defense theory that law enforcement received child pornography files from Person B, even though they had connected to Person A.  The connection to ICAC COPS is not at issue.

Notably inconsistent with the defense theory are:  (1)  Defendant's computer had the same uTorrent version reported to Agent Daniels in this investigation; and (2)  the names of the .torrents of charged child pornography were on Defendant's computer in the uTorrent's AppData folder showing that the .torrent files had been parsed / processed by Defendant's uTorrent software. (See Exhibits 1 and 2).  Further, Defendant's argument that law enforcement supposedly could have detected him as having a relevant child pornography .torrent file, but actually received the contents of the .torrent (payload) from a different source (Person A / Person B argument), has nothing to do with the data on ICAC COPS.

//
//

10

**The *Roviaro* law enforcement privilege should not give way to allow Loehrs Forensics access to the ICAC COPS database**

The law enforcement privilege has been recognized in the absence of statutory authority and has been used to prevent disclosure of law enforcement techniques and procedures, to preserve the confidentiality of sources, to protect witness and law enforcement personnel, to safeguard the privacy of individuals involved in an investigation, and otherwise to prevent interference with an investigation.  *In re Department of Investigation of City of New York*, 856 F.2d 481 (2d Cir. 1988).  In *Roviaro v. United States*, 353 U.S. 53, 59 (1957) in the context of whether an informant's identity could be withheld, the Supreme Court stated that the purpose of the privilege is the furtherance and protection of the public interest in effective law enforcement.  Subsequently, in *United States v. Van Horn*, 789 F.2d 1492, 1507 (11th Cir. 1986), in a drug investigation, the Eleventh Circuit held there was a qualified government privilege not to disclose sensitive investigative techniques, which included the location of the monitoring equipment, citing *United States v. Green*, 670 F.2d 1148 (D.C. Cir. 1981) and *United States v. Harley*, 682 F.2d 1018, 1020-21 (D.C. Cir. 1982), both cases holding the precise location from where officer did surveillance was privileged.

In *United States v. Rigmaiden*, 844 F.Supp.2d 982, 990 (D. Arizona 2012), a case involving a defense request for the details of the technology used to locate an air card connected to a defendant's computer, this Court denied the defense request for the technology as protected by the law enforcement privilege.  In one observation, this Court noted that the defense wanted the information for a suppression hearing and was not going to be used by the government at a trial.  This Court quoted *United States v. Raddatz*, 447 U.S. 667, 679 (1980), in which the Supreme Court explained that the interests involved at a suppression hearing are of a lesser magnitude and that a court can rely on hearsay and other evidence that may not be admissible at a trial.  *Id.*  Importantly, in the current case, the government has no need to refer to the ICAC COPS database, nor to Torrential Downpour Receptor, at a trial.  Rather, the government will present facts about the Torrential Downpour software and how its parameters were set for IP addresses that geolocated in Arizona, port

information, the particular .torrent files involved, and the log files generated from the software that captured publicly transmitted information on the BitTorrent network.

To allow Loehrs Forensics access to ICAC COPS would be akin to dropping Loehrs Forensics experts, hired by defense attorneys in cases around the United States, into a room full of officers who are communicating about their ongoing investigations. Currently, the government estimates about 7,000 ICAC officers utilize ICAC COPS for their proactive investigations. In this room, Loehrs Forensics would be able to learn the protected law enforcement techniques and strategies for detecting offenders who are trading child exploitative materials. Loehrs Forensics would essentially be able to look over the shoulders of officers about their ongoing investigations, the locations of their search warrants, information about where and whether cases were localized to a specific area, offenders' identities and the extent of their criminal activities, and law enforcement officers' identities and locations.

