1                    **UNITED STATES DISTRICT COURT**

2                    **FOR THE DISTRICT OF ARIZONA**

3                    _____

4    **United States of America,**          )
                                             )
5                           Plaintiff,       )  **CR 17-01311-PHX-DGC (BSB)**
                                             )
6              vs.                           )  Phoenix, Arizona
                                             )  **August 16, 2019**
7    **Anthony Espinosa Gonzales,**          )
                                             )
8                           Defendant.       )
     _____)

9

10            **BEFORE:   THE HONORABLE DAVID G. CAMPBELL, JUDGE**

11              **REPORTER'S TRANSCRIPT OF PROCEEDINGS**

12                    **EVIDENTIARY HEARING**

13

14   For the Government:
               U.S. Attorney's Office
15             By:  **GAYLE L. HELART**, ESQ.
               By:  **BRETT A. DAY**, ESQ.
16             40 North Central Ave., Ste. 1200
               Phoenix, AZ  85004
17
     For the Defendant:
18             Law Office of Barbara Hull
               By:  **BARBARA L. HULL**, ESQ.
19             2601 N. 16th St.
               Phoenix, AZ  85006
20

21   Official Court Reporter:
     Patricia Lyons, RMR, CRR
22   Sandra Day O'Connor U.S. Courthouse, Ste. 312
     401 West Washington Street, SPC 41
23   Phoenix, Arizona  85003-2150
     (602) 322-7257
24
     Proceedings Reported by Stenographic Court Reporter
25   Transcript Prepared with Computer-Aided Transcription

**P R O C E E D I N G S**

THE COURTROOM DEPUTY:  This is case number CR17-1311,
United States of America versus Anthony Espinosa Gonzales, on
for evidentiary hearing.

MS. HELART:  Good afternoon, Your Honor.
Gayle Helart and Brett Day appearing for the government.  Also
at counsel table today is Robert Erdely.  And in the courtroom
is Jimmie Daniels.  And both Mr. Erdely and Mr. Daniels are on
the government's witness list.

THE COURT:  All right.  Good afternoon.

MS. HULL:  Good afternoon, Your Honor.  Barbara Hull
on behalf of Mr. Gonzales, who is present and out of custody.
Also at the defense table is Ms. Tami Loehrs, who is also
listed on our list of witnesses.

THE COURT:  All right.  Good afternoon.

Go ahead and have a seat.

Let me ask you all a few questions.

I've read the materials you have provided.  And to
try to focus my thinking for purposes of what we're going to
try to cover today, I want to ask a few questions.

Where to start.

Let's start with a couple of questions about proposed
tests 1 and 2.

Question to the government:  If Torrential Downpour

13:02:03  1   Receptor is scanning the internet looking for torrents that

2   contain child pornography and it comes across an IP address

3   where the torrent has been downloaded but the images have not,

4   so the torrent text file is on that computer but no command

13:02:29  5   has been sent out to go get the images, will Torrential

6   Downpour identify that IP address as a suspicious location and

7   put it in the COPS database?

8        MS. HELART:  This answer is yes.  All BitTorrent

9   clients, though, to be more accurate, not just Torrential

13:02:52  10  Downpour Receptor, but all BitTorrent clients will do that.

11       THE COURT:  So it will identify it even though it

12  hasn't been downloaded?

13       MS. HELART:  So the BitTorrent network is matching IP

14  addresses who have the same .torrent file.  What in this

13:03:17  15  example that the Court said, Torrential Downpour doesn't know

16  yet, until it goes knocking on the door of the suspect

17  computer, is whether the payload is there.  It knows the text

18  torrent file is there.  It just doesn't know whether the

19  payload is there.

13:03:34  20       THE COURT:  And that's enough to get it into the COPS

21  database; right?

22       MS. HELART:  That information, that that IP address

23  is associated with that text torrent file, that will be

24  reported as a tip or lead to the ICAC COPS database.

13:03:51  25       THE COURT:  All right.  And if the only thing that's

13:03:54  1    happened at that IP address is that the torrent file and not

2    the payload, as you call it, has been downloaded and

3    Agent Daniels sees it in the COPS database and tells

4    Torrential Downpour to go retrieve child pornography if it

13:04:08  5    can.  If it goes to that IP address, I assume it can't

6    download any child pornography because the IP doesn't have it.

7    It only has the torrent.

8         MS. HELART:  Correct.

9         THE COURT:  What if -- let's say it goes to that IP

13:04:24 10    address and that IP address -- let's say hypothetically

11    there's ten pieces of a file that it wants and it goes to that

12    IP address and says give me these ten pieces, and the IP

13    address only has three of the ten.  Will Torrential Downpour

14    download the three and then stop or will it say I'm not going

13:04:44 15    to download because you don't have all ten?

16         MS. HELART:  So Torrential Downpour will act like all

17    client softwares.  It will go to the suspect computer, if you

18    will, knock on the door, that's an analogy we're going to use

19    today, and it will ask for those pieces.  In your case, in

13:05:07 20    your example, three.

21         THE COURT:  Let's say it asks for ten but all the IP

22    address is three of the ten.

23         MS. HELART:  Then it only gets three.

24         THE COURT:  But does it get the three?

13:05:19 25         MS. HELART:  If the sharing client has it -- excuse

13:05:24  1    me.

2              If the sharing client has the three pieces and it's

3    been requested, yes, it will give those three.

4              THE COURT:  And since Torrential Downpour, as you

13:05:43  5    have asserted, is a single-source program, it won't go looking

6    for the other seven anywhere else; is that right?

7              MS. HELART:  That's correct.  Torrential Downpour has

8    only connected, by design, to one IP address and it only gets

9    the payload that that suspect computer has.

13:06:01  10   THE COURT:  So when Agent Daniels comes in the next

11   morning and looks and all that was obtained from the IP

12   address were three of the ten pieces, I'm assuming he doesn't

13   have child pornography on his computer.

14             MS. HELART:  That is not a correct assumption because

13:06:15  15   pieces do not equal files.  In a torrent file, it is chunked

16   out for purposes of the computer efficiency and the network

17   efficiency to be chunked into pieces.  However, one piece

18   that's completed might contain 15 completed child pornography

19   files.

13:06:41  20             It also is the case that what you just said is

21   exactly correct, that Agent Daniels goes, gets three out of

22   ten pieces, maybe this is a torrent file that is made up of

23   one video file.  In that case, those three pieces do not

24   equate to a download of a complete video file and presumably

13:07:05  25   Jimmie Daniels would not have the complete file.

13:07:08  1          THE COURT:  Would he be able to see anything?

2          MS. HELART:  Sure.  It depends on -- I'm not trying

3    to testify.  I have seen some examples where Agent Daniels has

4    done incomplete downloads.  Sometimes you can see a few

13:07:22  5    seconds.  Sometimes you can even see a few seconds of illegal

6    conduct.  But our practice has been not to charge incomplete

7    downloads.

8          So if a piece, like in your example is three out of

9    ten, still image files could be part of those.  They could be

13:07:42 10    complete, and Agent Daniels would then view them and proceed

11    with whatever he's going to do in the investigation.

12          THE COURT:  All right.  Thank you.

13          Ms. Hull, if it is true, as the government appears

14    just to have acknowledged, that Torrential Downpour Receptor

13:08:02 15    will go identify an IP address that has the torrent but

16    nothing else, they agree with that, why do you need to do test

17    1?  Isn't that what you want to establish?

18          MS. HULL:  Thank you, Judge.  I'm consulting with

19    Ms. Loehrs.  This is the first time the government's ever

13:08:41 20    acknowledged this.  So -- and that was our purpose -- that was

21    the point of test 1, was to determine that.

22          THE COURT:  All right.  Let me ask you about test 2.

23          If the government acknowledges that it will identify

24    an IP address by what you call a partially parsed torrent and

13:09:05 25    put it in the COPS database for Agent Daniels to go knocking,

13:09:11   1   why do you need test 2?

2         MS. HULL:  I'm sorry, can you repeat the question,

3   sir.

4         THE COURT:  Yeah.  If the government has acknowledged

13:09:18   5   that Torrential Downpour Receptor will identify an IP address

6   as a suspicious IP address if it has a partially parsed

7   torrent and put it in COPS database to then be further

8   investigated, why do you need test 2?

9         MS. HULL:  Sorry, Your Honor.  One moment.

13:10:01  10         THE COURT:  You're good.  That's all right.

11         MS. HULL:  The answer as I understand it, Judge, is

12   because what we don't know is that if a partially parsed

13   torrent, if he has certain pieces but he doesn't have the

14   pieces that contain child pornography, is he still identified

13:10:41  15   as a suspect.

16         THE COURT:  Why does that matter?  Let's assume

17   hypothetically that --

18         Hold on, Ms. Loehrs, just a minute.

19         Is it Loehrs or Loehrs, by the way?

13:10:53  20         MS. HULL:  Loehrs.

21         THE COURT:  Loehrs.

22         MS. LOEHRS:  Loehrs.

23         THE COURT:  I'm probably going to get it wrong, but

24   okay, thanks.

13:10:59  25         If potential suspects are identified by Torrential

13:11:05   1   Downpour Receptor because they have something related to child

           2   pornography in them, including, let's say, a torrent that's

           3   partially parsed that has no child pornography in it, and they

           4   put it in the COPS database, why does that matter?

13:11:23   5        All they're saying is this is a place you ought to go

           6   look to see if there's child pornography.  If it's offering

           7   child pornography.  That's all it's doing, is putting it on a

           8   suspect list.  How does that help the defense?  Because

           9   there's no charge brought until, as I understand it,

13:11:40  10   Torrential Downpour goes to that address and actually gets

          11   child pornography.

          12        I'm just not seeing the significance of putting it on

          13   a suspicious IP list if the charge isn't brought about until

          14   it actually gets child pornography from that source.

13:11:59  15        MS. HULL:  Well, and I -- Judge, I -- that gives me

          16   concern that -- that torrents that contain -- are perfectly

          17   legal torrents are being brought in by Receptor and identified

          18   and create a suspect when they have done nothing illegal.

          19        THE COURT:  What's wrong with that?  Here's my

13:12:21  20   hypothetical --

          21        MS. LOEHRS:  Can I --

          22        THE COURT:  Hold on, Ms. Loehrs.

          23        Here's my hypothetical that I've been wrestling with

          24   as I read this.  Let's say a police officer says, you know, I

13:12:29  25   think that 11:00 p.m. on Van Buren Street is the time when

13:12:34  1   most drug transactions occur, so I'm going to walk down that

2   street as an undercover person every night at 11:00 and I'm

3   going to walk slowly by anybody who looks like a drug dealer

4   and I'm going to see if they offer me something.  And if they

13:12:48  5   do, I'm going to buy drugs and I'm going to arrest them.

6       What he's doing is he's saying here is a place where

7   there are suspects.  I want to investigate.  And I'm going to

8   do it by just walking by and see if they offer me drugs.

9       How is that any different from law enforcement saying

13:13:07 10  here are IP addresses, for whatever reason?

11      Let's say, they've loaded adult pornography or let's

12  say their users are on between 2:00 and 3:00 in the morning.

13  We're going to put them in this database and we're going to

14  send Torrential Downpour to walk by them and see if any of

13:13:23 15  them are offering child pornography.  And if it is, they're

16  going to buy the child pornography and they'll charge them.

17      I'm having trouble seeing how, even if it's a

18  completely innocent reason that they could get put into a

19  suspect -- or get -- they're on Van Buren at 11 o'clock at

13:13:41 20  night, what's the problem if nothing happens until they offer

21  drugs or, in this case, offer child pornography to the law

22  enforcement officer?

23      MS. HULL:  Well, one problem, respectfully, that I

24  have with your analogy is there's an expectation of privacy on

13:13:54 25  a computer.  So --

13:13:57 1        THE COURT:  On a peer-to-peer program that's offering

2    these things out in the internet, there's an expectation of

3    privacy?

4        MS. HULL:  We don't know that that's what happening.

13:14:08 5    That's the part of problem.

6        THE COURT:  That's a different issue.  The different

7    issue is whether it's going into other spaces on the computer,

8    and we'll talk about that in a minute.

9        But in a peer-to-peer network, as I understand it, my

13:14:17 10   computer is saying to the world "I've got it, come and get

11   it," just like somebody on Van Buren is saying "meth for

12   sale."

13        That's what I'm wrestling with.

14        MS. HULL:  If I may, Judge, I attached -- I attached

13:14:31 15   in my pleading, I attached excerpts from the testimony of

16   Mr. Goodyear, who, my understanding, works with Mr. Erdely.

17   And according to him, it actually checks -- it -- in his words

18   it's that people show an interest in.  Just show an interest

19   in.  And it sounded, from his testimony at least, it was

13:15:00 20   almost as if it was a search.  That someone is not necessarily

21   handing -- holding things out to share, but they're just

22   looking for something.

23        Because my understanding is these peer-to-peer,

24   somebody's going out looking for something.  They can do that,

13:15:18 25   but -- and Torrential Receptor is identifying those people.

13:15:24  1              THE COURT:  I'm having real trouble seeing what's

2       wrong with that, Ms. Hull.  How is that any different from

3       saying I'm going to walk by people at 11 o'clock on Van Buren

4       because there may be people selling drugs there?

