**Storrs Law Firm, PLLC**
Zachary Storrs
Arizona State Bar No. 025780
1641 E. Osborn Rd. Ste 8
Phoenix, AZ 85016-7146
Telephone (480) 231-0126
Facsimile (602) 955-4701
Zstorrs@hotmail.com

*Attorney for Defendant*

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| United States of America, | Case No. CR-17-01311-PHX-DGC |
|---|---|
| Plaintiff, | |
| vs. | **DEFENDANT'S MOTION TO COMPEL ADDITIONAL DISCOVERY AND NOTICE OF FILING OF TORRENTIAL DOWNPOUR VERSION 1.33 TESTING AND ANALYSIS** |
| Anthony Espinosa Gonzales, | |
| Defendant. | *(Evidentiary Hearing Requested)* |

Comes now Defendant, Anthony Espinosa Gonzales, by and through undersigned counsel, pursuant to **Brady v. Maryland**, Rule 16 of the Federal Rules of Criminal Procedure, and the Due Process Clause of the 5th Amendment to the United States Constitution and requests that this Court enter an additional order to compel the Government to disclose additional discovery, including all previously requested discovery relating to the law enforcement Computer program "Torrential Downpour" utilized by investigators in this matter. This motion incorporates by reference pleadings,

allegations, and argument previously presented in this matter. This motion is further supported by the following Memorandum of Points and Authorities.

# MEMORANDUM OF POINTS AND AUTHORITIES

## Introduction

Mr. Gonzales requests that this Court order additional testing of the software relevant to this matter, to include programs Torrential Downpour, Torrential Downpour Receptor, and ICAC COPS. Specifically, Mr. Gonzales moves that this Court issue its Order directing that (1) further testing of the software be granted to the defense; (2) ICAC COPS be included in that testing; (3) additional source computers be included in that testing; and (4) industry standard testing be conducted on this suite of software by a qualified software testing company.

In support, Mr. Gonzales offers as **Exhibit A** to this pleading, the Torrential Downpour Version 1.33 Testing and Analysis report generated by Loehrs Forensics. The report results from an initial round of data retrieval and examination conducted in October of 2019 and is based upon the Court's Order entered on August 27, 2019 (**Doc. 86**).

## Facts

The truth and accuracy of the Government's claim that its software conducts a single source download, to include ICAC COPS, is absolutely material to the defense. The Government has acknowledged that the entirety of the evidence on the eight

distribution charges is comprised of the logs of its own software stating that the child pornography was downloaded from Mr. Gonzalez's computer.  On January 31, 2019, the following exchange took place between this Court and AUSA Helart:

> The Court:  The distribution charged in each of these counts [Counts One through Eight] is the sharing of the video from defendant's computer to the Government's computer.  That is the act of distribution that's charged; correct?
>
> Ms. Helart:  That is correct.
>
> The Court:  It's not distribution with anybody else, it's that distribution.
>
> Ms. Helart:  Correct.  Yes.

**RT 1/31/19**, p. 141, l. 23 to p. 142, l. 4.

Later in the hearing, there was discussion about the limitation of the Government's evidence:

> The Court: Yeah. But, again, the only evidence you have that that video that you will be showing the jury came from the defendant's computer is what Torrential Downpour and its logs tell you.
>
> Ms. Helart: It is true.

**RT 1/31/19**, p. 143, lls. 18-22.

On, June 28, 2018, the defense filed a Motion to Compel Discovery; Preclude Certain Evidence.  Following the Government's Response, an Evidentiary Hearing was held on August 16, 2019.  The defense proposed conducting nine tests of the software.  In the Court's Order, filed on August 27, 2019, tests one and two were deemed unnecessary because the Government conceded that the Torrential Downpour software program will identify non-parsed and partially-parsed torrents of investigative interest. [Doc. 86].  The

Court granted Mr. Gonzales' request to conduct proposed tests three and four, however without the inclusion of ICAC COPS. The Court denied the request for tests four and five. Tests seven, eight, and nine were ordered without objection from the Government. The Court also granted a request to present a supplemental brief. The defense asserts that the tests conducted pursuant to the Court's order entered on August 27, 2019, provide direct evidence and support that the issues raised are material to the preparation of a defense, provide evidence that there is a 4th Amendment issue that must be addressed, and demonstrate that further testing is necessary to protect Mr. Gonzales' constitutional rights. A description of some of the tests conducted demonstrates some of the reasons that further testing is required.

