1   MICHAEL BAILEY
    United States Attorney
2   District of Arizona

3   GAYLE HELART
    California State Bar No. 151861
4   Email: Gayle.Helart@usdoj.gov
    BRETT A. DAY
5   Arizona State Bar No. 027236
    Email: Brett.Day@usdoj.gov
6   Assistant U.S. Attorneys
    Two Renaissance Square
7   40 N. Central Ave., Suite 1800
    Phoenix, Arizona 85004
8   Telephone:  602-514-7500
    Attorneys for Plaintiff
9

10                IN THE UNITED STATES DISTRICT COURT

11                   FOR THE DISTRICT OF ARIZONA

12
    United States of America,                No. CR-17-01311-PHX-DGC
13
                        Plaintiff,
14                                            **RESPONSE TO DEFENDANT'S
             vs.                              MOTION TO COMPEL ADDITIONAL
15                                            DISCOVERY AND NOTICE OF
                                              FILING OF TORRENTIAL
16   Anthony Espinoza Gonzales,               DOWNPOUR VERSION 1.33
                                              TESTING AND ANALYSIS**
17
                        Defendant.
18

19          The  government,  by  and  through  its  counsel,  hereby  responds  to  Defendant's

20   Motion to Compel Additional Discovery and Notice of Filing of Torrential Downpour

21   Version 1.33 Testing and Analysis, filed May 1, 2020.

22          The government requests this Court deny this motion in its entirety.

23          In this motion, the defense renews its request for this Court to grant all testing

24   requested previously, to grant further testing on the law enforcement database of ICAC

25   COPS, as well engage in testing that includes additional computers, and that industry

26   standard testing be performed.  (Docket 99[1] at 2).  Gonzales attaches the Loehrs Forensics

27   _____

28          [1]  Docket 99 refers to Gonzales's Motion to Compel Additional Discovery at issue
     herein, followed by the page number.  "Docket 99-1" refers to the Loehrs Forensic Report
     dated 1/2/20, followed by the page number.  "RT 1/31/19" refers to the Reporter's

1   report dated January 2, 2020 (hereafter "Docket 99-1") that is the summary of the analysis
2   of testing ordered by this Court, which took place at the Federal Bureau of Investigation
3   on October 7-9, 2019.

4          Loehrs Forensics did not report key pieces of information in its 150-page report, as
5   will be demonstrated below.  As a result, Loehrs Forensics' analysis fails to establish that
6   Torrential Downpour did not function accurately and consistently with the BitTorrent
7   protocol.  On October 7-9, 2019, during its testing of Torrential Downpour, Loehrs
8   Forensics performed the specific tests this Court ordered, all aimed at determining whether
9   Torrential Downpour performed single source downloads from a shared location on a
10  computer and whether Torrential Downpour accurately logged the information.  In the end,
11  Loehrs Forensics' analysis in its report does not support any irregularities with Torrential
12  Downpour v. 1.33.  Rather, the testing supports that Torrential Downpour functioned
13  properly when fully analyzing the data packet capture produced from the testing.

14                                      **Discussion**

15  **I.      October 7-9, 2019, Testing**

16         At the October 7-9, 2019, testing, the FBI operated the computer with the Torrential
17  Downpour software.  Loehrs Forensics operated the computer with the uTorrent software
18  and the .torrent files referred to in their report.  Generally, by Docket 99-1, this Court can
19  observe that the Loehrs Forensics tests consisted largely of creating anomalies by
20  manipulating .torrent files and/or the payload (*i.e.* contents) of a .torrent file by moving or
21  deleting (described in the Loehrs Forensics report as soft or hard deletions),[2] or changing
22  the names of the .torrent file, to observe how Torrential Downpour functioned after that
23  manipulation.

24

25

26  Transcript of the Motion to Compel hearing on January 31, 2019, followed by the page
    number.  "RT 8/16/19" refers to the Reporter's Transcript of the Motion to Compel hearing,
27  followed by the page number.

28         [2] A soft deletion means a file or data marked to delete, but that is not actually deleted
    and is easily recovered; a hard deletion deletes the file or data permanently.

It is important to note that Loehrs Forensics created these various anomalies by deleting, moving, or changing names of the files both inside and outside of the uTorrent program.  The only alleged failures of the Torrential Downpour software made by Loehrs Forensics occur after their manipulation of data *outside* the uTorrent program.  Detective Erdely discussed these expected results at the August 16, 2019, hearing, explaining that this is how the BitTorrent network operates when a user manipulates data outside of the uTorrent program.  (RT 8/16/19 at 71-72).