More specifically, in the computer context, IP address information provides the "who" and "where" data for both offenders and law enforcement officers. The infohash information supplies the knowledge about what offender is trading what kind of child exploitative file. The database identifies offenders who are on more than one file-sharing network. The database holds the IP addresses of the officers, and thus identifies and associates them to the kind and breadth of investigation they are doing. If details on covert identities used by law enforcement officers in these file-sharing investigations were exposed to non-law enforcement entities, then it could enable offenders to evade law enforcement detection. Law enforcement, therefore, does not disclose details about upcoming search warrants, arrests, and case connections to any non-case person in order to protect the safety of the officers and to preserve integrity of investigation and law enforcement techniques. Loehrs Forensics should not be privy to this sensitive information either.

//

//

//

**A protective order is not adequate for testing lawful .torrents while connected to ICAC COPS, nor for Loehrs Forensics access to ICAC COPS**

A protective order, generally designed for use in one particular case but protecting against future disclosure, is not adequate for at least three reasons:  (1)  the ICAC COPS database will be "polluted" with lawful .torrent files, thus hindering hundreds of other investigations; (2) other law enforcement officers' investigations could be compromised or delayed, and their strategies and techniques revealed; and (3) there is no way to protect against Loehrs Forensics, a company hired by defense attorneys in criminal cases, from remembering what they have learned in ICAC COPS and using it in future cases.

First, it is normally hard to imagine that anything of a lawful nature is a detriment; however, in this context, Torrential Downpour Receptor searching for lawful .torrents to populate the ICAC COPS database for testing affects investigations around the world.  It causes issues of disclosures of information for numerous other prosecutors and officers in the future for the specific topic of how and why legal .torrents ever got added to the ICAC COPS database, a database that has only ever been a repository for those people trading child exploitative material and not any other kind of legal or illegal .torrent file. Other prosecutors, defense attorneys and judges, for current and future cases have to be told the circumstances of this testing, and Agent Daniels could be summoned to testify repeatedly in numerous cases to explain the circumstances of the testing.  Adding legal .torrents has unknown consequences in future cases where a defendant could assert defenses relating to why legal .torrents were located. Defense counsel could view legal .torrents, coupled with the evidence in their particular cases, as exculpatory. Putting it another way, it is one thing when a law enforcement officer or prosecutor does something to affect his/her own current case only, but is unprecedented and concerning to affect hundreds of others even inadvertently or unintentionally.

Second, it is burdensome to force hundreds of other law enforcement officers to accommodate legal .torrents into their investigations. Legal .torrents are non-leads. Officers will waste time excluding them from their investigations.  Also, law enforcement officers

1  with licensing to use Torrential Downpour trust that the environment they are in with their
2  *ongoing* sensitive case investigation is not also simultaneously accessed by a defense-hired
3  expert.  The government would need to alert the several thousands of officers to give them
4  notice a defense expert will be conducting testing, and give these officers time to prepare for
5  the exposure of their investigative data because at least some officers might choose to pull
6  investigations or not to conduct investigations on the testing days that Loehrs Forensics
7  schedules.

8  Third, Loehrs Forensics is a group of experts hired by defense counsel in child
9  pornography investigations.  A protective order of "no disclosure" is not adequate because
10 no order can also make an expert forget what s/he has learned of law enforcement strategies,
11 techniques, locations, work product, and their deliberative process.  Loehrs Forensics is an
12 expert that is hired by defense counsel in cases all over the United States, and her knowing
13 what other jurisdictions are doing is significant to her.  In *In re Worlds of Wonder Sec. Litig.*,
14 147 F.R.D. 214 (N. D.Cal. 1992), the plaintiff shareholders filed a motion to compel
15 discovery of the defendant company's accountant's internal auditing manuals which
16 purportedly showed in-house accounting practices with higher standards (*i.e.* trade secrets)
17 than the generally accepted accounting standards.  The defendants countered that a protective
18 order would be worthless, since giving their auditing manuals to the plaintiff's experts would
19 put them at a competitive disadvantage.  The court agreed stating, "[Defendant's accounting
20 firm] is correct when it says that it would be naïve to think that these witnesses will erase the
21 audit manuals from their minds at the close of this case."  Likewise, since Loehrs Forensics
22 are the experts, and Ms. Loehrs cannot possibly forget the data, nor can this Court order her
23 to forget, a protective order is simply inadequate.  She and her personnel are the ones who
24 are expected to be hired in future similar cases.
25 //
26 //
27 //
28 //