13:15:36  5              If somebody's showing interest in child pornography,

6       what's wrong with saying I'm going to knock on their door and

7       see if they open it and offer me child pornography?  All I'm

8       doing is identifying suspects.  It's not a search.  It doesn't

9       require a search warrant.

13:15:59 10              And I'm inviting you to show where I'm wrong.  I'm

11      not trying to talk you out of this, but I'm just having

12      trouble with the notion that there is some material defense

13      argument by virtue of the fact that Torrential Downpour

14      Receptor compiles what I'm calling the suspect list on the

13:16:16 15      basis of legal behavior.

16              MS. HULL:  Well, again, it would be -- what if their

17      conduct, if the suspect computer's conduct was inadvertent,

18      that they didn't intend to do this?  I mean, is Receptor

19      identifying people based on some inadvertence?  We don't know.

13:16:41 20              If they are necessarily offering things for sharing

21      or they're looking for things to share, it doesn't account for

22      the fact that, you know, somebody's doing -- something is

23      entered on the computer inadvertently and it turns them into a

24      suspect, because I -- again, in your -- in your analogy, it

13:17:00 25      would be closer, at least, to your analogy of them going up

13:17:04  1    and knocking on a door.  Okay.  Because you have -- why are

2    you knocking on the door?  What is your reason to knock on the

3    door?

4              There's an expectation of privacy inside that door.

13:17:20  5    Officers cannot just walk up to your door, knock on it and see

6    if you open the door to offer child pornography.  That, they

7    can't do.  And that's what the Receptor is doing.

8              THE COURT:  I think --

9              MS. HULL:  My understanding --

13:17:33 10              THE COURT:  I think you're --

11              MS. HULL:  I'm sorry.

12              THE COURT:  I think you're arguing, Ms. Hull, that

13    scanning the internet looking for suspicious conduct is a

14    Fourth Amendment search.  Isn't that what you're arguing?

13:17:48 15              MS. HULL:  No.  I'm saying that if -- because the

16    problem that I have is, again, if someone is on that network

17    and they're either offering things to share or searching for

18    something, then perhaps I see -- I see your question, but,

19    again, what if it's -- what if it is detecting innocuous,

13:18:14 20    inadvertent, or other conduct?  We don't -- that, we don't

21    know.

22              THE COURT:  Well, let's assume somebody, through some

23    entirely inadvertent means, does something with their computer

24    that causes Torrential Downpour Receptor to put them on the

13:18:33 25    suspect list.  They're now in the IOC -- I'm forgetting the

13:18:37  1    name of it.  I have another case with IO in it.  They're in

2    the database.

3            Agent Daniels tells his Torrential Downpour to go

4    contact that IP address and see if they're offering child

13:18:49  5    pornography.  It does.  They're not offering child

6    pornography.  They got on the suspect list through some other

7    inadvertent means.  There's no charge.  There's no search of

8    that computer ever done.  All it's doing is saying are you

9    offering publicly child pornography and the computer says no.

13:19:05 10            Now, if the computer says yes because inadvertently

11    it got onto the computer, that's a different issue of intent

12    and knowledge and things like that.  But I'm having trouble

13    with the notion that there is some defect in the government's

14    case because somebody got onto a suspect list through legal

13:19:26 15    innocent behavior.

16            MS. HULL:  May I have a moment?

17            THE COURT:  Yeah.

18            MS. HULL:  Thank you, Judge.  Again, I -- because --

19    my position is regardless -- with my limited understanding of

13:20:33 20    the technology, okay, but with consulting with Ms. Loehrs, my

21    understanding is that the way this Receptor works -- and part

22    of the problem, Judge, is we're taking their word for how it

23    works.  So as we stand here today, you're taking their word

24    for how that works.  I can't -- I can't do that and I don't

13:20:56 25    want to do that for Mr. Gonzales because I don't know that it

13:21:00   1   works that way.  And that's part of the reason for that

2   testing.

3            I don't know -- I don't know if I can make a Fourth

4   Amendment -- I may be able to make a Fourth Amendment

13:21:10   5   argument.  I don't know that yet.  I mean, we're not at --

6            THE COURT:  I understand that point.  I understand

7   you don't have to take their word for it.  But what you do

8   have to do is make a showing of materiality under Rule 16 to

9   get the discovery.  And that's what I'm trying to figure out,

13:21:28  10   which of these tests have made a showing of materiality that

11   will allow you to get the information you want.  And that's

12   what I'm trying to focus on with tests 1 and 2, why are these

13   issues material.

14            MS. HULL:  Again, Judge, I believe that it is -- it

13:21:49  15   is -- it's a due process question, it is a materiality that we

16   determine how they get that information.  Because, for

17   example, if I download only part of the torrent and I only

18   download a legal part of it, I don't -- I don't obtain the

19   whole torrent and I download the legal portion, but the

13:22:18  20   torrent, according to Receptor, is suspect, so they go back

21   and they identify me.

22            THE COURT:  Right.

23            MS. HULL:  Okay.  That in and of itself, how it does

24   it, where it finds it, I don't know that the problems with the

13:22:39  25   software begins later.  And that's part of our problem.

13:22:43   1   Because we don't know that that's actually how it works.  It

2   just seems to me that they're already knocking on the door

3   when they do that.  And if I'm not doing anything wrong, then

4   why are they going back, back to their database and then

13:23:00   5   sending someone out to hook up with my computer?  Why my

6   computer?  Why my IP address?

7          THE COURT:  Let's assume, instead of having the COPS

8   database and Torrential Downpour Receptor, they just set up

9   Torrential Downpour to scan IP addresses just by number.  Just

13:23:21  10   zip through a thousand IP addresses a night, seeing if any are

11   offering child pornography.  And when they come upon one that

12   does, if they can download it, they can charge it.  Is there

13   something wrong with that?

14          MS. HULL:  They have to establish they're actually

13:23:39  15   scanning for people offering.  We don't know that that's what

16   they're scanning for.

17          THE COURT:  Well, but is there anything wrong with

18   them saying we are going to look at these thousand IP

19   addresses and see if any of them have BitTorrent and are

13:23:52  20   offering a torrent with a particular identifier that we know

21   is child pornography?  Is there something wrong with saying

22   we're going to look at these thousand addresses and do it?

23          I mean, if not, then how's -- I'm just having real

24   trouble with this notion that there's something defective in

13:24:11  25   their case by virtue of the fact they're looking for it when

13:24:14  1    it's offered openly by the computers that have it on it.

2             MS. HULL:  I think it's material to the defense

3    because if I were the defendant, why is it and how is it that

4    my IP address got into a government database of child porn.

13:24:32  5            THE COURT:  Who cares if the reality is he can't be

6    charged until they actually get child pornography from that

7    location.

8             MS. HULL:  Because I see it as a first step of their

9    investigation, Judge.  And if -- if all they're doing, if

13:24:45  10   Receptor is doing what they say it does and just running 24/7

11   and just seeing who is offering stuff up, how do we know --

12   number one, how do we know it's offered up?  Number two, it

13   takes you into the database.  Number three, they send out

14   Torrential Downpour to go to your computer.

13:25:08  15            I think it's a materiality issue to find out how you

16   get on that database in the first place.

17            THE COURT:  Okay.

18            MS. HULL:  Because I think that it -- it's material

19   for me to know.  If I am a suspect computer, I want to know

13:25:22  20   and I think I should be able to argue that that was flawed.

21   That there -- that -- you're assuming, of course, that the

22   next step is that Torrential Downpour actually finds this

23   information on my computer.  In shared space.  You're making

24   that assumption --

13:25:45  25            THE COURT:  Right.  Right.

17

13:25:46  1          MS. HULL:  -- with your --

2          THE COURT:  I am.  But that's a different test.

3   That's not 1 and 2.  We're going to talk about the other tests

4   in a minute.

13:25:53  5          MS. HULL:  I understand that.  But it's starting the

6   investigative process.  That's my argument.

7          THE COURT:  Okay.  I understand the argument.  Let

8   me -- that helps.  I think we've agreed test 1 is not

9   necessary in light of the government's agreement that you can

13:26:07 10   get on the suspect list just by having the non-parsed torrent.

11          MS. HULL:  We will.

12          THE COURT:  Okay.  So we've taken care of test 1.

13          I understand what you're arguing on test 2.

14          Let's talk for a minute about tests 3 and 4.

13:26:24 15          Question for the government, Ms. Helart.

16          MS. HELART:  Yes.  Can I have just a second?

17          THE COURT:  Yes, you can.

18          MS. HELART:  What we're discussing, Your Honor, is

19   just a hugely, like -- we just want to be very accurate about

13:27:18 20   parsed, this word parsed.  Parsed means processed -- well,

21   does the Court have the very last statement it made about

22   parsed?

23          THE COURT:  Well, what I'm using is the defense's

24   meaning of parsed.  As I understand what the defense is

13:27:41 25   arguing, what Ms. Loehrs has said, a torrent is parsed when

13:27:46  1   you activate it to go get the pieces of the pornography.

2          MS. HELART:  That's correct.

3          THE COURT:  That's the way I'm understanding.

4          MS. HELART:  That's correct.  Because just having

13:27:57  5   downloaded the text file does not necessarily mean it was ever

6   loaded into the client software and parsed or processed.  We

7   just wanted to be sure.

8          THE COURT:  But the text file is on your computer.

9          MS. HELART:  So if it's not parsed it would not show

13:28:10  10  up because it was never put into the uTorrent software.

11         THE COURT:  Well, isn't it on your computer?  The

12  text file?

13         MS. HELART:  The text file could be on.  But to be

14  parsed, it would have been loaded into the software and the

13:28:28  15  execute or submit button --

16         THE COURT:  If it's on your computer but it hasn't

17  been parsed, hasn't been executed, will Torrential Downpour

18  Receptor identify your IP address?

19         MS. HELART:  No.

13:28:44  20         THE COURT:  You said yes a minute ago to that

21  question.

22         MS. HELART:  Then I understood -- then I understood

23  that question to be that it had been put into the software and

24  parsed, but no payload.  We were in the discussion of whether

13:28:54  25  the payload was on the computer.  If the payload's not on the

13:28:58  1    computer but the text file is, but if it's never been parsed,

2    that was a different discussion just now with Ms. Hull.

3            Yours and my discussion, as I understood, had to do

4    with just the text file was on the computer, but the payload

13:29:14  5    was not.  But it didn't assume either way that the person had

6    put it into their software for processing.  I like the word

7    processing better, it just helps me.  But for execution, if

8    you will.

9            THE COURT:  And is that because if it's not in the

13:29:35 10    client software, Torrential Downpour Receptor won't see it?

11            MS. HELART:  Okay.  That's correct.  The Torrential

12    Downpour Receptor would not have detected a non-processed,

13    non-parsed torrent.

14            THE COURT:  Here's my problem.  Isn't it the client

13:29:57 15    that finds the torrent on the internet?

16            MS. HELART:  A client goes to a -- typically goes to

17    a website, finds some torrent that they might want to go get.

18    That's just a Google search.  They could download that torrent

19    onto their computer.  That doesn't mean necessarily they've

13:30:17 20    loaded it into their client software.

21            THE COURT:  What do they download it to if it's not

22    to their client software?

23            MS. HELART:  They can download it to anywhere on

24    their computer.  It's just a text file.

13:30:31 25            THE COURT:  I thought it was the client that went

13:30:32  1    looking for it.

2              MS. HELART:  Maybe we're -- if I'm just a uTorrent

3    user and I've downloaded the uTorrent software on my

4    computer and now I'm ready to go out and find something, I go

13:30:48  5    to -- I could do just a Google search and find a couple of

6    websites that host torrent names.  Of all kinds of subjects.

7    And I think to myself I'll download some Bruce Springsteen

8    concert in the park.  And so I get that torrent and I download

9    that torrent onto my computer.  It's just a word file.  It's

13:31:12  10   just a text file.  But I think right now I don't have time.

11   I'm not going to put that into my software to go get it, I

12   just have it on my computer.  Torrential Downpour Receptor,

13   it's not looking for Bruce Springsteen, but it would not

14   detect me just putting it somewhere on my computer.

13:31:31  15             However, once I've put it into my uTorrent

16   software, I can put it in there and hit submit or execute or

17   whatever the button is for that particular client software and

18   really just pretty instantaneously it gets processed.

19             So I want to be clear about the words.  I may in two

13:31:50  20   minutes say, gosh, I just don't have time to do this, and I

21   interrupt the connection.  So it's not fully downloaded.  But

22   now Torrential Downpour Receptor, if it were looking for Bruce

23   Springsteen, would notice that my IP address has now

24   associated with the Bruce Springsteen concert torrent file.

13:32:11  25   It wouldn't have noticed it had it just been somewhere in one

21

13:32:14  1    of my folders.

2            But yours and my discussion at the beginning was just

3    about if I had the Bruce Springsteen torrent but I didn't have

4    the payload, it wouldn't download.

13:32:27  5            THE COURT:  Well, it's still true -- and I want

6    Ms. Loehrs to hear this to see if they're in agreement.  It's

7    still true, I think, that if that torrent file gets from my

8    Google search results folder into my BitTorrent program, but

9    nothing gets executed, I don't get any files, Torrential

13:32:46 10    Downpour would see it and identify me as a suspect.