The defense respectfully underscores that the results of live testing and forensic analysis of the Torrential Downpour software has revealed two important realities. First, contrary to the Government's repeated claims, Torrential Downpour may identify data that exists outside of shared space to include deleted data. Second, the Government cannot rely on log files alone because Torrential Downpour may falsely report that a user possesses data that has been deleted.

**Test VII: Single Source Download**

Pursuant to Section VI of the report, "the seventh test determines the accuracy of Torrential Downpour limiting downloads to a sole IP address against the BitTorrent protocol." The Single Source Download test was designed to determine Torrential Downpour's accuracy in limiting downloads to a sole IP address against the BitTorrent protocol. This is significant because it assures law enforcement that the entirety of the

illegal files came from one suspect, as opposed to incomplete pieces from multiple suspects, as the BitTorrent protocol is designed and instructed to operate by default. The specific goal of the test is to determine whether Torrential Downpour will obtain files from other sources during the course of an investigation. However, during the testing the Government manually instructed Torrential Downpour to connect to a single IP address. The software did not run natively in an automated state, nor was it used to investigate suspects concurrently. In other words, the test did not allow the software to fail. This would be analogous to testing the safety features of a car without conducting a controlled car crash. Therefore, this test is incomplete and inconclusive.

The single source download test of Torrential Downpour was conducted to determine if the program limits "downloads to a sole IP address against the BitTorrent protocol." (**Exhibit A**, p. 4). More directly, "the question is whether Torrential Downpour will obtain files from other sources when it is unable to conduct a single source download." (**Id.**). The test is ultimately meaningless in regard to the actual functionality of the program as it is used by law enforcement.

## Argument

The Court found Torrential Downpour material to the defense under Rule 16(a)(1)(E(i). (Court's Order, Doc. 86). Nothing could be more material to Mr. Gonzales' defense. Again, the logs compose the entirety of the evidence for the distribution charges. Testing demonstrates that those logs are flawed. As noted in the Court's Order: "Evidence is 'material" under Rule 16 if it is helpful to the development

of a possible defense" **United States v. Budziak**, 697 F.3d 1105, 111 (9th Cir. 2012). Due process requires additional testing. It is fundamentally unfair to ask a defendant to defend against allegations that are entirely based upon flawed logs without allowing that defendant to ascertain the extent to which those logs are flawed and how those flaws may have affected the only evidence presented against him. To prevent a defendant from doing so is to effectively prevent him from confronting his accuser.

The Defendant here wishes to address three primary issues related to these findings. First, the Government conceded that Torrential Downpour will identify suspects in child pornography investigations who have no illegal content per the Non-Parsed Torrent and Partially Parsed Torrents tests. Because of this, and because the associated torrents and files identified by Torrential Downpour during the FBI investigation were not located on Mr. Gonzales' computer, the defense has evidence that Mr. Gonzales could have been improperly identified by Torrential Downpour when he did not possess any illegal content.

Second, the testing revealed Torrential Downpour will identify suspects as possessing child pornography for data that has been deleted and unshared. This result, combined with the fact that the associated torrents and files identified by Torrential Downpour during the FBI investigation were not located on Mr. Gonzales' computer, demonstrates that Mr. Gonzales could have been inappropriately identified by Torrential Downpour when he did not publicly share any illegal content. It is anticipated that the Government will argue the difference in Mr. Gonzales' case is that Torrential Downpour

reported downloading data whereas the testing only identified the suspect and could not download any content. This raises the third issue.

Third, the testing was largely inconclusive due to the limitations imposed on testing the single source download feature of Torrential Downpour. There are essentially two steps in an investigation using Torrential Downpour: the identification of a suspect possessing suspected child pornography and downloading data from the suspect as distribution of child pornography. In this case, Torrential Downpour first identified Mr. Gonzales as a suspect possessing child pornography. The testing revealed Torrential Downpour can and will falsely identify suspects as possessing suspected child pornography that is deleted and unshared. Next, Torrential Downpour allegedly downloaded illegal material from Mr. Gonzales' IP address. The testing did not allow Torrential Downpour to connect to multiple suspects and, therefore, the testing could not determine the possibility that data could have been downloaded from a source other than Mr. Gonzales during the investigation in this case. There are two logical explanations: the data was present in shared space when downloaded or it came from somewhere else. If the data was not on the computer, it must have been downloaded from ICAC COPS or from other users being monitored. Therefore, the Torrential Downpour logs relied upon by the Government as evidence that Mr. Gonzales possessed and distributed suspected child pornography are, in fact, unreliable.