Loehrs Forensics utilized Wireshark[3] to record the transfer of data between uTorrent and Torrential Downpour.  Likewise, the government utilized Wireshark to capture the data transfer between Torrential Downpour and uTorrent.  Both parties exchanged results of their respective Wireshark exchanges of data.  Loehrs Forensics also visually recorded their computer screen during their testing.  In this Response, the government will use the same nomenclature as in the Loehrs Forensics report (Docket 99-1) by identifying the computer with the uTorrent software and operated by Loehrs Forensics as the "the Suspect computer" and the computer operated by the FBI as the "Torrential Downpour" computer.

During the testing, Loehrs Forensic conducted the following tests per this Court's orders,[4] keeping the Tests' names and numbering consistent with Loehrs Forensics' original larger request:[5]

**Test 3:  Deleted Torrent Data** (including control + 8 additional tests)[6]

**Test 4:  Unshared Torrent Data** (including control + 8 additional tests)[7]

---

[3]  Wireshark is a program that allows a user to capture the network data between two computers on a network, in this case, between the FBI's computer loaded with Torrential Downpour and the Loehrs Forensics' computer loaded with uTorrent.

[4]  Docket 51, Order dated February 19, 2019, and Docket 86, Order dated August 27, 2019.

[5]  Docket 54-4 at 10-13, Loehrs Forensic Report dated March 25, 2019.

[6]  Docket 99-1 at 40-58.

[7]  Docket 99-1 at 59-75.

1    **Test 7:  Single Source Download** (including 12 tests)[8]

2    **Test 8:  Detailed Logging** (including 12 tests)[9]

3    **Test 9:  Restricts Sharing** (including 12 tests)[10]

4    The tests that were not ordered and not allowed were Test 1 (Non-parsed torrents), Test 2

5    (Partially Parsed Torrents), Test 5 (Non-investigative Torrents), and Test 6 (Files of

6    Interest).

7    **II.      Results Reported by Loehrs Forensics Following Testing**

8            Docket 99-1 at 4-5, and 140-145 details the Loehrs Forensics reported results

9    following their testing.  In summary, Loehrs Forensics reported:

10       (1) **Test 3, Deleted Torrent Data--**a 90% pass / 10% fail rate of Torrential Downpour

11            during Test 7 when the Suspect computer deleted the payload of a torrent and

12            Torrential Downpour still successfully connected to the uTorrent computer and

13            identified the uTorrent computer as being in possession of the torrent after it was

14            deleted.  (Docket 99-1 at 4).

15       (2) **Test 4, Unshared Torrent Data**[11]--a 60% pass / 40% fail rate of Torrential

16            Downpour during Tests 3, 4, 7, and 8, when the payload was unshared using various

17            methods but Torrential Downpour still successfully connected to the Suspect

18            Computer and identified the Suspect as being in possession of the torrent after it

19            was unshared.  (Docket 99-1 at 4).

20       (3) **Test 7, Single Source Download**--a 100% pass rate of Torrential Downpour, but

21            with Loehrs Forensics' caveat that the testing was incomplete and inconclusive in

22            that it was given no opportunity to fail because only one IP address was manually

23            provided to Torrential Downpour.  (Docket 99-1 at 4-5).

24    ─────────────────

25            [8] Docket 99-1 at 76-83.

26            [9]  Docket 99-1 at  84-131.

27            [10]  Docket 99-1 at 132-139.

28            [11]  The government presumes "Torrent Data" means payload.

(4) **Test 8, Detailed Logging**—no obvious failures in reporting IP addresses, ports, torrent specifications and hashes, but Loehrs Forensics asserting there were logging issues in Tests 3, 4, 7, and 8, with respect to data that was recorded but not actually there because it had been deleted or unshared.  (Docket 99-1 at 5).

(5) **Test 9, Restricts Sharing**—a 100% pass rate of Torrential Downpour acknowledging that Torrential Downpour did not share data but with Loehrs Forensics' caveat that the testing was incomplete and inconclusive because of manually loading the Suspect's IP address for connection.  (Docket 99-1 at 5).