**QUESTION 2: HOW IS ACCESS TO (ICAC) COPS NOT NECESSARY TO CONDUCT TESTS ONE THROUGH SIX?**

Loehrs Forensics never needs to connect to ICAC COPS for any test ordered by this Court because ICAC COPS does not have any information relating to any IP address that is not related to child exploitative files and because connecting to ICAC COPS does not further the goal of testing the single source download argument they have made. Loehrs Forensics alleges Tests One Through Six requires ICAC COPS access, but any testing can be and would have to be accomplished by manually providing the information in the testing scenario to Torrential Downpour to do a direct connect to the Loehrs Forensics test computer. The manual input of a lawful .torrent file into the Torrential Downpour software used by Loehrs Forensics accomplishes two things: (1) Loehrs Forensics will be able to test the reliability of the log files generated by Torrential Downpour and if this is a single-source download because they will have their own computer(s) to run the testing; and; (2) it does not require any cloning or moving any part of the current ICAC COPS, nor any creation of a simulated database, nor any loading of lawful .torrent files onto the ICAC COPS database which would be abnormal to the current function of what ICAC COPS does, *i.e.* act as the repository for child exploitative related .torrent files.  The manual process of loading replaces the need to connect and get any information from ICAC COPS because the information a law enforcement official acquires from ICAC COPS is the IP address, the networking port and the .torrent. Those are all pieces of information within the knowledge of the testing personnel from Loehrs Forensics and the Federal Bureau of Investigation during testing.

Specifically, in the testing scenario, Loehrs Forensics will provide information about the lawful .torrent(s) and the government and defense will know the IP address and networking port of Loehrs Forensics test computers; thus, to have that information provided by an online database is not needed. With manual loading of a lawful .torrent file(s) into the Torrential Downpour software, Loehrs Forensics will test Torrential Downpour, have access to the internet, and test the specifics of their single-source download argument. There is no need for Loehrs Forensics to be on ICAC COPS, nor to have a unique ICAC COPS login,

nor to have any access to the sensitive information about other law enforcement investigators' cases in any other jurisdiction.

### QUESTION 1: WHY ARE TESTS ONE AND TWO—NON-PARSED TORRENTS AND PARTIALLY-PARSED TORRENTS—NOT MATERIAL TO THE DEFENSE?

**Test One**

The government objects to Test One (non-parsed torrents[4]) as immaterial because the forensic data in Defendant's case is inconsistent with the charged files coming from non-parsed .torrents. Test One is beyond the scope of this Court's order.

Test One (non-parsed torrents) wants to test whether simply downloading a .torrent file (*i.e.* the instructions / the recipe) which is placed in the default Downloads folder, but not executed by loading it into the client software, will cause Torrential Downpour to "hit" on it in the Downloads folder. The presumed result Loehrs Forensics is testing is that there should be no results because Torrential Downpour software should not even know the .torrent is present in the Downloads folder. But, this testing is beyond the scope of this Court's order because this is not what happened in the current case, verified by the forensic data *on Defendant's computer* in Exhibits 1 and 2.[5]

Exhibit 1 is a printout of the forensic report detailing the location of the 10 .torrent files relevant in this case. They are the .torrent files from which the files listed in Counts 1-8 came. Exhibit 1 shows that the .torrent files had been processed / parsed into the uTorrent software and then placed into the "App Data" folder by the software after being processed / parsed. This is not a typical user activity; in fact, a user likely does not even know this file exists. The "App Data" folder keeps the .torrent file because it has the instructions it needs

---

[4] To "parse" means to analyze, but in computer language, "parsing" means to read computer code. In the context of .torrent files, "parsing" means to read and interpret the computer code that comprises the components of the .torrent file, such as how many files it references, the names of each file, the hash of each piece, and so on.