11            MS. HELART:  If loaded into the software and

12    executed, yes.  Yes, it would see it.  It takes -- it's pretty

13    instantaneous that it takes to process it.  It just may not

14    fully download the payload.

13:33:11 15            THE COURT:  Can I get it into -- can I get it into

16    the BitTorrent client on my computer and not do any

17    downloading?  So it's in there, but zero downloading's been

18    asked for yet.

19            MS. HELART:  Let me ask if there's a place to store

13:33:23 20    just the file.

21            THE COURT:  If you want to answer, Mr. Erdely, we can

22    do that if it's easier.

23            MR. ERDELY:  Thank you, Your Honor.

24            So the only time Torrential Downpour Receptor, the

13:33:33 25    search tool, will ever see any client and put it in the

13:33:37  1   suspect list, as we've been calling it, is if you downloaded

2   the file.  You have to find the instructions from other

3   locations like websites and such.  You can download a file,

4   for instance a music file, and put it on your desktop but not

13:33:51  5   play it through your music player.

6          So what we're saying is you can download the

7   instructions files from a website and put it anywhere on your

8   computer, but until you hit file open and consume or ingest

9   that torrent into your BitTorrent software, our search tool

13:34:09  10  wouldn't find it, nor would any BitTorrent client.

11         But the moment you put the torrent file into the

12  BitTorrent software, it processes a torrent and it's figuring

13  out the instructions, how do I get these files that this

14  torrent acts as instructions for.  At that moment in time when

13:34:25  15  it reaches out to the BitTorrent network to find places to

16  download the payload, it's at that moment in time that anyone

17  in the world can see that association between the IP and the

18  torrent.  But it takes communication from the BitTorrent

19  software to the network, and that association just says to

13:34:44  20  anyone else that might be interested in that same data, here

21  is a place you could go and potentially get it.

22         You don't know how much the person has, our software

23  or any other BitTorrent client, until you connect to them,

24  which is what Agent Daniels did with Torrential Downpour.

13:35:04  25         But the association happens after you load the

13:35:06   1   torrent into the program.  Much like you double click a Word

          2   document, it opens up in Word or you hit file open and get to

          3   a Word document, it opens.  Same thing with BitTorrent.  I

          4   have a file on a computer.  Nothing's happened yet.  Until I

13:35:18   5   double click and it loads into my BitTorrent program, or

          6   another way with a file open and you open your torrent.  It's

          7   at that point that the communication happens and it starts

          8   talking to the BitTorrent network.  So any client in the world

          9   could see the association.  And that's all any client knows.

13:35:36  10   They don't know about how much they have until you actually

         11   connect to the client.

         12           THE COURT:  So if -- is there a way for me to double

         13   click open, get it into the BitTorrent program, but not start

         14   the downloading process?

13:35:55  15           MR. ERDELY:  I very much doubt it because as she had

         16   just said, it's instantaneous.  I'd have to be a really quick

         17   clicker.  Because the moment you double click it and it's in

         18   your BitTorrent software, it's milliseconds and it's already

         19   communicating with the BitTorrent network inquiring how can I

13:36:16  20   download this.  So you'd have to load it and stop it right

         21   away.

         22           THE COURT:  But I can do that, I can load it and stop

         23   it?

         24           MR. ERDELY:  If you were fast enough.  It would be an

13:36:24  25   incredibly difficult task.

13:36:27  1         THE COURT:  But I can stop it before the full

       2  download occurs.

       3         MR. ERDELY:  Before the full download occurs, yes.

       4  But before the file sharing network realizes the association,

13:36:36  5  I doubt very much anyone could click that fast.

       6         THE COURT:  Okay.

       7         Ms. Loehrs, do you disagree with what he just said?

       8         MS. LOEHRS:  I do.

       9         THE COURT:  What do you disagree with?

13:36:45 10         MS. LOEHRS:  So speaking specifically to

      11  Mr. Gonzales's computer.  He had torrent files, the text files

      12  with instructions within his torrent software.  We have no

      13  evidence that those torrents were ever parsed, that any files

      14  were ever downloaded that are associated with those torrents.

13:37:04 15  Which is what this test is based on.

      16         We have tested BitTorrent software.  You can

      17  absolutely have a torrent that is reporting information -- we

      18  had this happen at our own office during a test.  You can have

      19  a torrent that is reporting information and have never

13:37:21 20  downloaded the files, never clicked to open it, never

      21  physically processed it yourself.

      22         They are correct, you can go to a website and

      23  download a torrent file and put it anywhere on your computer,

      24  but that's not what we're talking about in Mr. Gonzales's

13:37:36 25  case.  In his case he had torrent software.  He used the

13:37:40  1  torrent software to obtain the torrents.  Some of them were

2  parsed and some of them were not.

3         THE COURT:  Well, I think what you're saying is

4  you're in agreement with Mr. Erdely that the text file, the

13:37:53  5  torrent file, has to get into the file sharing software.

6         MS. LOEHRS:  Correct.

7         THE COURT:  You're saying it can get there and do

8  nothing more.

9         MS. LOEHRS:  Correct.  We're not talking about

13:38:03  10  torrents that were downloaded separately and put in some other

11  folder.  That's not what we're talking about here.

12         THE COURT:  Okay.

13         MS. LOEHRS:  We're talking about torrents that are

14  associated with the torrent software.

13:38:15  15         THE COURT:  And your view is that it's possible to

16  get the torrent into the file sharing software and not have

17  downloaded anything?

18         MS. LOEHRS:  It's not only possible, we've done it.

19  Many times.  Yes.

13:38:27  20         THE COURT:  So if that can happen, back to

21  Mr. Erdely.

22         Hold on, Counsel.

23         Back to you, Mr. Erdely, I want you to hear this.

24         If that's possible, so you've got the torrent in the

13:38:37  25  file sharing software but there's been no download, would

26

13:38:41    1    Torrential Downpour Receptor see it?

2         MR. ERDELY:  It would absolutely.  If you load a

3    torrent into the software, it will be visible to any

4    BitTorrent client on the file sharing network.  And to be

13:38:54    5    clear, every one of the torrents investigated by Agent Daniels

6    was absolutely loaded into the uTorrent software.

7         THE COURT:  Okay.  But what you're saying is even

8    though you think it would be hard to get into the file sharing

9    software and stop it before any download occurs, if it's in

13:39:08   10    the file sharing software, you're search program will see it?

11         MR. ERDELY:  Yes.  Once it's load into the program,

12    it announces to the BitTorrent network the association and any

13    program will see it, yes.

14         THE COURT:  Ms. Loehrs, that's what you wanted to

13:39:22   15    prove with test 1; right?

16         MS. LOEHRS:  Yes.  This is the first time I've ever

17    heard them admit that, so yes.

18         THE COURT:  I think test 1 is still unnecessary.

19         MS. LOEHRS:  Correct.

13:39:32   20         THE COURT:  And I understand you to say, Mr. Erdely,

21    that if I put it in the file sharing software and I let it run

22    for a minute and then I stop it, so we've got a partial

23    download, it will be seen by your search program?

24         MR. ERDELY:  Correct, Your Honor.  As soon as it's

13:39:48   25    loaded, whether nothing is downloaded, it's partially

13:39:51  1    downloaded or fully downloaded, that association happens that

2    any BitTorrent client would see it.

3              THE COURT:  Okay.  Isn't that test 2, Ms. Loehrs?

4              MS. LOEHRS:  Test 2 is the partially parsed.

13:40:05  5              THE COURT:  Right.  And he just said a partially

6    downloaded program will be seen and found by the search

7    program.

8              MS. LOEHRS:  Correct.  That was another thing we

9    wanted to prove that this is the first time we've heard.

13:40:13 10    That's correct.

11              THE COURT:  Okay.  So I think we've taken care of

12    tests 1 and 2.  I want to talk about 3 and 4 for a minute.

13              And I have a question for government counsel.  The

14    response we primarily -- I primarily saw in your papers is 3

13:40:26 15    and 4 are unnecessary because you've already ruled against the

16    defense on their Fourth Amendment argument, that there's an

17    improper search of other parts of the computer.

18              Here's my question:  Let's assume hypothetically that

19    the defense is able to obtain evidence through their testing,

13:40:51 20    that the government's Torrential Downpour program run by

21    Agent Daniels looked in unallocated space on the computer and

22    perhaps downloaded the files from -- or could have downloaded

23    the files from unallocated space.

24              If they were able to construct an argument that that

13:41:12 25    was possible, it seems to me that's relevant to more than the

13:41:16  1    Fourth Amendment because what they could say is that somebody

      2    who downloads a torrent, executes it, it starts running, they

      3    see child pornography and they say, oh no, and they delete it

      4    and it goes into unallocated space could still get charged

13:41:36  5    with distributing child pornography because the Torrential

      6    Downpour program found it in the unallocated space.

      7          I think that's part of the defense argument.  That's

      8    not a Fourth Amendment issue.  That's a defense that we never

      9    distributed it.  We deleted it and it went straight to

13:41:53 10    unallocated space and that's where you came and got it, we

     11    didn't distribute it to you.

     12          What is your response on that?

     13          MS. HELART:  I think the most difficult part for me

     14    about answering that question is the when was a file deleted

13:43:07 15    portion of the hypothetical.  Files can get deleted as

     16    immediately, I suppose, as someone can click the button or it

     17    can get deleted ten minutes later and we don't know because a

     18    lot of file attributes get stripped away from files once

     19    they're deleted.

13:43:36 20          In this Court's example, it is a deleted file going

     21    to unallocated space.  So forensically it is true that we can

     22    sometimes, but not always, recover deleted things; other times

     23    we can't.

     24          It might depend on the device.  For example, tablets

13:44:02 25    have a fairly small storage space so things could get written

29

13:44:06 1    over very quickly.  It's also true that law enforcement in a

2    practical sense just doesn't get to a house -- you know, the

3    next day after downloads, there's a lot of verifications of IP

4    addresses, et cetera.  So I don't know that I can answer that

13:44:25 5    question very well because a deleted file is missing

6    information.  But if it had date and time stamp information --

7            THE COURT:  Well, let me interrupt you, if I can,

8    Ms. Helart --

9            MS. HELART:  Yes.

13:44:37 10           THE COURT:  -- because I understand what you're

11   saying and they're fair points.  But I don't think that's the

12   question I need to wrestle with.  What I'm trying to figure

13   out is whether what the defense is seeking in tests 3 and 4

14   satisfies the materiality standard of Rule 16.

13:44:53 15           And it seems to me what they are arguing, these are

16   my words not theirs, but I think it's the thrust of what

17   they're arguing is the government's going to stand up at trial

18   and say we got these child pornography images from the

19   defendant's computer from shared space.  And the fact that

13:45:11 20   they were in shared space in a BitTorrent program means he was

21   offering them to the world.  He was distributing.  And he

22   distributed to us when we connected with him.  Therefore, find

23   him guilty of distribution.

24           What the defense wants to be able to say is, ah, but

13:45:29 25   their program could have gotten it from an unallocated space.

13:45:32  1   And if it was there, he wasn't offering it to the world.  He

2   wasn't distributing.  And you don't know that he was because

3   their program can get it from someplace other than the shared

4   folder.

13:45:43  5           That seems to me to be a material issue for the

6   defense.

7           MS. HELART:  So there's two responses.  One is that

8   all along in Mr. Erdely's and I's discussions, Torrential

9   Downpour operates much like any client software.  So there's

13:46:05 10   that respect.  This is what uTorrent would do, this is what

11   Torrential Downpour would do.

12           But, really, it seems to me that the single-source

13   testing that they are going to do, and we agree with that

14   testing, that's what the Court's ordered, part of that answers

13:46:24 15   this question, is does the defendant have the material, if

16   that's what the Court's concern is, and the government didn't

17   get it from unallocated space.  Because those log files show

18   exactly, those were the documents admitted at the January 31st

19   hearing, it's the transmission of computer speak between the

13:46:47 20   computers about the computers connecting, and what the

21   client -- the suspect computer has already.  I have 12 out of

22   538 pieces.  And it shows the transmission.

23           If it was in deleted space, those log files would be

24   different.

13:47:09 25           But more to the point, because they might answer that

13:47:12  1   saying, well, if we don't trust your software, we don't trust

2   your log files.  But that's the single-source downloading.

3   They'll get the log files and they'll get the Wireshark packet

4   capture.  They'll get both of those things as part of it, and

13:47:27  5   they'll see what the transmission is in their own testing.

6   So if they're testing -- it will just show it.  It

7   will show it as part of their own testing that they're doing

8   already that the Court has authorized because they'll see that

9   the -- we believe they'll see exactly what we are claiming, is

13:47:45 10   that the log files do accurately record all of the computer

11   language and the handshake took place and these are the files

12   that were had and this is how much.  And these are all of the

13   variations of what the defense wants to test as far as pausing

14   the test and, I don't know, stopping the test and doing all

13:48:07 15   that.  So they'll see from the log files what occurred when

16   the connection was broken.

17   THE COURT:  These are tests 7, 8, and 9 you're

18   talking about?