Because none of the suspect files that were charged in Counts 1-8 were found on Mr. Gonzales' computer, there is no forensic evidence to corroborate claims presented by the Government. If the software performed as described by the Government, the files

must certainly have been downloaded to the shared file, distributed during the undercover investigation, and deleted at some time between the undercover investigation and the date of seizure. However, if the software does not work as the Government has described, one of several possible scenarios must have occurred. The testing described in the report that constitutes **Exhibit A** addresses these scenarios.

An imperfect, but, nevertheless, instructive analogy is to consider a scenario in which a defendant is charged driving under the influence of alcohol where the blood alcohol analysis constitutes the only evidence against the defendant. A forensic analysis of Mr. Gonzales' computer revealed none of the materials that constitute the distribution charges. This is analogous to a driver who presents no poor driving, no smell of alcohol, no slurred speech, and no other indications of alcohol ingestion. In addition, the results of the forensic analysis of the computer is also analogous to a driver who has taken and passed all field sobriety tests and who has given no indication of being inebriated. If the sole evidence against this defendant is the result of the blood analysis, nothing can be any more material to the defense than the reliability of that analysis. If that defendant develops evidence that the blood analysis is flawed in a way that might directly affect the analysis of her blood, but is not permitted to seek out and present that evidence, then that defendant can present no meaningful defense at all.

Here, there is demonstrable evidence that the Torrential Downpour logs are unreliable when describing exactly the type of information which forms the basis of the charges against Mr. Gonzales. One difference between the scenarios is that there would be no probable cause for a traffic stop or for further testing in the DUI example, whereas,

here, the Government is able to conduct the download without probable cause because the data that they seek is presumed to be in shared space. Another distinction involves the novelty and complexity of the subject matter. In a DUI case, jurors typically have knowledge of alcohol use and real world experience that would be likely to make them understand the issues and question the lack of evidence of alcohol consumption in comparison to the alcohol analysis. Conversely, jurors likely would not have relevant knowledge or experience in a trial involving complex issues surrounding a network with which they are unlikely to have any experience and a government software program with which they will necessarily have none.

## Amendment of Prior Arguments

In order to provide proper context, Mr. Gonzales seeks to review and underscore certain positions previously advanced by both the defense and by the Government. The defense asserted in its first motion that it had reason to believe that the Government software used here accesses data beyond the public domain. (**Doc. 25**, p. 6). The Court has previously established that the log files the Government intends to use in this case are generated in their entirety by Torrential Downpour. Furthermore, the Government has repeatedly avowed that the evidence that Torrential Downpour captures is solely within the public domain.

In its Response the Government alleged as follows: "It is important to note that Torrential Downpour obtains *only* what is being offered *to the public* on the BitTorrent

network." (*Emphasis added*).  (**Doc. 29**, p. 9, l. 4).  Further, at the evidentiary hearing held January 31, 2019, the following exchange was held regarding the log files:

> The Court: But they are 100 percent a product of Torrential Downpour.
>
> Ms. Helart: They're generated by Torrential Downpour.
>
> The Court: They purport to show what Torrential Downpour was doing.
>
> Ms. Helart: It's what Torrential Downpour captured *in the public space*.

**RT 1/31/2019**, p. 145, ls. 11-18. (*Emphasis added*).

The Government's witness at the August 16, 2019 hearing, testified similarly: "Detective Erdely testified that Torrential Downpour never obtains any unshared information from any computer running BitTorrent compatible software; rather, the Torrential Downpour law enforcement software searches the .torrent download candidates the same that any public user of the BitTorrent network searches and 'only searches for information that a user has already made public by the very use of the [uTorrent] software.'" (**RT 8/16/19** at p. 42).  Detective Erdely further explained that due to the BitTorrent software's matching of SHA-1 hash values of downloaded pieces "*it would be absolutely impossible to randomly download files from a suspect's computer which are from unshared folders.*" (Government's Response, **Doc. 29**, p. 9, l. 25 to p. 10, l. 8, (*Emphasis added.*))

    The defense asserts that the Government universally claims that this software cannot possibly access unshared folders.  In fact, at the evidentiary hearing held on August 16, 2019, this Court inquired of the defense if it had any evidence that Torrential

Downpour accessed data in the defendant's computer that is beyond the shared space or public domain. The defense responded that it did not have evidence at that time. The testing conducted by Loehrs Forensics changes this entirely. The data collection and analysis conducted thus far provides clear evidence that this claim by the Government is false.