Now, Gonzales requests additional testing, to include Tests 1, 2, 5, and 6,[12] ICAC COPS, and Torrential Downpour Receptor,[13] all of which have been denied by this Court. Significantly, Gonzales supports his request by asserting the several ways the already completed testing showed the Torrential Downpour log files to be inaccurate and flawed.[14]

## III. Gonzales Has Not Shown Materiality for Further Testing, Access to ICAC COPS, Torrential Downpour Receptor, Additional Computers to be Included in the Testing, Nor Industry Standard Testing

Fed. R. Crim. P. 16 requires a party seeking discovery to make a showing of materiality for the information sought.  *United States v. Santiago*, 46 F.3d 885, 894 (9th

---

[12]  It is unclear to the government which further tests are requested in defense's motion based on the statement "Specifically, Mr. Gonzales moves that this Court issue its Order directing that (1) further testing of the software be granted to the defense…." (Docket 99 at 2), so the government will assume they want all the tests not granted previously.

[13]  Docket 99-1 at 2, 3, 6, 14, 15

[14]  *See e.g.*  **Docket 99-1 at 4** ("[t]he Government cannot rely on log files alone because Torrential Downpour may falsely report that a user possesses data that has been deleted"); **at 5** ("Again, the logs compose the entirety of the evidence for the distribution charges.  Testing demonstrates that those logs are flawed."); **at 6** ("It is fundamentally unfair to ask a defendant to defend against allegations that are entirely based upon flawed logs without allowing that defendant to ascertain the extent to which those logs are flawed and how those flaws may have affected the only evidence presented against him"); **at 7** ("…[t]he Torrential Downpour logs relied upon by the Government as evidence that Mr. Gonzales possessed and distributed suspected child pornography are, in fact, unreliable"); **at 12** ("Further, the log files created by Torrential Downpour will falsely indicate that the user still has the files in spite of those files being deleted or unshared"); **at 13** ("[The government's] proof [of single source downloading] is nothing more than the logs of its own software").

Cir. 1995).  Materiality requires a presentation of facts which would tend to show that the government is in possession of information helpful to the defense.  *Id.*, also citing *United States v. Mandel*, 914 F.2d 1215, 1219 (9th Cir. 1990).  Neither a general description of the information sought nor conclusory allegations of materiality suffice.  *Mandel*, 914 F.2d at 1219.  (In *Santiago*, denying request for BOP files of inmate witnesses as they were only conclusory allegations and not material to the case).  Here, Gonzales' request for even more testing is not warranted given the results of the already completed testing which do not support his unsubstantiated claims.

Gonzales argues three issues following the October 7-9, 2019 testing.  In support of his argument for additional testing, Gonzales claims:  (1) Torrential Downpour improperly identified him as having illegal content; (2)  Torrential Downpour inaccurately identified him as having illegal content to share; and (3)  If he did not possess any illegal content to share, then Torrential Downpour must have downloaded the illegal content from another source or from ICAC COPS.  (Docket 99 at 6-7).

At the heart of Gonzales' argument is the assumption that the Torrential Downpour's log files inaccurately report how the software functions.  However, as demonstrated by the defense testing, and the corresponding Wireshark data captures, Torrential Downpour accurately logged the data exchange between the Suspect computer and Torrential Downpour.  As such, Gonzales has not established anything new to meet his burden of showing materiality.  At the August 16, 2019, hearing, this Court was presented with the testing anomalies proposed by the Loehrs Forensics testing.  The government stated at that hearing that a user would be associated with a .torrent file on the BitTorrent indices[15] even if that user deleted or moved the payload of the .torrent file from their computer.  (RT 8/16/19 at 71-72).  Additionally, a user may still report that he possesses the payload of a .torrent file on his computer where he manipulated or deleted the payload data outside of the BitTorrent client.  (Docket 99 at 6; RT 8/16/19 at 72).  Detective Erdely

---

[15]  See Exhibit 1 ¶¶ 10, 11.

explained that this is how the BitTorrent network operates and this is, in fact, what happened during the testing. When Loehrs Forensics manipulated the data outside the uTorrent program, the uTorrent program had no way of knowing the data was moved, deleted, or renamed. When Torrential Downpour made a request, the Suspect computer reported it had the data and Torrential Downpour logged the response sent by the Suspect computer.

Detective Erdely has reviewed Docket 99-2, examined the packet captures of data from the October 7-9, 2019 testing, and prepared an affidavit attached herein as Exhibit 1. In summary, Detective Erdely observed that the Loehrs Forensics results in Docket 99-1 *omit* key facts present in the raw data transferred between the Suspect computer and the Torrential Downpour computer that was captured in the Wireshark recording. Loehrs Forensics claims that Torrential Downpour is improperly logging that a user's possession of the payload when such payload has been deleted or moved. However, Loehrs Forensics fails to disclose that the raw data establishes that the Suspect computer in fact reported to Torrential Downpour that it still possessed the payload files when it did not. In other words, Torrential Downpour properly logged the message sent by the Suspect computer.