[5] Exhibit 1 corresponds to Exhibit 9 admitted at the Motion to Compel Hearing, 1/31/19. Exhibit 2 corresponds to Exhibit 10 admitted at the Motion to Compel Hearing, 1/31/19.

to download the .torrent, verify the hash of each piece, and so forth.

Exhibit 2 is a full listing of all 114 .torrent files that *had* been processed / parsed into Defendant's uTorrent software and found in the Defendant's computer's "AppData" folder. In other words, this list would not have been created on Defendant's computer without Defendant actually having put these 114 .torrent names into his software for processing / parsing. The 10 .torrent files relevant in the current case are part of the 114 total.

Test One, testing "non-parsed" torrents, therefore, is simply not applicable in this case and Loehrs Forensics testing proposed by Test One is speculation, a fishing expedition to see if Torrential Downpour overstepped the boundaries, and not material to the current case.

**Test Two**

Initially, as to Test Two (phrased as "partially-parsed torrents" by Loehrs Forensics, Testing Protocols, p. 10) the government wants to be clear that what Loehrs Forensics really means is "fully parsed, but just not fully downloaded."[6] And, if this is what they mean, and *as long as there is no connection to the ICAC COPS database*, then the government agrees that Test Two can readily be run in conjunction with Test Seven (vii) to which the government has already agreed. This is because the government envisions that that Loehrs Forensics' testing would include some variation of starting a download of a .torrent, and stopping it part-way through (mimicking the internet possibilities of an interruption that can occur with connection being lost or that the BitTorrent program had been shut down), to test the notion of what was downloaded after the connection was interrupted or the BitTorrent program is restarted.

Thus, summarily, for Tests One and Two Loehrs Forensics states it needs access to

---

[6] The phrasing "partially parsed" is not accurate. The code in the .torrent file was either executed or not, which is different than whether the contents from the .torrent file were fully *downloaded* or not. The Torrential Downpour software, or the uTorrent software, once loaded with a .torrent file, executes it. An analogy might be a switch to a light bulb—it is on or off, not partially on. Likewise, a .torrent file loaded into the software is understood as a command by the user to go retrieve the payload of the .torrent file.

ICAC COPS[7] to which the government vehemently objects.  Access to ICAC COPS is not material, nor relevant, to testing whether Torrential Downpour software functions with a direct connect and single source download as the government contends it does and the defense has been authorized to test.  Further, Torrential Downpour also has no search function.  But, even if this Court expands its order allowing testing of Torrential Downpour Receptor, then the results of the Torrential Downpour Receptor search can be satisfactorily shown through Loehrs Forensics looking at the data from Torrential Downpour Receptor through a local file or spreadsheet.   This manual loading process also eliminates the anticipated high costs associated with creating a simulated database.

The government is not, however, in agreement with testing Torrential Downpour Receptor, since it is not at issue in this case, and for all the reasons discussed above.

**Conclusion**

The government has profound and legitimate interests in keeping the contents and functionality of the ICAC COPS database as law enforcement privileged.  See *United States v. Van Horn*, 789 F.2d 1492, 1508 (11th Cir. 1986).

All currently ordered testing can be accomplished without Loehrs Forensics accessing Torrential Downpour Receptor or ICAC COPS.  The government agrees with Test Two (with the explanation above), and Tests Seven, Eight, and Nine.

Respectfully submitted this 24th day of June, 2019.

MICHAEL BAILEY
United States Attorney
District of Arizona

*s/Gayle Helart / Brett A. Day*_____
GAYLE L. HELART
BRETT A. DAY
Assistant U.S. Attorneys

---

[7] See specifically, in the Loehrs Forensics Testing Protocols, related to each of Tests One and Two (p. 10), the last step in each proposed test reads: "Search the ICAC COPS database for any investigative hits on the Suspect IP Addresses and determine if Torrential Downpour attempts to connect with the Suspect IP to download data."

CERTIFICATE OF SERVICE

I hereby certify that on the 24th day of June, 2019, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing a copy to the following CM/ECF registrant: Barbara Hull.

*s/ Denise Trimble*
Denise Trimble
U.S. Attorney's Office