19   MS. HELART:  Yes, these are tests 7, 8, 9.

13:48:18 20   THE COURT:  Let me throw out a hypothetical that may

21   be implausible.  But let's say in a test -- or not in a test

22   but in an actual search Torrential Downpour goes to a

23   computer, finds the child pornography video in unallocated

24   space, downloads it, and says the way it's written, we got

13:48:42 25   this from the shared space on that computer.  How --

32

13:48:51  1     Hold on, Mr. Erdely, for a minute.

2     How do the defendants know if that's true unless they

3 can test where the computer went and got the information?

4     Yeah, you can respond.

13:49:03  5     MR. ERDELY:  Your Honor, our software can only get

6 what the sharing client offers us.  So what is being described

7 here is really a test of uTorrent, the software the suspect

8 used.  We can only get from that computer what that software

9 offers.  Short of there being some other way to do it.

13:49:26 10     So the test of uTorrent to see if it can even carve

11 from unallocated these deleted files, which forensically could

12 take days or weeks to do, to think uTorrent has put this

13 into their software that it would offer to share these files

14 from deleted space or even move to new location would be a

13:49:54 15 failing of uTorrent, not a failing of Torrential Downpour or

16 any other software that would have the same exact same

17 communication.

18     The test should be of uTorrent to see if uTorrent

19 has the capability to share from unallocated space or when

13:50:08 20 it's moved to an unshared location.  How that's a test for

21 Torrential Downpour, I don't understand.

22     I hope I answered your question.

23     THE COURT:  I understand what you've said.

24     Ms. Loehrs, do you disagree with that?

13:50:22 25     MS. LOEHRS:  I do.

33

13:50:23  1            THE COURT:  Why?

        2            MS. LOEHRS:  It's not a question of the uTorrent

        3    software, the publicly available software offering.  Our issue

        4    with their software is that it's been modified by them.  We

13:50:33  5    don't know what those modifications are.  So even if regular

        6    uTorrent software can't go get a file from unallocated

        7    space, have they made some modification that says, you know

        8    what, here's the instructions, here's your torrent, I know you

        9    had that file, now it's been deleted, I'm going to get it

13:50:53 10    anyway.

       11            That's why we want to test from unallocated space.

       12            Their log files -- I've seen thousands of their log

       13    files.  I've never seen in a single log file where it has

       14    shown where the file they obtained was located on the

13:51:09 15    suspect's computer.

       16            THE COURT:  Well, let me -- let me ask you a computer

       17    question from a position of total ignorance.  If I'm law

       18    enforcement and I come to your computer looking for a torrent

       19    of suspicion, I assume the way I talk to you, the way I

13:51:25 20    communicate with you is with your BitTorrent program on your

       21    computer?

       22            MS. LOEHRS:  Correct.

       23            THE COURT:  So now I'm talking to the BitTorrent

       24    program.

13:51:37 25            MS. LOEHRS:  Correct.

13:51:37    1          THE COURT:  And I'm getting what the BitTorrent

        2    program is going to offer me.

        3          You're saying I can program my computer so that once

        4    I'm talking to the BitTorrent program, I go around it and I

13:51:49    5    search other parts of the computer and get the child

        6    pornography from someplace else than the BitTorrent program.

        7          MS. LOEHRS:  Correct.  We've actually seen this with

        8    other law enforcement software in the investigations, they've

        9    modified software to place things on people's computers.

13:52:07   10          So you can make any modification to software you

       11    want.  It's just instructions telling the software what to do.

       12    So once you have that handshake and you're talking to each

       13    other, now I can modify my software to say, well, I'm not just

       14    going to follow the protocols of the public BitTorrent

13:52:24   15    network, I've thrown some modifications in where I'm going to

       16    look around, I'm going to place a file on your computer and

       17    have it report back some private information.  I'm going to

       18    find out where files are at.

       19          I'm not saying that's what's happening.  That's what

13:52:37   20    we want to test.

       21          So once they've made that connection with the public

       22    protocol, their modifications can do anything they want.

       23    They're just instructions.

       24          THE COURT:  Mr. Erdely, what's your response?

13:52:50   25          MR. ERDELY:  That's absolutely not the case.  We're

13:52:52  1   limited by what uTorrent allows us to do.  What she's

2   describing is -- would require some sort of vulnerability or

3   exploit or some way through the program.

4       You're communicating on one specific port.  You have

13:53:06  5   a tunnel between these two computers, and what's acceptable?

6   The messages are defined on BitTorrent.  There's only a few of

7   them.  And you send a message to them and they respond.

8       I can't just write commands as I'm communicating with

9   a BitTorrent piece of software to say drop me out to the hard

13:53:27  10  drive and let me start poking around, so to speak.  That's

11  just not a possibility.  And if it was a possibility, it's a

12  flaw in uTorrent because the protocol specifies these are

13  acceptable messages.

14      For me to just craft some message out of the blue, it

13:53:44  15  doesn't exist.  It can only receive the messages it expects to

16  receive and return to me the way that that program was

17  designed to respond.  You can't just, in every program,

18  decide -- otherwise, my goodness, every computer would be

19  vulnerable to such an attack if it's just as easy as

13:54:07  20  described.  It would be a flaw to uTorrent if that would be

21  possible.

22      THE COURT:  Okay.

23      MS. HULL:  Sir, may I supplement?

24      THE COURT:  Yeah.  I'm going to get back to you in a

13:54:20  25  minute.  I want to do two things.  I want to look at something

36

13:54:23  1   I know was written in this document somewhere, but it occurs

2   to me that we're in effect taking testimony here.  Do counsel

3   have a problem with us putting these two under oath as we

4   continue just so we know we've got a clear record?  And I'll

13:54:38  5   let you all ask questions as well.

6         MS. HULL:  I'm sorry, Judge, any issue with what?

7         THE COURT:  With these witnesses being put under oath

8   as we continue this back and forth.

9         MS. HULL:  Sure.

13:54:46  10        MS. HELART:  I agree.  I like -- I think it's

11  promoting a discussion that's faster.

12        THE COURT:  All right.

13        Then, Christine -- you can just stay there -- would

14  you put both of these, one by one, individuals under oath,

13:54:58  15  starting with Mr. Erdely.

16     (Mr. Erdely sworn.)

17     (Ms. Loehrs sworn.)

18        THE COURT:  All right.  Thank you both.

19        Mr. Erdely, are the statements you've made so far in

13:55:20  20  this hearing true and accurate?

21        MR. ERDELY:  Yes, Your Honor.

22        THE COURT:  Ms. Loehrs, are the statements you've

23  made so far in this hearing true and accurate?

24        MS. LOEHRS:  Yes, they are.

13:55:30  25        THE COURT:  Okay.  Good.  So we've got the testimony

13:55:32   1    under oath.

           2           Before I come back to you, I have a question, but

           3    maybe I ought to first hear the response to what Mr. Erdely

           4    just said and then I'll ask the question.

13:55:44   5           Go ahead.

           6           I'm going to have them respond to what you just said,

           7    Mr. Erdely.

           8           Go ahead, Ms. Loehrs.

           9           MS. LOEHRS:  I --

13:55:50  10           THE COURT:  Or Ms. Hull.  You said you wanted to say

          11    something?

          12           MS. LOEHRS:  Oh, no.  She wanted to say something.

          13           MS. HULL:  I did, Judge.

          14           I have reason to believe that what Mr. Erdely said is

13:56:02  15    inaccurate because they have -- we already know they have

          16    modified uTorrent.  They claim they've modified it, I think

          17    we talked about this earlier.  This software, uTorrent, the

          18    publicly available, is designed for multi source.  Not single

          19    source.  So they claim they have altered it to create a

13:56:26  20    single-source download.

          21           We also know that uTorrent requires sharing, just

          22    as an example.  It requires you to share.  They have somehow

          23    changed the source code such that they do not have to share in

          24    order to be on that -- on that system.

13:56:50  25           And I -- I think you covered everything else.  Thank

1  you.

2          THE COURT:  Well, you may have just answered the

3  question I was going to ask Ms. Hull, but it was this:  As we

4  know under Rule 16, before a defendant gets discovery of

5  information in the government's possession, the defendant

6  needs to make a showing to satisfy the materiality

7  requirement.  Has to come forward with something to suggest

8  the information is really in the possession of the government.

9  Just listing things the defendant would like to know is not

10  enough under Rule 16.

11          And the question that I was going to ask you, and I

12  will ask you to see if you have anything more, is besides the

13  fact that the government has made those modifications to the

14  BitTorrent program so that it gets single-source downloads and

15  it doesn't share, do you have any other basis for believing

16  that Torrential Downpour searches space other than shared

17  drives available through the uTorrent program?  And, if so,

18  what is the other information?

19          MS. HULL:  We do, Judge.

20          May I defer to Ms. Loehrs?

21          THE COURT:  Yes.  Yes.

22          MS. LOEHRS:  Is it okay if I sit?

23          THE COURT:  That's all right.  You can stay there,

24  that's fine.

25          MS. LOEHRS:  One of the things Mr. Erdely brought up

13:58:14  1    was the exploit.  He talked about an exploit.  That is a

2    serious issue with all BitTorrent.  We know there are exploits

3    in the publicly available BitTorrent software that will go

4    into a shared file or a non-shared file that you didn't mean

13:58:30  5    to share.  We have experienced that in our own testing.

6          So that's part of our issue is we believe their

7    software is susceptible to the same exploits and may be

8    getting files that are not in shared locations because of

9    those exploits.

13:58:46  10         Secondly, I've worked on hundreds and hundreds of

11    these cases where we have actually seen files in non-shared

12    locations, had dates and times of when they were shared and

13    seen them been downloaded by law enforcement software.

14         So there's many reasons that we believe this is

13:59:04  15    happening based on our own testing, based on the exploits that

16    are in the system, and based on other cases.

17              THE COURT:  Let me -- let me ask a second question.

18         To test the proposition that Torrential Downpour can

19    look in places other than shared files of a particular

13:59:28  20    computer, why do you need access to the COPS database?

21              MS. LOEHRS:  They're completely interrelated.  My

22    understanding -- and again, this is just through my

23    understanding because I've never had access to any of these

24    products -- my understanding is ICAC COPS database receives

13:59:42  25    information from law enforcement, it instructs Torrential

13:59:46  1    Downpour what to do.  Torrential Downpour does it, reports it

2    back to ICAC COPS, and it's an integrated system.

3         THE COURT:  Well, but when you say "Torrential

4    Downpour does it," my understanding is what Torrential

14:00:00  5    Downpour does is it goes out to the IP address that it got

6    from COPS, it shakes hands, it sees that it can download child

7    pornography, and then it reports back what it did.

8         But while it's talking to that computer, shaking

9    hands, downloading what it can, COPS database isn't in the

14:00:20 10    loop.  That's Torrential Downpour going and talking to that IP

11    address.

12         MS. LOEHRS:  I don't know how ICAC COPS is in that

13    loop because, again, we've never tested it.  Our understanding

14    and from what we've heard in recent testimony is that they

14:00:33 15    work in conjunction with each other.  The only way they can't

16    work together is if you take Torrential Downpour and run it

17    manually.  But once you've done that, you've completely

18    changed the entire investigation.  You've changed what

19    happened to Mr. Gonzales.

14:00:50 20         If you take out that automated function, I

21    automatically send instructions to you, I tell you what to do.

22    You go get it, you bring it back, you send it to me.  If you

23    take out all of that automation and only make it manual,

24    you've change the tests, you've changed what's happening.

14:01:08 25    It's like testing a manual transmission when you want to find

14:01:12   1   out what happens with an automatic transmission.  You can't do

2   it.  They're completely separate operations.

3           THE COURT:  Mr. Erdely, do you have --

4           MR. ERDELY:  Yes.  And there's only three pieces of

14:01:22   5   information given, whether manually or automatically:  The IP

6   address; the port, it's a networking port like the doorway to

7   go through; and the info hash to the torrent.  It is the same

8   three pieces of data, whether it is manually loaded.  And on a

9   side note, that is actually where this investigative software

14:01:42   10   started.  We would manually pass those three pieces of

11   information to conduct the investigation.  And then as things

12   progressed, automation came into play so that we didn't have

13   to sit behind our computer, and those same three pieces of

14   information are passed from ICAC COPS to Torrential Downpour,

14:02:01   15   and investigation begins.

16           So it doesn't matter whether it's automatically or

17   manually.

18           And to clarify, her understanding is a little off.

19   And, granted, she hasn't seen everything perhaps, but there is

14:02:20   20   no -- there's a search tool that reports to ICAC COPS tips or

21   leads.  And those three pieces of information can be looked at

22   in ICAC COPS and manually inserted into the program, which is

23   what we suggest it could be done or it could automatically be

24   done, but Torrential Downpour doesn't report back to ICAC COPS

14:02:41   25   again.  It's Torrential Downpour Receptor that is doing the

14:02:46  1    searching that gives the tips and leads.

2    But my point is whether it's automatic or manual,

3    three pieces of information are passed from ICAC COPS to

4    Torrential Downpour.  And it's just those three pieces.  So --

14:02:59  5    and it's actually how we use the software.  We didn't put this

6    in place for some other purpose.

7    THE COURT:  When the Torrential Downpour program

8    takes those three pieces of information and goes out to a

9    computer and communicates and attempts to download child

14:03:16 10    pornography, is COPS doing anything in that process?