This is a hugely important point for several reasons. The first reason is that Mr. Gonzales and defendants in other cases have previously asserted that the Government software does not function as the Government claims. (*See* **Doc. 25,** Motion to Compel Discovery; Preclude Certain Evidence). One example of Government claims regarding access to unshared folders is evidenced by an ROI generated by an agent in attendance at the data collection conducted in this case in October of 2019, but not disclosed to the defense in this case. An ROI was made a part of the record in a case in the United States District Court of Alaska: United States v. Matthew William Schweir. **Exhibit B** (Case 3:17-cr-00095-SLG, Document 221-1, 10/16/19). The ROI was used by the Government in Alaska and elsewhere to assert, not that the software executed the tasks instructed within the parameters of the testing protocol, which is all it could claim since analysis had not yet even begun, but that it functioned as the Government has claimed it functions. These are two very different things. The ROI makes it clear that a distinction can be drawn. This distinction has, however, in some cases, been lost. In this case, the Government has chosen to not only not disclose to the defense this ROI, but has not attempted to make this assertion. The Government cannot successfully make this claim here, as the defense was present at testing.

The Government has zealously fought against disclosing information about its software. However, the Government may not misrepresent the function of the software under scrutiny in order to prevent the Court from granting the defense access to that which it should be entitled based upon Mr. Gonzales' constitutional rights. While the Government may claim to be making these allegations based upon what the software owner asserts, the Government is now on notice that, if that is the case, the owner's assertions may not be trusted.

Based upon the testing and validation of the Torrential Downpour software to date, it is apparent that the software will identify files on a suspect's computer that have been deleted or moved into non-shared locations. Further, the log files created by Torrential Downpour will falsely indicate that the user still has the files in spite of those files being deleted or unshared. This is material to Mr. Gonzales' case because the files were not found on his computer and the Government relied only on the Torrential Downpour logs that, based upon testing, may have been false.

Although Torrential Downpour was unable to download any deleted and unshared files from the suspect computer during testing, two critical elements were omitted from the test, (i) Torrential Downpour's ability to obtain the files from other sources pursuant to the BitTorrent protocol, and (ii) Torrential Downpour's ability to obtain the files from the ICAC COPS database. It is imperative that these two elements are included in the testing and validation of the Torrential Downpour software to determine whether Torrential Downpour falsely identified Mr. Gonzales as having those files not found on his computer and whether Torrential Downpour obtained those

files from some other source, such as other users, ICAC COPS, or both. These issues remain relevant even in the scenario in which a detective manually directs the software.

## Additional Evidence Regarding Single Source Download

The theory of the Government's case and the sole evidence supporting the distribution charges. Because of these facts, the Government must prove that, indeed, their computer did not receive the charged items from any other source than defendant's computer. The BitTorrent network normally functions by use of multi-source downloads and the Government claims that its software modifies this, guaranteeing that its software only downloads from a single source. Its proof is nothing more than the logs of its own software. In order to adequately defend against these claims, it is absolutely material and essential to the defense to thoroughly test this software utilizing the entire suite of software to include ICAC COPS.

Now that initial data gathering has been conducted, the defense can demonstrate that at least two additional tests must be conducted to determine whether the Government's assertion of a single source download is, in fact, accurate.

First, because the structure of the data collection utilized only one suspect computer, determination of single-source downloading cannot be confirmed. In other words, one additional factor must be included in additional testing: the use of other computers that possess and share parts of the file to confirm that Torrential Downpour *cannot* obtain files from other computers. This fact is absolutely material to the defense of this case.

Second, ICAC COPS is likewise material to further testing. Statements made by Government experts in court support the claim that it is a suite of software rather than independent working parts.