It is critical to note that Loehrs Forensics' "errors" all stem from the tests involving their various data manipulations outside of the uTorrent program. (Exhibit 1 at ¶ 17). This is an important fact because until and unless the data is queried again after a data manipulation, the uTorrent program on the Suspect computer will be unaware that the data has been moved or deleted. As such, the uTorrent program on the Suspect computer will report the last known state of the data. When Torrential Downpour first queries the uTorrent program on the Suspect computer, the Suspect computer will report that it possesses the data by sending a "Have-All" message. Torrential Downpour then accurately logs this response in its log file. Loehrs Forensics' report is silent as to the message sent from the Suspect computer to Torrential Downpour; instead, Loehrs Forensics only reported the Torrential Downpour side of the communication by pointing to the entries in the Torrential Downpour log files. Gonzales asserts to this Court that the "Have-All"

message recorded by Torrential Downpour is inaccurate falsely concluding there is a failure in the Torrential Downpour software.  This assertion is not accurate, however, because Torrential Downpour is simply, and correctly, reporting the message that it received from the Suspect computer.  In the same way that Detective Erdely has located the message sent by the Suspect computer,[16] Loehrs Forensics could find the very same data, and, thus, find that Torrential Downpour's logging function worked accurately.  But, Loehrs Forensics' conclusions have little value if they did not, at the very least, look for this message sent from the Suspect computer to Torrential Downpour.  In contrast, Detective Erdely specifically looked for the relevant message sent from the Suspect computer to Torrential Downpour, located it, and discusses his findings in Exhibit 1 at ¶¶ 22-28.[17]

In sum, the Suspect computer reported that it had the payload and sent that message to Torrential Downpour, which accurately logged it.  However, Loehrs Forensics manipulated the data unbeknownst to the uTorrent program on the Suspect computer, which caused the Suspect computer to report that it still possessed the payload.

The tests then focused on Torrential Downpour's attempt to connect to and download from the Suspect computer.  The Suspect computer, now being asked by Torrential Downpour for the .torrent and payload that it reported having, looked for what was requested.  When the Suspect computer detected that the .torrent and/or payload were not present, the Suspect computer did not share any files because the files were no longer available. (Exhibit 1 at ¶ 24).  And, more importantly, Torrential Downpour did not receive any files. Once uTorrent discovers the files are missing, the Suspect computer terminates

---

[16]  Exhibit 1 at ¶¶ 23-28.

[17]  In the government's case in chief, the "Have-All" message is not the evidence of Gonzales possessing the files.  The actual downloaded files, personally verified by the case agent, is the evidence.

1   the connection with Torrential Downpour and no files are shared.

2       Despite the fact that Torrential Downpour did not receive files during the testing,

3   and without any corroborating evidence, Loehrs Forensics speculates that Torrential

4   Downpour was able to download the files, during the Gonzales investigation, from some

5   other source or from ICAC COPS.  The argument is, Gonzalez did not possess the payload

6   files at the time of the search warrant, therefore, Torrential Downpour must have

7   downloaded the files from some other source.

8       Gonzales accurately notes that at the time his computer was seized, approximately

9   one to two months after the downloads, the charged files were not located on his computer,

10  but also claims that the associated .torrent files were not located on his computer.  (Docket

11  99 at 6).  The latter statement is not accurate, though, since all ten of the associated .torrent

12  file names for the files charged in Counts 1-8 were on Gonzales' computer in the AppData

13  folder, showing they had been parsed, or processed, into the uTorrent software and placed

14  per the uTorrent program in the AppData folder location.  (Docket 29-3).  In other words,

15  the list of .torrent files would not appear randomly on Gonzales' computer without his

16  parsing, or processing, them into the uTorrent software.[18]  This demonstrates that the

17  .torrent files involved in Counts 1-8 existed on Gonzales's computer at some previous time.

18  Additionally, there were other significant forensic artifacts to establish that several of the

19  charged files did exist at one time on Gonzales' computer.[19]  To conclude these files were

20  not being shared by Gonzales' computer at the time of Torrential Downpour's download

21  and speculate that Torrential Downpour must have downloaded the files from some other

22  source or ICAC COPS blatantly ignores the obvious that Gonzalez deleted the payload files

23  in the intervening weeks between the downloads and the search warrant.

24

25

26

27       [18]  RT 1/31/19 at 109-11; RT 8/16/19 at 47.