11    MR. ERDELY:  No.  Nothing.  It is a leads location

12    and it's now, in today's form, it allows it to add some

13    automatic loading of these jobs, think of it like a job, but

14    it's the same exact end result.  You will see the same

14:03:41 15    information and interface if I manually specify that

16    information or if it comes down automatically.  And I could

17    show that to whoever wanted to see it, that the automization

18    and the manual process is the same.  And it doesn't expose the

19    law enforcement information in ICAC COPS.

14:04:06 20    THE COURT:  Okay.  Hold on just as minute, please.

21    I've got a question for the defense.

22    It seems to me that if the proposition you wanted to

23    test was whether Torrential Downpour, when it goes out

24    searching, looks at more than the shared files in the

14:05:55 25    BitTorrent software, you could construct the test where it

43

14:06:00  1    goes and looks at a computer or two or three where there's

2    some things in the shared file and there's some things

3    elsewhere on the computer, and see what it finds.  See if it

4    just finds what's in the shared file or if it does look

14:06:13  5    elsewhere and find more.  Am I wrong about that?

6            MS. HULL:  Well, Judge, if I may, and I would like to

7    get to that, but is it possible for the Court to hear what

8    Ms. Loehrs has to say about what Mr. Erdely --

9            THE COURT:  Yeah, that's fine.

14:06:31 10            MS. LOEHRS:  Yeah.  So my understanding is he said

11    there's only three pieces of information in the ICAC COPS

12    database.  And, again --

13            THE COURT:  I don't think he said there's only three

14    in the database.  I think he said there's only three that is

14:06:43 15    automatically downloaded to Torrential Downpour from the

16    database.

17            MS. LOEHRS:  Right.  But my understanding was more

18    information was exchanged between those.  But, again, I don't

19    have access to it so it's -- I can only go by the information

14:06:58 20    I've received over the years and I -- my understanding was

21    there is a lot more information that was going back and forth.

22    And, again, ICAC COPS is the instructions to Torrential

23    Downpour.

24            I understand that Torrential Downpour is doing the

14:07:11 25    physical downloading.  But we need to know what those

14:07:15  1    instructions are from ICAC COPS.  What is ICAC COPS telling

2    Torrential Downpour to do?  Because my understanding, again,

3    from recent testimony, is ICAC COPS is instructing Torrential

4    Downpour on what to do.  So if the instructions about going

14:07:33  5    outside of shared space or downloading a file from a

6    non-parsed torrent is part of those instructions, then that's

7    critical to our testing.

8         THE COURT:  Okay.  I understand that point.

9         Ms. Hull.

14:07:49  10        MS. HULL:  Thank you, Judge.  Our position is that in

11    order to -- what we want to do is conduct an industry standard

12    test which requires that we try basically to replicate what

13    Agent Daniels did here.  Number one.  And that process

14    included use of ICAC COPS.

14:08:12  15        I -- also, in Mr. Goodyear's testimony, which I just

16    received Monday, and where he said they cannot be tested --

17    they cannot properly be tested separately.  They must be

18    tested together.  That was his testimony.  He was called as a

19    government witness.  My understanding is he works with

14:08:36  20    Mr. Erdely.

21        So for those reasons, Judge, yes, absolutely, I think

22    that ICAC COPS has got to be included in all of this because

23    to do an industry standard we have to test to try to replicate

24    what Agent Daniels did.  He didn't do anything manually.  It

14:08:57  25    was ICAC COPS that sent Torrential Downpour to do the task.

14:09:03   1          THE COURT:  But the way I read the testimony that you

2     quoted, Ms. Hull, in your hearing memorandum from

3     Mr. Goodyear, I assume you're referring to that back and forth

4     you've got on page 4 of your memo?  Where he says that they

14:09:18   5     work integrally together.

6          MS. HULL:  Yes.

7          THE COURT:  It doesn't look to me like he's talking

8     about a test of what Torrential Downpour searches when it gets

9     to a computer.  He's talking about a test where Torrential

14:09:32  10     Downpour gets information from COPS and he's saying you can't

11     test that without both of them.

12          MS. HULL:  And that's the point.  That's our point,

13     Judge.  That they have to be --

14          THE COURT:  I understand you can't learn what

14:09:45  15     Torrential Downpour gets from COPS unless you test what

16     Torrential Downpour gets from COPS.  What I'm wrestling with

17     is the materiality question.  What is the basis for me to

18     conclude that you've made a materiality showing that

19     Torrential Downpour gets something from COPS that affects the

14:10:06  20     defense in this case?

21          MS. HULL:  Because if I'm going to defend

22     Mr. Gonzales against the process that was utilized by the

23     government and that process includes ICAC COPS operate --

24     telling Torrential Downpour what to look for, I need to know

14:10:25  25     what it told -- what ICAC COPS told Torrential Downpour to

14:10:29   1   look for.  Because what if in between -- number one, it takes

2   out the automation.

3        Number two, any testing without ICAC COPS would make

4   the test flawed, for one, because, number one, it's not

14:10:49   5   replicating; and number two, it's -- what it did in this case

6   is what we're talking about.  What if -- what if Torrential

7   Downpour operates differently when it is not connected ICAC

8   COPS automation?

9        We don't know that.  And necessarily, Judge, I don't

14:11:14  10   want to know that.  That's not what we're trying to get at.

11   We're trying to test the process that was used in this case.

12   I don't want to know what Torrential Downpour does without

13   ICAC COPS because that's a different issue.  I don't want to

14   know -- I don't need to know one without the other.

14:11:31  15        It is the two working together that were used here.

16   Their accuracy.  Their reliability.  What percentage, for

17   example, that no one has talked about.  What if half the time

18   ICAC COPS tells Torrential Downpour to do something and it

19   does it improperly?  What if any part of that process is

14:11:56  20   flawed?  It's the accuracy and reliability and if it's --

21   certainly, the more substantially it's flawed, the greater my

22   defense.  The more likely there is reasonable doubt.

23        THE COURT:  Okay.  I understand what you've argued.

24        Mr. Erdely, did you want to respond to any of that?

14:12:10  25        MS. HELART:  I'd like to respond first to a factual

14:12:13  1    difference.  On January 31st, Exhibits 9 and 10 were admitted

2    and they were then attached to the government's June 24th

3    filing answering the four questions.

4         And what's important about Ms. Loehrs' testimony here

14:12:32  5    a bit ago was that there was no evidence that these torrents

6    were parsed on Mr. Gonzales's computer, and that was the whole

7    point of now Exhibits 5 and 6 because they showed up in the

8    uTorrent app data folder.  They don't show up there unless

9    they're parsed into the software.

14:12:59 10         So one of those exhibits is some forensic facts that

11    were pulled out from the software about some of the torrents,

12    and the other exhibit is the list of 114.  But those don't get

13    created.  Agent Daniels didn't create that.  That was forensic

14    data taken off of Mr. Gonzales's computer.

14:13:19 15         So one argument is that defeats materiality.

16         The thing that I would ask Detective Erdely to

17    address, but I'll set it up, is that the testimony that

18    Ms. Hull and Ms. Loehrs are -- is referring to of Jim Goodyear

19    relates to the *Cameron* case.  And it is true that Mr. Erdely

14:13:37 20    works with Mr. Goodyear, they're colleagues.  And he is

21    familiar somewhat with -- more than somewhat, probably, with

22    the *Cameron* case, and it wasn't a Torrential Downpour case, it

23    was a Torrential Downpour Receptor case.

24         So it's important because we have to judge that

14:13:54 25    testimony in that light and the "integral to each other"

14:13:59  1    portion is because it's Torrential Downpour Receptor that

2    reports the information to ICAC COPS.  And so that can be

3    really taken out of context.

4         But the *Cameron* case transcript, Detective Erdely has

14:14:18  5    read it in its entirety and he's spoken with

6    Detective Goodyear about it before today.  So that's the part

7    I would like him to answer just so the Court accurately knows

8    what that case was about.

9         THE COURT:  Okay.

14:14:30  10         MR. ERDELY:  Yes, Your Honor, and it's something we

11    haven't discussed here because it didn't relate to this case.

12    But because it was brought up in the *Cameron* case that now is

13    part of this case.

14         Torrential Downpour Receptor is a search tool and it

14:14:40  15    was part of what was incorporated into Ms. Loehrs' testing

16    protocol that she's suggesting.

17         Torrential Downpour Receptor is also an investigative

18    tool.  That case was done completely without ICAC COPS, with

19    Torrential Downpour Receptor.  The difference between the two

14:15:03  20    tools you can almost discern through its name.  Torrential

21    Downpour takes that tip and lead information and makes an

22    outbound connection and tries and knocks on the door, see if

23    they would respond, BitTorrent software, do you have this info

24    hash, this torrent?  If yes, then we decide what pieces are

14:15:23  25    available to share.  So that is Torrential Downpour, which was

14:15:26  1    used in this case.

2              Agent Daniels' computer makes an outbound connection

3        to the suspect computer, which responded and transferred

4        files.

14:15:37  5            Torrential Downpour Receptor, which is our search

6        tool, also has an investigative component which had nothing to

7        do with this case, and that's what *Cameron*'s about.

8              But by virtue of searching for a torrent, so we have

9        our torrents that law enforcement's familiar with that relate

14:15:56 10    to child exploitation.  The search tool goes out to the

11       BitTorrent file sharing networks, the indices that acts --

12       excuse me, bless you -- that acts as a matchmaker, and so the

13       search -- the searching for these torrents makes us, law

14       enforcement's IP address, visible and searchable by any other

14:16:17 15    program, just like we were talking about earlier with

16       Receptor.  So that what happens is the whole world will see

17       law enforcement's IP address as having that same association

18       as we'll see it in Mr. Gonzales's computer.  And the suspects

19       come to us.  The suspects are downloading child pornography,

14:16:40 20    see law enforcement's IP address as a download candidate, and

21       they come to us.  And it would be the equivalent of drug

22       dealer coming to the police office, do you want to buy some

23       crack.  It is literally that.  The suspects have come to us.

24             My point is, two different pieces of software for

14:17:02 25    investigation.  In *Cameron* you used Torrential Downpour

14:17:04  1    Receptor end to end.  The searching component caused people to

2    come to us like they come to any computer.  If I was running

3    uTorrent and I loaded my torrent into that program and I've

4    queried these indices to get IPs and ports, those same indices

14:17:24  5    now know my IP and port and it shares that information, so

6    people will start coming to my uTorrent to trade files.  To

7    get what I have and also to share.

8         So Torrential Downpour Receptor is the other half of

9    this investigative suite of tools and it's what was used in

14:17:44  10   *Cameron* but not what was used in Mr. Gonzales's case.

11        THE COURT:  Counsel, I assume you both have the

12   Goodyear testimony transcript.  Would you --

13        MS. HULL:  Yes, sir.

14        THE COURT:  -- have one of you provide a copy to us?

14:18:00  15   All we've got is the excerpt in the --

16        MS. HULL:  I'd be happy to, Judge.  I don't have it

17   with me today but I can get it to you.

18        THE COURT:  That's fine.  Yeah.  But do it in a way

19   that copies the government so they can see what you're giving

14:18:13  20   me just to make sure that they agree it's the same transcript.

21        MS. HULL:  Happy to.

22        THE COURT:  All right.  Let me ask a question about

23   tests 5 and 6.

24        Ms. Hull, it seems to me that the issue on 5 and 6 is

14:19:05  25   what we were previously talking about, which is what you want

14:19:10  1    to establish through 5 and 6 is that Torrential Downpour

2    Receptor will identify -- will identify IP addresses on the

3    basis of non-investigated torrents or files of interest that

4    are not child pornography.

14:19:39  5            Am I right about that?  That's what you're trying to

6    establish?

7            MS. HULL:  Not just the Receptor, but Torrential

8    Downpour, Judge.

9            THE COURT:  Well, but if Torrential Downpour

14:19:48 10    identifies them and puts them in the COPS database, then

11    Torrential Downpour is going to go look at them.  But I mean I

12    think it -- isn't it -- isn't it the same issue we were

13    talking about before, which is how you get on the suspect

14    list?  Isn't that what you're after in 5 and 6?

14:20:06 15            MS. HULL:  May I have Ms. Loehrs answer?

16            THE COURT:  Yes.  Ms. Loehrs.

17            MS. LOEHRS:  I think the issue here is that, so ICAC

18    COPS is instructing Torrential Downpour to go get these files

19    of interest and it's downloading -- it's downloading files

14:20:23 20    Not just identifying them and putting them in the database,

21    it's actually downloading files that are not child

22    pornography.

23            THE COURT:  "It" being what?

24            MS. LOEHRS:  Torrential Downpour.

14:20:33 25            THE COURT:  Right.

14:20:35 1          MS. LOEHRS:  So ICAC COPS is instructing Torrential

2     Downpour to go get these files that are not illegal and

3     download them.  And I guess our concern is that those files

4     are being downloaded as files of investigative interest, but

14:20:51 5     if they're not child pornography then they're not chargeable

6     files.  Why are they being downloaded?  Because we've been

7     told it only downloads child pornography.

8          So it's a question to us as to the instructions ICAC

9     COPS is giving Torrential Downpour.  We've been told it only

14:21:12 10    tells it to download child pornography.