## Disclosure of ICAC COPS is Required Pursuant to Rule 16

The Government has repeatedly claimed that ICAC COPS and Torrential Downpour operate independently for purposes of Torrential Downpour's connection to the suspect computer and it is, therefore, unnecessary to explore and immaterial to the defense. For instance, this exchange between the Court and Mr. Erdley:

> The Court: When the Torrential Downpour program takes those three pieces of information and goes out to a computer and communicates and attempts to download child pornography, is COPS doing anything in that process.
>
> Mr. Erdley: No. Nothing.

**RT 8/16/19** at p. 42.

The data analysis conducted demonstrates that this is not accurate. The data analysis performed to date verifies that ICAC COPS is an integral and essential component of the software and must be included in testing in order to satisfy industry standards regarding function and accuracy. From the Loehrs Report:

> ... [U]pon learning that references to the ICAC COPS database is contained within actual system files of the software, it is reasonable to assume that it must also be contained within the source code. If this is true, it would be fundamental to the testing process to analyze the source code to determine the importance of the ICAC COPS database as it relates to the overall functionality of the Torrential Downpour software. For example, if Torrential Downpour is unable to obtain a file from the suspect, ICAC COPS could potentially intervene to obtain the file from its own database or send instructions to the Torrential Downpour software to obtain the file from other IP addresses.

**Exhibit A**, p. 7

This specifically addresses the issue of why Agent Daniels may direct Torrential Downpour to one IP address, but it could nevertheless seek the data elsewhere. As an example, ICAC COPS could instruct Torrential Downpour to access other computers to obtain the illegal parts of the torrent. If Torrential Downpour locates only the hash value of an illegal file, but not the file itself, ICAC COPS could obtain those illegal files from its own database. These possibilities must be considered in light of the fact that none of the files charged in Counts 1 through 8 were found on Mr. Gonzales' computer.

Gerhard Goodyear, who worked with Mr. Erdley on development of this software, has testified that the parts of this suite cannot be properly tested separately. (*See* 8/16/19 RT at p. 44 and **Doc. 81-2**.) Agent Daniels, the Government expert in this case, also testified in United States v. Douglas Allen Jones, (Case 2:18-cr-08040-SMB) on November 26, 2019 as follows:

> Q. So Torrential Downpour, in order to launch the investigation you're talking about, it has to interact with this ICAC COPS database to learn about these leads?
>
> A. Only briefly. It's -- it's not doing the search function itself, but it's just gathering information from the database.
>
> Q. Without the information from the database, you can't really conduct your investigation. Fair to say?
>
> A. Um, for Torrential Downpour, yes.

District Court of Arizona. Case 2:18-cr-08040-SMB.

## Torrential Downpour Receptor

Finally, because Torrential Downpour Receptor has only recently been revealed by the Government's experts as working in conjunction with ICAC COPS and Torrential Downpour. It has not been tested for accuracy. The defense is unaware whether

Torrential Downpour Receptor works in the same or similar way as Torrential Downpour. Mr. Gonzales submits that Torrential Downpour Receptor logs are, likewise, material to the defense, as it is part of the suite of software used in this case.

Wherefore, Mr. Gonzales moves that this court issue its Order directing that (1) further testing of the software be granted to the defense; (2) ICAC COPS be included in that testing; (3) additional source computers be included in that testing; and (4) industry standard testing be conducted on this suite of software by a software testing facility chosen by the defense.

## Conclusion

For the reasons stated in this motion, Mr. Gonzales requests that this Court order the additional software testing requested.

RESPECTFULLY SUBMITTED this 1st day of May, 2020.

/s Zachary Storrs
Attorney for Defendant

**CERTIFICATE OF SERVICE**

I hereby certify that on May 1, 2020, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF system for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Hon. David G. Campbell
United States Senior District Judge
401 West Washington Street
Phoenix, AZ 85003
Campbell_Chambers@azd.uscourts.gov

Gayle L. Helart
Assistant United States Attorney
Two Renaissance Square
40 N. Central Avenue, Suite 1200
Phoenix, Arizona 85004-4408
Gayle.Helart@usdoj.gov

Brett A. Day
Assistant United States Attorney
Two Renaissance Square
40 N. Central Avenue, Suite 1200
Phoenix, Arizona 85004-4408
Brett.Day@usdoj.gov


By:/s Zachary Storrs