28       [19]  RT 1/31/19 at 113-117.

To the point of Gonzales' request for further testing, Gonzales has not made a showing of materiality.  The entire basis of the defense request is supported by their claim that Torrential Downpour inaccurately logged that the Suspect computer had the payload files when it did not.  Their claim is not consistent with what the data captures show.  In fact, when analyzing the data captures, Torrential Downpour accurately logged the "Have-All" message sent by the Suspect computer.  Loehrs Forensics never looked for the message sent by the Suspect computer.  Thus, any errors with Torrential Downpour alleged by Loehrs Forensics simply do not exist and the basis for any further testing does not exist.

Further, Gonzalez fails to establish materiality where Loehrs Forensics did not perform a baseline test between two or more computers running uTorrent.  Had they done so, they would have discovered their alleged errors are exactly how the BitTorrent network functions, just as Detective Erdely explained at the August 16, 2019, hearing.

An analogy might be where Customer 1 calls a retail store to confirm the availability of an item for sale.  An employee looks at the computer inventory, notes one such item is on the shelf, and informs Customer 1 to come to the store to purchase.  However, unbeknownst to the store clerk, Customer 2 has removed the item from the shelf.  When Customer 1 arrives, the employee's search for the item will find that the item is gone, thus the store is unable to provide Customer 1 with the item.  The employee had no idea *until* s/he went to retrieve the item and discovered it was gone.  The analogy is the same if the item is moved or if the item is renamed.  However, in each scenario, the store will be unable to provide Customer 1 with the item because the item no longer exists or is not where the employee expects it to be.   The employee can now update the inventory that the item is gone.

Gonzales, in his motion, speculates that the government will rely on the ROI authored by FBI Special Agent Brian Wade,[20] to substantiate and validate that Torrential

---

[20]   Agent Wade was present during the testing, and operated the computer for Torrential Downpour.  Loehrs Forensics interacted with Agent Wade for the entirety of the testing.  Loehrs Forensics received the disks from all the tests just after the testing.  Essentially, 99-2 documented Agent Wade's observations that the Torrential Downpour

Downpour works properly.  (Docket 99 at 13).  While it is true that the government did not disclose the ROI in this case, it was not the intent of the government to withhold it from defense counsel, as it disclosed the ROI in two other cases.  It has always been the government's intent that the testing itself would establish the accuracy of Torrential Downpour, not Special Agent Wade's ROI.

## IV.    Conclusion

As detailed above, the core of Gonzales' arguments require that Torrential Downpour's logging of the "Have-All" message is an error.    However, as the defense testing has established, it is the Suspect computer reporting to Torrential Downpour that it has the entirety of the files through a "Have-All" message.    Torrential Downpour accurately logged the "Have-All" message sent from the Suspect computer.    Thus, Torrential Downpour is functioning properly and the core of Gonzales' arguments are flawed.

The defense testing has established that the Torrential Downpour log files are accurate.  This has been verified through analysis of the packet capture.  Because the Torrential Downpour log files are accurate the defense has failed to establish that the data files could have been downloaded from another source.  To speculate that the data could have been downloaded from any other source completely ignores the results of their own testing.  As established in the testing, when Torrential Downpour was unable to download any files from the Suspect computer as a result of their manipulation, Torrential Downpour did not receive any files from any source.  In other words, since the defense testing only substantiated that Torrential Downpour's log files were accurate, this Court can also rely on the accuracy of Torrential Downpour's log files and single source downloading in the current investigation.

---

appeared to function in its usual way as he operated it during the testing in this case.  The government apologizes for the oversight of not disclosing Agent Wade's ROI.

1    The Court should deny Gonzales' motion because he has not met the requirements

2    of Fed. R. Crim. Pro. 16.

3    Respectfully submitted this 12th day of June, 2020.

4                                                    MICHAEL BAILEY
                                                     United States Attorney
5                                                    District of Arizona

6                                                     *s/Gayle L. Helart*
                                                     Gayle L. Helart / Brett A. Day
7                                                    Assistant U.S. Attorneys

8

9                              **CERTIFICATE OF SERVICE**

10   I hereby certify that on this same day, I electronically transmitted the attached

11   document to the Clerk's Office using the CM/ECF System for filing and transmittal of a

12   Notice of Electronic Filing to the following CM/ECF registrant:

13   Zachary Storrs, Esq,
14   *Attorney for Defendant*

15   *s/Erica Lane*
16   U.S. Attorney's Office

17

18

19

20

21

22

23

24

25

26

27

28