11         THE COURT:  Let me interrupt you with a question,

12    Ms. Loehrs.  I had somehow gotten the idea in all of this that

13    a torrent may have both child pornography and adult

14    pornography in it.

14:21:26 15         MS. LOEHRS:  That's correct.

16         THE COURT:  If it does and if my BitTorrent program

17    on my computer is told to go get that torrent, it's going to

18    go get both; right?

19         MS. LOEHRS:  If it's instructed to download the

14:21:40 20    entire torrent, then yes.  If it's only instructed to take the

21    file of child pornography, because all those files inside that

22    torrent, they all have hash values and names.  So you can tell

23    what each one of those files is, whether or not it's legal.

24         THE COURT:  Well, from the name?

14:21:58 25         MS. LOEHRS:  No, from the hash value based on their

53

14:22:01  1   database.  They know which hash values are illegal.

2   THE COURT:  Well, let's assume -- this is a question

3   to Ms. Hull because it's a legal question -- let's assume that

4   Torrential Downpour -- and I'll find out if this happens in a

14:22:12  5   minute -- but let's assume that it identifies a torrent and it

6   goes and it downloads everything in the torrent, and ten of

7   the files are adult pornography and three are child

8   pornography, and the government charges the three child

9   pornography files.  Where is the legal problem in the fact

14:22:30  10   that it downloaded the other ten?

11   MS. HULL:  Where did it get them?

12   THE COURT:  Same place.  Got them from the client

13   computer through the BitTorrent network, because it was being

14   offered.

14:22:40  15   MS. HULL:  Well, that's what I'm saying.  That's part

16   of the problem, is where it finds it.  If they're saying and

17   then it goes to the single source, is it getting all ten files

18   and only charging the three child pornography?  What if my

19   client only had the legal files.

14:22:58  20   THE COURT:  Well, but I'm talking about tests 5 and

21   6.  I understood in 5 and 6 what you wanted to confirm is that

22   Torrential Downpour will download legal files.

23   MS. HULL:  Correct.

24   THE COURT:  And my problem is, let's say yes, it

14:23:16  25   does.  I don't know if that's the answer, but if it does,

14:23:19   1    what's the problem with that?  He's not being charged for the

       2    legal files.  It's not a Fourth Amendment violation because

       3    these are offered freely through the software and anybody who

       4    comes looking for them.  What's the problem with law

14:23:32   5    enforcement downloading those ten legal files?

       6              MS. HULL:  They may not be all from his computer,

       7    they may not be in shared space.

       8              THE COURT:  But those are the other tests.  That's

       9    single source, that's shared versus unallocated space.  I'm

14:23:47  10    trying to figure out why we need tests 5 and 6.

      11              MS. HULL:  Judge, I -- if -- and this is -- this kind

      12    of goes back to my question of playing the tape through to the

      13    end of trial.  Again, if -- does the software do this?  What

      14    is the percentage of time it does this?  Does it falsely

14:24:21  15    identify legal files as illegal files?  Because we know that

      16    more -- that Torrential Downpour goes after what in

      17    Mr. Goodyear's testimony was child exploitative, but it

      18    includes completely legal -- completely legal files.

      19              So do we know what it went after?  Where it got them?

14:24:51  20    What percentage of the time does it falsely identify?  Is it a

      21    single source?

      22              THE COURT:  Well, but here's the -- I'm sorry to keep

      23    interrupting you --

      24              MS. HULL:  Sure.

14:25:00  25              THE COURT:  -- Ms. Hull, but falsely identify.  Let's

14:25:02  1    say it downloads an adult pornography file and it says in the

       2    document it creates, this is child pornography.  That's why

       3    Agent Daniels goes through and looks at it, says is this child

       4    pornography.  And if it's not, if it's adult pornography,

14:25:17  5    they're not going to charge somebody because the program

       6    labeled it child pornography.  It still has to be child

       7    pornography to be charged.

       8         So I'm still struggling with the notion of why this

       9    is a problem if it downloads stuff other than child

14:25:35  10   pornography.

       11        MS. HULL:  Well, Judge, if you recall back in

       12   Agent Daniels' search warrant affidavit, he said that he

       13   actually found 31, Torrential Downpour brought back

       14   essentially 31 files from Mr. Gonzales's computer somewhere.

14:25:54  15   And he indicated that three were child pornography.

       16        That tells me that in that example, Torrential

       17   Downpour, 90 percent of the time, is grabbing totally legal

       18   files.

       19        THE COURT:  Well, you know that fact from those

14:26:17  20   numbers.  And I don't mean to be flip, but so what.  He's not

       21   being charged with 90 percent.  He's only being charged with

       22   the 10 percent that's child pornography.

       23        I'm having trouble with what's wrong with the program

       24   that sweeps broadly and picks up stuff in addition to child

14:26:33  25   pornography if the only thing that gets charged is the child

56

pornography.  And if there's not a Fourth Amendment problem because this is all being offered freely on the internet.

MS. HULL:  Well, I guess my argument keeps going back to as well not only to reasonable doubt, but their single-source claim.  Because, again, if he's -- he's saying all those 31 came from my client's shared folder.  We don't know that.  We don't know for a fact that that's where they were found.

THE COURT:  But isn't test 7 going to get that information for you?  Which is the single-source download test?

MS. HULL:  I'm being told no, Judge.  The single-source download has nothing to do with --

THE COURT:  We -- you were just arguing that the problem is it's not a single source if they're sweeping so broadly.  And I'm saying you're going to test for single source.

You can answer, Ms. Loehrs, if you want.

MS. LOEHRS:  I'm sorry, I didn't want to answer a legal question.

But the question with the legal files is not that they're only coming from one computer and single source is one issue, but where they're coming from on the computer.  So it's not just that they're only coming from one, but where they're coming from.  So --

14:27:56  1          THE COURT:  That's the shared versus other space

2    issue, isn't it?

3          MS. LOEHRS:  Correct.  That is shared versus other

4    space.

14:28:02  5          THE COURT:  Okay.

6          All right.

7          Question for the prosecution, whoever wants to answer

8    it.  Does Torrential Downpour download legal files in the

9    process of downloading from torrents?

14:28:18 10          MR. ERDELY:  Yes, Your Honor.  I'm the one that

11   reviews and add the torrents to be investigated.  I'm the

12   database administrator, the system administrator of this.  And

13   with the torrent, you're exactly correct that we add the

14   torrent to be investigated.  Whether there's one file in

14:28:34 15   there, 50 files or 100 files.  And we try -- we identify at

16   least one of our files in that torrent for it to be added.

17          That's not to say that the other 99 files in there

18   that aren't child pornographic, it's one of the files I'm

19   familiar with, so it got added to investigate.

14:28:59 20          But our software, just like uTorrent, just like all

21   the other BitTorrent programs, when you load the torrent,

22   short of changing what you want to download, the default is to

23   get all of the files.  And we do the exact same thing.  The

24   torrent is added to download and if those files are available,

14:29:20 25   we will download everything that's available, and then leave

14:29:25  1   up to the investigator to decide what's charged.

2            And to be clear, this system doesn't just investigate

3   child pornography.  To stay totally legal, you have to also

4   consider the obscenity section and other sections.  And beyond

14:29:41  5   that, we have to consider every state law besides the federal

6   laws and international law.  We have over 60 countries using

7   this system.

8            So our files that we investigate relate to child

9   exploitation, as Detective Goodyear testified in that other

14:29:56 10   case and I'm testifying here today, and the onus is on the

11   investigator to find which files are appropriate to be

12   prosecuted or be used as probable cause to further that

13   investigation.

14            But our software downloads everything, just like all

14:30:12 15   of the other BitTorrent software does.

16            THE COURT:  Okay.  Thank you.

17            MS. HELART:  And I just wanted to have

18   Detective Erdely's testimony be absolutely clear.  It is

19   related to child exploitative material.  So if we say child

14:30:27 20   pornography, maybe we're all putting a lens in this courtroom

21   on the 2256 definition.  However, what Detective Erdely and I

22   have spoken about, and he can clarify if necessary, totally

23   legal might be totally illegal in Iowa.

24            So like a picture -- for example, I came from the

14:30:49 25   Southern District of Indiana.  I became somewhat familiar with

the Indiana State definition of their child exploitative
files.

So what could be illegal in Indiana is uncovered
genitals.  That could be a kid standing in a doorway.  That
would be a picture I'd be very hard-pressed to charge
federally because it is not necessarily a lascivious
exhibition.  It's a small example.

But the point of the database of torrents is that it
focuses on the child exploitative material.  And I think what
he said that I would really like him to be very clear about
this, is that every torrent file has been reviewed and it's
ongoing, it's a regular weekly process by law enforcement
agents who can decide to put another torrent in or maybe
decide, eh, this one's not very good, let's take this one out.
But it's an ongoing review.  He is -- he is saying that every
law enforcement officer has the responsibility to make sure
their laws are being violated.

Plus other countries.  Internationally, I have no
idea what their laws are.  So but it does relate to people
under 18.  That's the point.

So totally legal might be, you know, 90 text stories
about molesting children and three files of child pornography
and one file of child erotica.  But something of child
exploitative material is in that torrent.

THE COURT:  Okay.  Thanks.

14:32:24    1          Ms. Hull and Ms. Loehrs, I think the government --
            2    correct me if I'm wrong -- has just agreed that when
            3    Torrential Downpour goes out to an IP address and seeks to
            4    download a torrent, it will get everything that's in that
14:32:35    5    torrent whether adult pornography or child pornography.
            6          Isn't that what you were seeking to establish in
            7    tests 5 and 6?
            8          MS. HULL:  Well, Judge, it's -- according to
            9    Ms. Loehrs, yes, but from my prospective it is -- it is again,
14:32:59   10    it is beyond that because -- and, quite frankly, the idea just
           11    hearing that this is in 60 countries and is putting people
           12    behind bars and has never been tested is shocking to me.

           13          The fact that it obtains -- we're taking their word
           14    for the fact that all of these torrents -- our understanding
14:33:24   15    is that officers from all over the country feed into ICAC
           16    COPS.  You know, some investigator from Texas thinks, oh, this
           17    looks like it might have something to do with stories about
           18    children.  According to Mr. Goodyear, he talked about the
           19    kinds of things that are in there that are entire torrents.
14:33:44   20    There's nothing illegal in the torrent.  They're talking about
           21    stories or other things that lead to child pornography,
           22    whatever that means.  So we do not, for one, believe that all
           23    of these torrents contain any child pornography.

           24          THE COURT:  Let's assume for a minute, Ms. Hull, that
14:34:06   25    there is in the COPS database a torrent identified that has no

14:34:10   1   child pornography in it.  How does that affect the defense in

2   this case?

3          MS. HULL:  Because then ICAC COPS is sending

4   Torrential Downpour.  Again, it goes back to our earlier

14:34:32   5   discussions.  It then instructs Torrential Downpour to go into

6   computers, they say only in shared space, to access legal

7   files.  Right.  But how is it that -- on what basis are they

8   doing that?  How is it that the government thinks that it is

9   legitimate for them to do that based on legal activity?  This

14:35:01  10   isn't even illegal.  Just because it's, you know, stories

11   about children or, according to Mr. Goodyear, instructions on

12   how to abuse a child.  Not good, but not illegal.

13          THE COURT:  But how does that help you?  I mean, I'm

14   still struggling with materiality.  Let's say you want to

14:35:25  15   argue all of that to the jury.  If an agent in Florida is

16   today telling Torrential Downpour to go download something

17   that is entirely legal and he does and he gets it and he can't

18   charge anybody because it's all legal, what does that say

19   about this case where the government claims to have downloaded

14:35:47  20   child pornography from the defendant?

21          Now, I know there's the shared space, the allocated,

22   that's a different issue.  But I'm having real trouble with

23   the notion that the fact that somebody doing legal things can

24   get on the suspect list or the fact that there could be

14:36:01  25   something in the COPS database that is legal undercuts the

14:36:07   1   prosecution in this case.  That's what I'm really wrestling

2   with.

3           MS. LOEHRS:  Can I respond?

4           MS. HULL:  Yeah.

14:36:15   5           MS. LOEHRS:  So again, on Mr. Gonzales's computer

6   specifically, he had torrents that had illegal files

7   referenced in them.  He did not have any illegal files in the

8   allocated space of his computer.  And on a lot of those

9   torrents, we have no idea if he downloaded any of those files.

14:36:37  10   He did have torrents where he downloaded some legal files and

11   those files still exist in the allocated space of his

12   computer.

13           Again, let's just say -- and this is why we added

14   these tests into our protocol.  Let's just say ICAC COPS went

14:36:51  15   out, read those perfectly legal files as files of interest and

16   started downloading them.  Let's say as a torrent with ten

17   files, nine of them are legal.  Torrential Downpour got nine

18   of those legal files.  He never downloaded the tenth file that

19   is child pornography that he can be charged with.  What if

14:37:07  20   Torrential Downpour ICAC COPS then says, oh, we're missing

21   that one file, go get that from somewhere else and attribute

22   it to this computer.

23           THE COURT:  That's the single-source problem, isn't

24   it?

14:37:18  25           MS. LOEHRS:  It is, but we kind of see it as a

14:37:22  1    combination of both because if you didn't -- if you weren't

2    identifying those legal files to begin with, it then wouldn't

3    even try to do that.  So we want to know what the instructions

4    are.

14:37:33  5              THE COURT:  But let me interrupt you on that point.

6    So if the only thing identified is Number 10 and it's child

7    pornography and it goes to his computer and it's not there,

8    what you're saying could happen is it would go get it

9    somewhere else and say it got it from his computer.

14:37:50 10              MS. LOEHRS:  Correct.

11              THE COURT:  That's the single-source issue.

12              MS. LOEHRS:  It is, but it's not limited to a single

13    source because what if that torrent wasn't being -- what if

14    ICAC COPS wasn't instructing it to do anything, it said, oh,

14:38:03 15    those files are legal, let's just leave this one alone, we're

16    not interested.

17              I want to know what all the instructions are, not

18    just that it only does a single-source download.  What is it

19    instructing that software to do?

14:38:16 20              This guy's got a bunch of legal files.  We know

21    there's one illegal file in that torrent.  We don't like the

22    fact that we can't get the illegal one.  Have we then added an

23    instruction to do something to get that illegal file?  Not

24    saying that's not what it is, but we're trying to put all of

14:38:31 25    the tests in to make it a complete picture, a complete test.

14:38:37   1   And that's why we added those tests.

           2               THE COURT:  Okay.  Thank you.

           3           Does the government want to respond on any of that?

           4               MR. ERDELY:  Well, it's just that we -- we're not

14:38:47   5   telling -- BitTorrent doesn't work exactly as it was just

           6   described.  We tell BitTorrent we want to download a torrent.

           7   As Your Honor had already said.  And all of the files are

           8   included.  So we don't individually say download file one,

           9   file two, or file three.  We act like all of the other

14:39:07  10   BitTorrent clients.  We issue an IP and port for a connect and

          11   we define the material we want to download by one piece of

          12   information.  It's called an info hash.  It uniquely

          13   identifies a torrent.  There is no messages in BitTorrent to

          14   say, I want file one, two, or three.  You identify the torrent

14:39:26  15   you want to download, and then after you exchange information

          16   back and forth and I understand what pieces you have to share

          17   and you understand what pieces I have to share, then we

          18   would -- could request the pieces that relate to the

          19   information we'd like.

14:39:40  20           But my point is we're asking to download the torrent.

          21   And we get all of the data, as I previously said, not the

          22   files themselves.  And a single-source downloading would show

          23   if we were getting it from someone else.

          24               THE COURT:  All right.  Counsel, I think I've covered

14:41:06  25   the questions I wanted to cover.

65

14:41:09  1        But I want to give you an opportunity to address

2    things you think we've missed that you want to make sure I

3    think about as I rule on this.  So why don't we give each side

4    a few minutes to outline what else you think needs to be

14:41:28  5    addressed today.

6        All right, Counsel.

7        Ms. Hull, it's your motion so I'll give you the first

8    opportunity if there's more you want to say.

9        MS. HULL:  I'm sorry, I was waiting for Ms. Helart.

14:47:27 10        THE COURT:  That's fine.  She was talking to folks,

11   so that's fine.  But let's go ahead and hear what additional

12   points you want to make.

13        MS. HULL:  May I approach?

14        THE COURT:  Yes.

14:47:34 15        MS. HULL:  Judge, this is -- quite frankly, this is

16   more akin to argument issues.  Is that okay?

17        THE COURT:  That's fine.  I just want -- to make sure

18   I'm thinking about everything you want me to.

19        MS. HULL:  Okay.  And I appreciate that you at least

14:47:51 20   appear to understand our argument, our position about -- we

21   may get to a Fourth Amendment issue, but that's not what the

22   testing is for.  And because I want to be able not only to

23   tell the jury that this software is flawed, but at what

24   percentage of the time.  What if it is 50 percent of the time

14:48:17 25   that it's flawed, that it misidentifies information,

14:48:20  1  misidentifies images, or thinks it sees a certain image that's

2  not there.

3        And the questions that I posed in my brief, and the

4  Court talked about, it actually goes farther than that because

14:48:36  5  what if -- and because where it's located, how it's located is

6  important.  And I get that the Court disagrees with me about

7  certain of the tests, but I believe that we have to be able to

8  examine this software and to materiality, to find out what the

9  flaws are, wherever they are, whatever they are.  Because I --

14:49:10  10  for a proper software test, it has to be standardized, it has

11  to meet -- it has to be industry standard testing.  That's

12  what we want.  Because I want to be able to argue whatever I

13  can find on this software to a jury.  What flaws, how often

14  it's flawed, in what circumstances it's flawed, based on the

14:49:40  15  tools as they were used by Agent Daniels in my client's case.

16        The Torrential Receptor, ICAC COPS, and Torrential

17  Downpour, they work together.  And as a general proposition,

18  yes, I find it constitutionally offensive that they're getting

19  into people's computers, and we don't know where, based on

14:50:09  20  legal activity, just because you're looking for something that

21  some law enforcement officer thinks might lead to child

22  pornography.  Whatever that means.

23        But it's not just what if -- what if it locates

24  images that are outside shared space in allocated space?  What

14:50:35  25  if it locates items not in shared, not in allocated, in

67

14:50:43  1    unallocated?  What if it identifies something that was never

2    on that computer?  And what are the chances of that?

3        What if, similar to -- take one of your hypotheticals

4    one step further.  You used the example, okay, somebody, they

14:51:07  5    have a file they start downloading and they think, oh, geez,

6    and I'll use the Jenny example.  I use the Jenny example

7    because it's a fairly well-known series of photographs where

8    it starts with her, she's just in a pretty little dress, and

9    then it progressively gets worse.  Someone sees where this is

14:51:28 10    going and deletes it.  Doesn't even get to the objectionable

11    part of that series.

12        Not only did they do that in your hypothetical, what

13    if they did that before Torrential Downpour even reached out?

14    Those are the things I want to know.  What is that software

14:51:51 15    capable of doing?  How many different ways can it identify and

16    incorrectly identify a suspect computer?

17        And I don't want a demonstration, I want an exam.  I

18    want a legitimate examination to test this software as it was

19    used and, quite frankly, I'm not testing to see how it works,

14:52:12 20    I'm testing to see how it's broken.  I want to see its flaws.

21    That's what industry standard software testing is for.  It's

22    not a demonstration, it's not to be shown, okay, this is our

23    perfect case scenario, this is how it works.  That's not what

24    testing is about.

14:52:37 25        And, again, Judge, I keep getting information and I

14:52:41  1    will forward Mr. Goodyear's testimony in its entirety as soon

2    as I'm able, but I keep getting information, quite frankly,

3    almost on a weekly basis from around the country because more

4    and more people are getting more and more upset about this,

14:52:57  5    and I get it.

6           But one thing that I have not heard is that any part

7    of this test is not an industry standardized protocol.  It's a

8    legitimate protocol.  And, again, we believe that -- we don't

9    just want to know how it worked in this case, although we do

14:53:19 10    want to know what it did in this case, in using the tools

11    Agent Daniels used, but what else does it do such that my

12    client might have been improperly identified.  And I can argue

13    that to the jury.  Not just what it does or if it does it, how

14    often does it do it.  If it's one in a million, that's a

14:53:42 15    different argument than if it does it half the time.  But I

16    have a right to know that.  I ask that you allow us to do the

17    testing as proposed.  Thank you, sir.

18           THE COURT:  Thank you.

19           Ms. Helart.

14:53:55 20           MS. HELART:  One very important fact, is the Court

21    still okay with taking some testimony from --

22           THE COURT:  Yeah.

23           MS. HELART:  Okay.  One point is from

24    Detective Daniels about the statement that Ms. Loehrs made

14:54:12 25    about law enforcement software has -- or law enforcement has

14:54:15  1    the ability just to get on other people's computers.  If

2    that's a reference to the *Tolworthy* case, Agent Daniels knows

3    about that case and can discuss that specifically.

4            THE COURT:  Well, I don't know that we need to.  I

14:54:30  5    don't think that's a particularly critical point here.

6            MS. HELART:  Okay.

7            Okay.  Because it just can sit out there and it

8    sounds terrible without some more explanation.

9            The part that I would ask Detective Erdely to be able

14:54:46  10   to speak about is the scoring that is done in these 18-page

11   protocol of these nine tests or however many tests the Court

12   does.  Detective Erdely and I had a discussion about this and

13   I really do understand the balance.

14           This Court could look at the government and say, I

14:55:06  15   get it, government, you don't want any of this testing and you

16   handle whatever are the results in cross-examination.  You

17   have the ability to do other testing and show other results

18   and just do it during cross-exam.

19           But a big concern that I do want to note is that what

14:55:24  20   I don't want this to be is an endgame for a motion in limine

21   to exclude the investigation because Detective Erdely can look

22   at this scoring and he knows how the BitTorrent network

23   generally operates.  Some of the tests or many of the tests

24   are -- looks like a failure if something doesn't happen within

14:55:47  25   10 tries or if something doesn't happen within 10 minutes, and

14:55:51   1    so the software by these standards, which I have no reason to

2    know that they're industry standards or whatever standards,

3    they're Ms. Loehrs' standards, will fail.

4         And so what will that lead to is really the concern

14:56:08   5    of the government.  I understand we can handle a lot in

6    cross-examination, but I don't want it to lead to another

7    hearing based on, well, the software failed and what does that

8    mean.

9         So I would ask Detective Erdely to speak on the

14:56:21  10    scoring just to understand the BitTorrent network generally.

11         MR. ERDELY:  Thank you, Your Honor.  I'll be very

12    quick.  I apologize for taking up your time.

13         But a lot of these tests are actually describing how

14    BitTorrent works.  For instance, test 2, partially parsed

14:56:41  15    torrents.  Will they be visible to our search tool?  The

16    answer is yes.  I conceded that.  But it is also visible to

17    every other BitTorrent client.  So I don't understand the

18    test.  She's going to score us and potentially pass or fail

19    us.

14:56:58  20         Test 3 is very concerning because in the scoring of

21    test 3, and it is outlined in the affidavit Your Honor has

22    that I filed or gave to the U.S. Attorney here.  If Torrential

23    Downpour attempts to connect to the suspect computer, meaning

24    it logs a connection at least once, it's a failure.

14:57:23  25         That's a huge issue because, first of all, I have

14:57:29  1  been involved in many cases with Ms. Loehrs.  She knows that

2  our software will continue to connect.  And I'm telling the

3  Court today that we will attempt to connect to the computer if

4  the user has hit the delete key or stopped sharing.  And the

14:57:46  5  reason for that is outlined in my affidavit so I won't take

6  too much time, but the BitTorrent network is not real time.

7  So if I'm online right now at this moment in time and I load

8  that torrent, it's parsed, using her terminology, into my

9  BitTorrent program and it's communicated with the network,

14:58:05  10  there is an association with my IP address and that torrent.

11          Now, ten seconds later, I shut my computer or I turn

12  off my BitTorrent program or my internet goes down.  Does

13  BitTorrent stop telling the world about this association

14  between my IP address and that torrent?  The answer is no.

14:58:25  15  UTorrent will continue to connect to a client even after they

16  hit delete, which is test 3, or move.  But yet one attempted

17  connect in her scoring fails us.

18          So I'll end it by saying this:  I don't understand

19  why the scoring.  If she's testing for single-source

14:58:47  20  downloading, then either we do single-source downloading and

21  she reports that, or we don't and she reports that.

22          If we try to connect to a computer after she has

23  deleted the data or moved the data, I don't understand why the

24  need to say, oh, they failed.  And I don't understand what her

14:59:12  25  baseline is for failing us because uTorrent operates exactly

14:59:15  1    in the manner that we do.  We will attempt to connect because,

2    again, the BitTorrent network is not real time.  These indices

3    on the network are remembering.  A day, a week, potentially

4    even a month.  And that is when we use Torrential Downpour to

14:59:34  5    knock on the door and see, are you still running your

6    BitTorrent software?  Are you still associated with that

7    torrent?  And if the answer to those two questions is yes,

8    then the next logical thing happens with any BitTorrent client

9    is we exchange information about what we have to share.

14:59:49  10            We continually knock on the door.

11            And test 3 is going to fail us the first time we

12    knock on the door after you delete that data.

13            I would just suggest whatever this Court orders her

14    testing to be or allowed to be, that she just reports her

15:00:05  15    findings.  I just don't understand the scoring.  And it just

16    appears, and I'm telling the Court now here today, we will

17    fail test 3 because we will try to connect to that computer

18    after she deletes the torrent because there's no communication

19    from her BitTorrent software to the network to say that that

15:00:24  20    happened.  That's not part of the BitTorrent protocol.

21            THE COURT:  Okay.

22            MR. ERDELY:  That's all I want to say, Your Honor.

23    Thank you.

24            THE COURT:  All right.

15:00:32  25            MS. HELART:  All right.  And my final comments really

15:00:34  1    were written into the June 24th, I do believe the Court knows

2    what our concerns are.  But really emphasizing we just so

3    object to tests 1 through 6 for their -- mostly for their

4    connection to the ICAC COPS database; 3 and 4 for the

15:00:51  5    potential Fourth Amendment.  But dealing with the functions of

6    Torrential Downpour Receptor and Torrential Downpour, the only

7    thing involved in Mr. Gonzales's case was Torrential Downpour.

8    Connecting to the ICAC COPS database, I know that on the

9    August 14th submission made by Ms. Hull there was a suggestion

15:01:10  10   that she, meaning Ms. Loehrs, could have limited log-on access

11   to ICAC COPS.  But that's not a feature of ICAC COPS.  Nobody

12   can have limited log-on access.

13        So full access to ICAC COPS means the full analogy

14   that I made in the June 24th.  We're dropping her into a room

15:01:31  15   full of law enforcement officers talking about their cases,

16   identifying IP suspects, IP addresses of suspects, the IP

17   addresses of the officers, real physical addresses of people.

18   We're -- we would -- it would be very burdensome to clone this

19   database, simulate the database, it wouldn't react in its

15:01:55  20   native format.  I know that that's something that they really

21   want to do.

22        But at the same time, a lot of their tests talk about

23   files of non-investigative interest.  Presuming those are

24   torrents of the space shuttle, something completely lawful to

15:02:10  25   do.  But that's even problematic with ICAC COPS because we

15:02:14  1   can't put those kind of files in ICAC COPS because then the

2   universe of police officers using ICAC COPS starts

3   investigating those as torrents that have child exploitative

4   material, and now we start making real intrusions into

15:02:32  5   people's investigations and they have to make explanations to

6   defense lawyers and defendants and prosecutors.  It's just not

7   workable to do that.

8        So the ICAC COPS portions of the June 24th hearing is

9   something I would reiterate word for word.  I won't do it, but

15:02:51  10  it is something critical to us not to let a defense expert

11  have access to ICAC COPS.

12       The only people who currently have access are the

13  people who have gone through a training process, they have

14  licensing, like Agent Daniels.  He's not authorized to give

15:03:07  15  it.  He is authorized to connect to it.  But it's a database

16  that has obviously critical and sensitive information.

17       So with that, we know that the Court understands the

18  issues.  Thank you.

19       THE COURT:  Okay.  Thanks.

15:03:20  20  Ms. Hull, did you have any final comments?

21       MS. HULL:  Last word, Judge.

22       With, respectfully, my understanding, and I'm not

23  cross-examining, I'm just going off of lots of transcripts

24  that Mr. Erdely is not himself someone who tests software for

15:03:44  25  a living or is a programmer.  So I don't believe that his

15:03:51  1   questions about the testing are relevant because there's

2   nothing to say that these are industry standards.

3          And, Judge, if it's Ms. Loehrs that's the problem, we

4   can get another agency or entity to do the testing.

15:04:15  5   Ms. Loehrs is not the evil person they make her out to be.

6   She is an expert.  And they keep attacking her integrity,

7   saying she's going to disseminate this stuff, she's not going

8   to forget.  Well, they have officers who have left the job

9   that used to work on this.  Those people don't forget either.

15:04:40 10   She's no less trustworthy.

11          That's all I have, Your Honor.  Thank you.

12          THE COURT:  All right.  Thank you.

13          Let me just ask two questions just to make sure I'm

14   right on a couple of facts.

15:04:51 15          I understand from what was said by the government

16   that when COPS communicates with Torrential Downpour in an

17   automated way, the only thing I think you said, Mr. Erdely,

18   that it communicates are those three pieces of information:

19   The IP address, the port, and the hash value for the torrent;

15:05:18 20   is that right?

21          MR. ERDELY:  Yes, Your Honor.  The info hash of a

22   torrent or if you have the actual torrent itself.  Three

23   pieces of information:  IP, port, and info hash, which is also

24   saying torrent, yes, Your Honor.

15:05:30 25          THE COURT:  And I think you said when you provided

15:05:31   1   that explanation, you said you could show that.

2           MR. ERDELY:  Absolutely, Your Honor.  I could show

3   that in a test.  I could devise a test where we actually pull

4   data directly from ICAC COPS and you can see it's those three

15:05:46   5   pieces of information.  I could do that -- and when you input

6   it, you know that's the three pieces of information because

7   there's a place for you to place it.

8           THE COURT:  And you're saying no other instructions

9   are given by COPS to Torrential Downpour.

15:06:02  10           MR. ERDELY:  No, not for the investigation.  You need

11   those three pieces of information and then the investigation

12   begins.  There's no more instructions to get -- there is

13   preference.  I apologize.  There is preference given.  We try

14   to download the files of interest first.  But it's just a

15:06:17  15   matter of what pieces of data we're asking for.  I apologize.

16   I didn't think about that particular aspect of it.  But there

17   is a priority we built in, just like the end user can do the

18   same thing, they can select which file that they want.

19   There's check boxes in any standard client.

15:06:38  20           THE COURT:  Which file in the torrent they want?

21           MR. ERDELY:  Right.  Because, again, we target the

22   torrent, not the files necessarily.  But there is the ability,

23   because we know which file matches our files of interest,

24   however, we don't know maybe what the other 99 files are.

15:06:54  25   They could have names that describe child pornography and

77

15:06:56   1   we'll download them and if they're chargeable, okay, but if

2   not, we don't charge them.

3            But the standard clients have a similar function.

4   When you load the torrent into the program, a window pops up,

15:07:08   5   and if there's ten files in that torrent you can select or

6   deselect those files you'd like to give preference to.  So

7   it's like --

8            THE COURT:  You're saying COPS does that?

9            MR. ERDELY:  Yes.  In ICAC COPS there is the ability

15:07:26  10   to try to download the files we're familiar with before the

11   rest of the files.  But at the end of the day we try to just

12   download all of the files.

13            THE COURT:  So COPS will say this torrent has ten

14   files in it, download these three first.

15:07:42  15            MR. ERDELY:  You have the option to do that, yes,

16   Your Honor.  Just like the standard client, you could pick and

17   choose which files within the torrent to download.

18            THE COURT:  I thought you indicated COPS does that,

19   COPS states a preference.

15:07:54  20            MR. ERDELY:  Yes.  ICAC COPS knows what files are

21   files of interest.  However, we target -- we do the

22   investigation simply at the torrent level.  However, the

23   system knows as we evaluate these torrents, I'm the evaluator,

24   we know which files are files of interest.  But, again, it's

15:08:15  25   just like the standard client, you can pick and choose which

15:08:18   1   ones to download.  We have the ability -- when the user tells

2   us what they have to share.

3          So, for instance, they have 50 of 100 pieces and

4   we're allowed to ask for any of those 50 pieces they have.  We

15:08:32   5   can be smart about what we ask for and ask for piece two,

6   three, and four, because we know that that is one of our files

7   of interest that we investigate.

8          THE COURT:  And does COPS do that?  Does COPS say

9   pick two, three, and four?

15:08:52  10          MR. ERDELY:  ICAC COPS has the information about

11   which ones are files of interest and which ones aren't, yes.

12          THE COURT:  So does that mean that Torrential

13   Downpour is communicating back to COPS saying which of these

14   50 should I get?

15:08:58  15          MR. ERDELY:  No.  No, I don't think it goes the other

16   direction.  It doesn't go the other direction.

17          That's the information provided at the time that the

18   job is initiated.  So there is that functionality.

19          THE COURT:  So what does it say?

15:09:13  20          MR. ERDELY:  It tells --

21          THE COURT:  What is the information provided?

22          MR. ERDELY:  It tells the system which files are

23   files of interest.

24          THE COURT:  You're saying --

15:09:21  25          MR. ERDELY:  We give preference to that because it

15:09:24   1   would give us a greater opportunity before we get cut off or

2   before the guy goes offline to download files we think are

3   most likely child pornography, and then we get the rest of

4   them anyways.

15:09:35   5           THE COURT:  I was going to ask about that last

6   statement.

7           So when it sends those three pieces of information

8   you described, it also says these are the ones we're most

9   interested in?

15:09:46   10           MR. ERDELY:  Yes, I would get output of that data.

11           THE COURT:  You're saying Torrential Downpour will

12   look for those first --

13           MR. ERDELY:  Yes.

14           THE COURT:  -- but before it stops its download, it

15:09:57   15   will get everything else, too?

16           MR. ERDELY:  It will give preference to the files we

17   believe are files of interest, but it's still going to get all

18   the rest of the files as well.

19           THE COURT:  Give preference meaning download first?

15:10:07   20           MR. ERDELY:  Download first if those pieces are

21   available to make up that file.

22           THE COURT:  Anything else that COPS tells Torrential

23   Downpour?

24           MR. ERDELY:  No.

15:10:18   25           THE COURT:  The second question that I had, which is

15:10:20   1   really to both sides, am I correct that when the tablet of

2   Mr. Gonzales was forensically searched, you looked in both

3   allocated and unallocated space; is that right?

4          MS. HELART:  Can you define -- was searched by the

15:10:42   5   forensic exam --

6          THE COURT:  When you examined it, yeah, did you

7   look --

8          MS. HELART:  When the examination.  All right.  Let

9   me ask that question.

15:10:47  10          THE COURT:  -- did you look in both allocated and

11   unallocated space?  In other words, did you look at everything

12   you could on the tablet?

13          MS. HELART:  Agent Daniels did that examination.  He

14   looked at allocated and unallocated space.

15:11:02  15          THE COURT:  Okay.

16          MS. HULL:  We just looked in -- our understanding is

17   we looked in --

18          THE COURT:  Go ahead, Ms. --

19          MS. LOEHRS:  We only corroborate what he finds.  In

15:11:07  20   order for us to go into unallocated space is a very lengthy,

21   time-consuming, expensive process.  So we don't do that if

22   there's nothing there that we need to worry about.

23          THE COURT:  So you didn't go look --

24          MS. LOEHRS:  We did not go looking through

15:11:20  25   unallocated; correct.

81

15:11:22  1          THE COURT:  All right.

2          MS. HULL:  Your Honor, if I may, I think Mr. Erdely

3     just made our case for needing COPS because they have changed

4     their story from what it was just moments ago about what COPS

15:11:33  5     looks for and how it looks for it.

6          If, in fact, it can target the file within the

7     torrent, that's contrary to what they said before.  They said

8     they download the torrent.  If they can target that, then why

9     are they going after legal files, is my question.  Again, I

15:11:56 10     think he just made our case for needing ICAC COPS in testing.

11          MR. ERDELY:  To be clear, Torrential Downpour

12     operates completely independent from ICAC COPS.  You input

13     those three pieces of information and it will initiate an

14     investigation.

15:12:18 15          And I apologize, it was not my intent to mislead this

16     Court, but --

17          THE COURT:  What is your answer to Ms. Hull's

18     question if ICAC COPS knows the files it wants out of a

19     torrent, why does it pick up everything else as well?

15:12:32 20          MR. ERDELY:  We don't have every file on the

21     internet.  We have four million files that we've amassed

22     through these investigations through the years.  If we only

23     downloaded the files we knew about, we could preclude about

24     learning about new files that are being traded.  And obviously

15:12:49 25     we all know in this room that the file names are not always an

15:12:52  1   indicator of what you might see.  Some are named very

2   descriptively and some are not.  We download everything, just

3   like anybody else on the network does; however, and, again, it

4   wasn't intentional, there is a prioritization scheme that's in

15:13:11  5   place because when we process a torrent, we know the ones

6   which match our files, but we don't know what we don't know.

7   I don't know what those other 99 files are.  It's paired with

8   child pornography or child exploitation material, so certainly

9   I want to see all of the other files in this one single

15:13:28  10   torrent.

11        So it's not a matter of me wanting to download not --

12   or -- perfectly legal files, it's a matter of downloading the

13   rest of the files associated with this torrent that has a file

14   that we're interested in that relates to child exploitation

15:13:47  15   and determining what those other 99 files are.  It's not

16   designed to download legal files.  It's designed to download

17   everything and to determine through the review of the case

18   agent.

19        THE COURT:  Okay.

15:13:59  20        30 seconds.

21        MS. HULL:  Judge, they already know what's in these

22   torrents.  They're saying they have over four million, but

23   according to Mr. Goodyear, only 2500.  I mean, if they know

24   what -- if they know what is in all of these, then why do they

15:14:19  25   have four million but only 2500 contain -- again, we need to

15:14:24   1   include COPS in the testing, Judge.

2          THE COURT:  All right.  I think we've plowed this

3   ground enough.

4          MS. HELART:  Okay.  There's 2500 torrents.  There's

15:14:32   5   four million files.  A torrent is different than a file.

6          THE COURT:  All right.  Thank you for all of the

7   information.  It's helpful.  I will take this under

8   advisement.

9          (End of transcript.)

15:14:45   10                         *  *  *  *  *

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# C E R T I F I C A T E

I, PATRICIA LYONS, do hereby certify that I am duly appointed and qualified to act as Official Court Reporter for the United States District Court for the District of Arizona.

I FURTHER CERTIFY that the foregoing pages constitute a full, true, and accurate transcript of all of that portion of the proceedings contained herein, had in the above-entitled cause on the date specified therein, and that said transcript was prepared under my direction and control, and to the best of my ability.

DATED at Phoenix, Arizona, this 26th day of August, 2019.


s/ Patricia Lyons, RMR, CRR
Official Court Reporter