# Exhibit 1

**AFFIDAVIT OF ROBERT ERDELY**

1. I have over 26 total years of experience in law enforcement.  For over 20 years I specialized in computer crime, and for over 12 years, and at the present time, I provide instruction to law enforcement officers on the skills necessary to conduct online investigations and computer forensic examinations, including investigations involving peer-to-peer file sharing networks, including BitTorrent.  My CV (Exhibit 2) is submitted along with this affidavit (Exhibit 1).

2. I am familiar with the issues relating to the Motion to Compel filed in this case of *United States v. Anthony Gonzalez*, Case No. CR-17-01311-001-PHX-DGC.  I have had discussions with the prosecutor, specifically to respond to the DEFENDANT'S MOTION TO COMPEL ADDITIONAL DISCOVERY AND NOTICE OF FILING OF TORRENTIAL DOWNPOUR VERSION 1.33 TESTING AND ANALYSIS in order to supply information because of my familiarity with the workings of the BitTorrent file sharing network and the Torrential Downpour suite of software.  I am also ready to testify at a further hearing relating to Loehrs Forensics testing.

3. I am currently a Detective with the Computer Crime Unit of the Indiana County Pennsylvania's Detective Bureau.  I was previously employed as the supervisor for the Pennsylvania State Police Computer Crime Unit until I retired in 2012.  Both Computer Crime Units are responsible for investigations of crimes which occur on the Internet including the distribution of child exploitation material through peer-to-peer networks (P2P networks).

4. I created the ICAC law enforcement database and system now known as ICAC Cops.  My initial development started in 2007 where I began recording search results of a file sharing network.  I later became involved with the development of file sharing investigative tools with the University of Massachusetts, Amherst (UMass).  Since then, this investigative system has grown to include several different file sharing networks, one of which is the BitTorrent file sharing network. Although any file sharing network, including BitTorrent, allows its users to share any type of music, video, text, or image file, my work and the work of ICAC Cops concentrates of files of child exploitative materials.  ICAC Cops contains the search results of law enforcement officers who are trained to use it, and acts as a case coordination and case tracking tool.  ICAC Cops includes critical details of active investigative data like the Internet Protocol (IP) address(es) and physical addresses of the officers, as well as the IP address(es) and physical addresses of users being investigated for distributing and receiving child exploitative material.

1

Currently, I am the administrator of the ICAC Cops system as well as the database administrator. In these roles I am responsible for the system's computer hardware and software, to include the database which houses the data on ICAC Cops.

5. Brian Lynn, a Senior Programmer at UMass, and I worked together to develop two software programs that officers use to conduct investigations on the BitTorrent file sharing network. The two software programs are called Torrential Downpour and Torrential Downpour Receptor. Torrential Downpour Receptor queries publicly available BitTorrent network indices and shares the search results with the ICAC Cops database; however, it also has the option to store those search results locally to a log file / Excel spreadsheet. ICAC Cops is a system that officers use to identify potential distributors, receivers, and possessors of child exploitative material, including child pornography per federal law, accomplished over the BitTorrent P2P sharing network. I am intimately familiar with the creation of this system, the use of the system, and the technical specifications and capabilities of the system. I conduct trainings for law enforcement officers on how to utilize the ICAC law enforcement system. I am familiar with the fact that the current case involved the BitTorrent P2P sharing network.

6. In laypersons' terms, the ICAC law enforcement system identifies potential sharers of child exploitation material in essentially the same way that any other individual P2P user seeking to share child pornography identifies a potential source of that child exploitation material.

7. To receive or distribute child pornography over the BitTorrent P2P network, a user must first download a client software that will access and interact with the BitTorrent network, such as uTorrent which was involved in this case. A user must then obtain a ".torrent file." This is commonly done from performing a usual website search, or by receiving information about a .torrent file from another source (such as another person providing through a posting on a social media platform, or email). A .torrent file does not contain any actual files (in this case, an actual child exploitative file); rather, the .torrent file only contains information about the file(s) within the .torrent file, such as the name, size, folder structure, and cryptographic "hash value" (Sha-1) for the data of the file(s) being shared within the .torrent file. The .torrent file also contains information about where the user's client software can learn how to obtain the file or files itself.

8. Hash values are an alpha/numerical identifier for a given file, and certain hash values can identify a given file as child pornography. The Secure Hash Algorithm (SHA-1) was developed by the National Institute of Standards and Technology

(NIST), along with the National Security Agency (NSA).  The BitTorrent file sharing network uses this hashing algorithm to identify the files being shared on this network.  The odds of the Sha-1 hashing failing (i.e. – having a known file and its corresponding SHA-1 has value, to find a different file producing the same Sha-1 hash) is $2^{160}$, or 1 in 1,461,501,637,330,900,000,000,000,000,000,000,000,000,000,000,000.  In practical terms, therefore, every text, music, video, or image file is considered unique and can be verified through this SHA-1 value.

9.  After locating the .torrent file, which are the instructions for the client software accessing the BitTorrent network to download the file(s) described, the .torrent file needs to be loaded into the user's client software program to start the downloading process.  Once loaded, the first step in the downloading process is that the user's client software program will reach out to BitTorrent network indices, which will provide a list of IP addresses that are associated with the same .torrent file.  These BitTorrent indices are essentially matchmakers.  More specifically, indices are computers or servers that identify and match the users on the BitTorrent network who are looking for or actively sharing the same file(s) described by the .torrent file.  Those matches are called "download candidates."  The BitTorrent indices typically match multiple download candidates with each other.  The client software program can then connect to one or many download candidates and request to download the pieces of the files needed.  That process is often referred to as "swarming."  Both the sharing computer and the downloading computer must have the same .torrent file (identified through a unique identifier called an "infohash").  If both the sharing computer and downloading computer do not have the same .torrent file, confirmed by the infohash between the computers, downloading a file or files is impossible.  This information can also be confirmed by reading the documented BitTorrent protocol.

10. After a BitTorrent user (called User 1 in this explanation) loads a .torrent file into his/her client software program, the client software program will initiate contact with BitTorrent network indices to locate download candidates. User 1, through the use of his/her computer connected through the internet to the BitTorrent network and client software, provides the BitTorrent index with certain information, including User 1's computer's IP address and the infohash, *i.e.* the unique identifier of the .torrent file.  The .torrent file contains the instructions on how to download the file(s) that User 1 seeks to download and/or share. The infohash is calculated using the Sha-1 algorithm, *i.e.* a very reliable way to uniquely identify every collection of file(s) being shared on the BitTorrent P2P network.  At this point of User 1 loading the .torrent file into his/her client software, User 1's computer, which queried the

index for the particular .torrent file(s), will now have an association with the particular .torrent file(s). Now, other BitTorrent users who query this index could receive information that User 1 is associated with this particular .torrent file. When law enforcement officers search the BitTorrent network, officers receive the same search results from the indices* that other users' client software programs receive.

> * It is important to note that these search results do not come from the sharing client, but instead, an index or indices which is a third party. The BitTorrent indices are available to search by the entire BitTorrent community of users. The individual programs used to download material on this network receive these search results from these third party indices and do not have control over the data they receive. The BitTorrent index and/or indices is not real time, instead the index and/or indices provide the computers' IP addresses which have shown an association with the same .torrent file recently. Since the index and/or indices do not track this association in real time, it is common to receive search results from the index even after a computer user has shut down the BitTorrent program, or the computer running the BitTorrent program was shut down, or the content is no longer being shared (*i.e.* the sharing had been stopped in the BitTorrent Program, the associated files had been moved, or the files had been deleted). In these cases, although a connection may be attempted the connection and or downloads would not be successful because the data is not being shared.

11. Any BitTorrent user, through the use of his/her client software on the BitTorrent network, voluntarily contacts the BitTorrent index and voluntarily provides the BitTorrent index with his/her IP address and the infohash of the data that he/she is seeking to download or share. In fact, a user shares that information with the BitTorrent index for the very purpose of the index to share that information with other potential peers who possess, or are seeking the same file. In this way, efficient file-sharing, *i.e.* the goal of the user, is accomplished.

12. There are a few differences between the ICAC law enforcement system's use of the BitTorrent P2P system and a usual "peer's" use of the P2P system. One difference is that an ordinary user must obtain a .torrent file before s/he can seek a given file from another peer through a BitTorrent network. The ICAC law enforcement system, however, maintains only those .torrent files and hash values of investigative interest relating to child exploitative material so that the ICAC officers do not have to search outside websites. These .torrent files relate to child exploitation and can include child pornography, other nude and partially nude

images of children (sometimes called child erotica), child abuse stories, child abuse guides, and obscene material. This investigative system is used both nationally and internationally. Since there are various state, federal, and international laws regarding child exploitation material, it is the duty of the officer to view the material shared and/or attempted to be shared to confirm it meets the statutory definition of the offense s/he is investigating.

13. A second difference relates to the actual P2P download. Law enforcement uses the Torrential Downpour software to engage in a single-source download from a solitary download candidate. This is an example of law enforcement being more restrictive than the original design of BitTorrent which can download from many sharing computers to speed up the download times. Torrential Downpour was not built on any existing software but instead was created for law enforcement through a partnership with UMass. Files being downloaded from a single IP address (single source download) is not unique to the law enforcement software, downloads from a single source can and do happen on the BitTorrent P2P network with other BitTorrent software such as uTorrent, Vuze, and Transmission regularly. A prime example of when single source downloading occurs is the time when only a single user has a .torrent file which had to occur at one time for every .torrent file on the network.

14. A third difference is that the Torrential Downpour software does not share any of the content downloaded during an investigation. Although the BitTorrent network incentivizes the sharing of data back to other peers on the network, law enforcement does not and cannot share illegal files in the course of an investigation. As a result of Torrential Downpour never sharing data to other peers, the download process is often slowed during investigations.

15. On October 7-9, 2019, Loehrs Forensics conducted testing of Torrential Downpour 1.33 and a written report was prepared dated 1/2/2020, which I have reviewed. Overall, I saw that Ms. Loehrs reports errors in Torrential Downpour during five tests. I noted, for example, that Loehrs Forensics stated the following about two of the tests it conducted:

*DELETED TORRENT DATA*
*"This test simulates a scenario in which the Suspect Computer contains deleted torrents including legal torrents and torrents of investigative interest and their associated data. This test received a score of 90%, with a 10% failure rate. The failure occurred on Test 7 when the Suspect Computer deleted the payload of a torrent and Torrential Downpour still successfully connected to the Suspect Computer and identified the suspect as being in possession of the torrent after it was deleted."*

*UNSHARED TORRENT DATA*

*"Pursuant to Section III(i)(a)(4), the fourth test simulates a scenario in which the Suspect Computer contains torrents including legal torrents and torrents of investigative interest but all of the associated data has been moved to unshared locations.*

*This test received a score of 60%, with a 40% failure rate. The failures occurred on Tests 3, 4, 7 and 8. In these four tests, the data of the payload was unshared using various methods but Torrential Downpour still successfully connected to the Suspect Computer and identified the suspect as being in possession of the torrent after it was unshared."*

In both tests, Loehrs Forensics reported that errors were found.  In fact, (TD) accurately reported the information that was received from uTorrent (suspect computer).  uTorrent explicitly notified Torrential Downpour that it possessed all of the pieces/files.  This behavior is consistent with how uTorrent would behave with other BitTorrent clients.  For example, Loehrs Forensics stated, "*Torrential Downpour still successfully connected to the Suspect Computer and identified the suspect as being in possession of the torrent* [sic] *after it was deleted."*  This wording suggests that Torrential Downpour identifies the files as being shared, which is not true.  Torrential Downpour simply reported the messages received from uTorrent.  Therefore, there was no error—Torrential Downpour properly recorded the "Piece Exchange" which was sent by the suspect computer (uTorrent).  This information is used to inform the BitTorrent programs, what pieces were available for sharing.  After the piece exchange is completed, BitTorrent programs can request any of the pieces the sharing client has reported as being available.  If the data is no longer available to be shared, no data is sent.

16. My more detailed review of the Loehrs Forensics testing revealed what Loehrs Forensics considered errors.  Generally speaking, Ms. Loehrs highlighted how Torrential Downpour recorded a "piece exchange" even after she had made those files unavailable through moving, deleting or otherwise making them unavailable in some other way to uTorrent (the Suspect computer).  It is important to understand that Loehrs Forensics tested files they deleted, moved or made unavailable some other way from *outside* of the uTorrent Program.  It should be noted that uTorrent provides a method to stop sharing the files from *within* the program, which was known to the uTorrent program immediately by the fact that pieces were exchanged after deleting and no errors were reported.  But, the tests where Loehrs Forensics reported an error, the files were moved, deleted or made unavailable *outside* of the running program.  In other words, uTorrent would not be aware that the files were no longer available until uTorrent attempted to access those files.

17. I am unclear if Loehrs Forensics attempted to determine if uTorrent had sent the piece exchange message and, therefore, that Torrential Downpour properly

recorded this BitTorrent protocol message.  The Loehrs Forensics' report does not indicate in their findings whether uTorrent had sent this message, nor does the report indicate whether they looked for this important message.

18. Much of the analysis performed by Loehrs Forensics, as detailed in the Loehrs Forensics report, was analyzing the packet capture of the data of the testing.  The packet capture is where Loehrs Forensics could find the answer to this important question, specifically, whether uTorrent sent the message to Torrential Downpour or not.  Ms. Loehrs did not report on any such analysis of the packet capture and simply reports that the files were unavailable on the Suspect computer because of their deleting, moving, etc.  The report's analysis concludes that the detailed logging occurred and was wrong when Torrential Downpour recorded this BitTorrent protocol message from uTorrent.

19. Through my analysis, explained below, I can see what actually occurred was that until uTorrent discovered that the files were no longer present, uTorrent sent a standard BitTorrent protocol message indicating what pieces were available to be shared to Torrential Downpour.  Torrential Downpour properly reported the BitTorrent protocol message received from the suspect computer (uTorrent), specifically, the "have-all"   message.

20. This same message would be sent to other BitTorrent client software programs assuming the same conditions were present.  I do not see that Loehrs Forensics conducted other similar tests between other BitTorrent clients to establish a baseline.  Establishing this baseline using other BitTorrent programs would have given Loehrs Forensics data to compare against.

21. In order to respond to Loehrs Forensics report, FBI Phoenix provided me with the Wireshark packet captures and the details.txt (detailed log files generated by Torrential Downpour from the Loehrs Forensics testing.

22. In preparation to complete my analysis, I reviewed the BitTorrent Protocol.  It is important to understand the BitTorrent protocol in order to analyze the packet capture to locate the logged events.  In general terms, to use the BitTorrent network, a client needs to adhere to the network's protocol.  A protocol is simply a set of rules governing how members of the network will communicate with one another and share information over the network.  The protocol defines the necessary content and formatting of messages sent and received on a network, and can also refer to the circumstances in which a particular message is sent.

The following are excerpts from the BitTorrent protocol[1]:

o   The BitTorrent protocol which states in part:

**Have All/Have None Message**

**\*Have All\*: <len=0x0001> <op=0x0E>**
**\*Have None\*: <len=0x0001><op=0x0F>**

*Have All* and *Have None* specify that the message sender has all or none of the pieces respectively.  When present, *Have All* or *Have None* replace the *Have Bitfield.* Exactly one of *Have All*, *Have None*, or *Have Bitfield* MUST appear and only immediately after the handshake. The reason for these messages is to save bandwidth. Also slightly to remove the idiosyncrasy of sending no message when a peer has no pieces.

**The interested message**:  this message indicates that a BitTorrent program would like to request piece(s) reported as being available for sharing.

**interested: <len=0001><id=2>**

---

[1] The BitTorrent protocol reference material:
https://wiki.theory.org/index.php/BitTorrentSpecification (protocol)
http://bittorrent.org/beps/bep_0003.html (protocol)
http://bittorrent.org/beps/bep_0006.html (fast extension, including have all/none)
http://bittorrent.org/beps/bep_0010.html (extension protocol, including the extended handshake)

23. The following is my review of the first "error" Loehrs Forensics reported, my response, and the analysis of the packet capture to locate this message sent from uTorrent to Torrential Downpour:

- Relating to the third in the series of Loehrs Forensics testing protocol; Loehrs Forensics uses several different methods of making the shared data unavailable as uTorrent was left running.  On page 48 of Loehrs Forensics report, Loehrs Forensics details "**TEST07 | HARD DELETE PAYLOAD OF NCT003**".  Loehrs Forensics conclusion was that a have-all (the pieces reported as being available for sharing) was recorded in the Torrential Downpour logs in error.

- RESPONSE:  I located the "have-all" message in the packet capture that was sent by the Suspect computer (uTorrent) and confirmed that it was properly recorded by Torrential Downpour.

  Based my testing, uTorrent reported it had pieces to share after the files were made unavailable from within the Windows operating system as uTorrent was left running (in this case by deleting the files) until uTorrent discovered the data was no longer present.  Although, uTorrent will indicate that pieces are available to be shared until it detects the file(s) are no longer present, uTorrent does not share any data since the files are no longer available.

- My analysis of the packet capture from this test using Wireshark for Windows (64 bit) version 3.2.4.  The packet capture during this test was named "Test_07-NCT003.pcapng".

  - When viewed within Wireshark, the following data was found to be present.  Screen capture of the data follows:

Line 18 – A message is seen being sent by the suspect computer (uTorrent).  This is a "have-all" and is part of the piece exchange process.  As detailed above, the have-all message will be indicated in a packet capture as 0x0e (hex value 0e).  Excerpt from the packet capture follows:



**Have-all message**:

The first four bytes of the message is the length of the message excluding those four bytes.  In this case, the message is the next 1 byte (0e).   The area in red shows the message is 1 byte in length.  The message itself is

located in the Green box received from uTorrent indicating a "have-all" message.

24. The following is my review of the second error Loehrs Forensics reported, my response, and the analysis of the packet capture to locate this message sent from uTorrent to (TD):

Relating to the fourth in the series of Loehrs Forensics testing protocol; Loehrs Forensics uses several different methods of making the shared data unavailable as uTorrent was left running.  On page 64 of Loehrs Forensics report, Loehrs Forensics details "**TEST03 | MOVE NCT001 TO ENCRYPTED DRIVE**". Loehrs Forensics conclusion was that a have-all (the pieces reported as being available for sharing) was recorded in Torrential Downpour logs in error.

- RESPONSE:  I located the "have-all" message that was sent by the suspect computer (uTorrent) and confirmed that it was properly recorded by (TD).

  Based my testing, uTorrent reported it has pieces to share after the files were made unavailable from within the Windows operating system as uTorrent was left running (in this case by detaching an encrypted drive) until the uTorrent program discovered the data was no longer present.  Although, uTorrent will indicate that pieces are available to be shared until it detects the file(s) are no longer present, uTorrent does not share any data since the files are no longer available.

- My analysis of the packet capture from this test using Wireshark for Windows (64 bit) version 3.2.4.  The packet capture during this test was named "Test_03-NCT001.pcapng".

  - When viewed within Wireshark, the following data was found to be present.  Screen capture of the data follows:

Line 11 – A message is seen being sent by the suspect computer
(uTorrent).  This is a "have-all" and is part of the piece exchange process.
As detailed above, the have-all message will be indicated in a packet
capture as 0x0e (hex value 0e).  Excerpt from the packet capture follows:



**<u>Have-all message</u>**:

The first four bytes of the message is the length of the message excluding those
four bytes.  In this case, the message is the next 1 byte (0e).   The area in red
shows the message is 1 byte in length.  The message itself is located in the
Green box received from uTorrent indicating a "have-all" message.

25. The following is a review of the third error Loehrs Forensics reported, my response, and the analysis of the packet capture to locate this message sent from uTorrent to Torrential Downpour:

Relating to the fourth in the series of Loehrs Forensics testing protocol; Loehrs Forensics used several different methods of making the shared data unavailable as the uTorrent program was left running.  On page 66 of Loehrs Forensics report, Loehrs Forensics details "**TEST04 | MOVE NCT001 TO NON-SHARED FOLDER**". Loehrs Forensics' conclusion was that a have-all (the pieces reported as being available for sharing) was recorded in the Torrential Downpour logs in error.

- RESPONSE:  I located the "have-all" message that was sent by the suspect computer (uTorrent) and confirmed that it was properly recorded by (TD).

  Based my testing, uTorrent reports it has pieces to share after the files have been made unavailable from within the Windows operating system as uTorrent was left running (in this case by moving the data downloaded to an unshared location), until uTorrent discovered the data was no longer present.  Although, the uTorrent program will indicate that pieces are available to be shared until it detects the file(s) are no longer present, uTorrent does not share any data since the files are no longer available.

- My analysis of the packet capture from this test using Wireshark for Windows (64 bit) version 3.2.4.  The packet capture during this test was named "Test_04-NCT001.pcapng".

  - When viewed within Wireshark, the following data was found to be present.  Screen capture of the data follows:

Line 12 – A message is seen being sent by the suspect computer (uTorrent).  This is a "have-all" and is part of the piece exchange process.  As detailed above, the have-all message will be indicated in a packet capture as 0x0e (hex value 0e).  Excerpt from the packet capture follows:



**Have-all message**:

The first four bytes of the message is the length of the message excluding those four bytes.  In this case, the message is the next 1 byte (0e).   The area in red shows the messages is 1 byte in length.  The message itself is located in the Green box received from uTorrent indicating a "have-all" message.

26. The following is a review of the fourth error Loehrs Forensics reported, my response, and the analysis of the packet capture to locate this message sent from uTorrent to (TD):

Relating to the fourth series of Loehrs Forensics testing protocol; Loehrs Forensics uses several different methods of making the shared data unavailable as uTorrent was left running.  On page 72 of Loehrs Forensics report, Loehrs Forensics details "**TEST07 | MOVE NCT001 TO UN-SHARED SUBFOLDER**". Loehrs Forensics conclusion was that a have-all (the pieces reported as being available for sharing) was recorded in the Torrential Downpour logs in error.

- RESPONSE:  I located the "have-all" message that was sent by the suspect computer (uTorrent) and confirmed that it was properly recorded by Torrential Downpour.

  Based my testing, uTorrent reported it had pieces to share after the files have been made unavailable from within the Windows operating system as the uTorrent program was left running (in this case by moving the data downloaded to an unshared location), until uTorrent discovers the data was no longer present. Although, uTorrent will indicate that pieces are available to be shared until it detects the file(s) are no longer present, uTorrent does not share any data since the files are no longer available.

- My analysis of the packet capture from this test using Wireshark for Windows (64 bit) version 3.2.4.  The packet capture during this test was named "Test_07-NCT001.pcapng".

  - When viewed within Wireshark, the following data was found to be present.  Screen capture of the data follows:

Line 11 – A message is seen being sent by the suspect computer (uTorrent).  This is a "have-all" and is part of the piece exchange process. As detailed above, the have-all message will be indicated in a packet capture as 0x0e (hex value 0e).  Excerpt from the packet capture follows:



**Have-all message**:

The first four bytes of the message is the length of the message excluding those four bytes.  In this case, the message is the next 1 byte (0e).   The area in red shows the messages is 1 byte in length.  The message itself is located in the Green box received from uTorrent indicating a "have-all" message.

27. The following is a review of the fifth error Loehrs Forensics reported, my response, and the analysis of the packet capture to locate this message sent from uTorrent to (TD):

Relating to the fourth in the series of Loehrs Forensics testing protocol; Loehrs Forensics used several different methods of making the shared data unavailable as uTorrent was left running.  On page 73 of Loehrs Forensics report, Ms. Loehrs details "**TEST08 | DOWNLOAD NCT001 DIRECTLY TO EXTERNAL DRIVE**". Loehrs Forensics conclusion was that a have-all (the pieces reported as being available for sharing) was recorded in the Torrential Downpour logs in error.

- RESPONSE:  I located the "have-all" message that was sent by the suspect computer (uTorrent) and confirmed that it was properly recorded by Torrential Downpour.

  Based my testing, uTorrent reported it had pieces to share after the files were made unavailable from within the Windows operating system as the uTorrent program was left running (in this case by detaching the external hard drive from the computer), until uTorrent discovered the data was no longer present.  Although, uTorrent will indicate that pieces are available to be shared until it detects the file(s) are no longer present, uTorrent does not share any data since the files are no longer available.

- My analysis of the packet capture from this test using Wireshark for Windows (64 bit) version 3.2.4.  The packet capture during this test was named "Test_08-NCT001.pcapng".

  - When viewed within Wireshark, the following data was found to be present.  Screen capture of the data follows:

Line 13 – A message is seen being sent by the suspect computer
(uTorrent).  This is a "have-all" and is part of the piece exchange process.
As detailed above, the have-all message will be indicated in a packet
capture as 0x0e (hex value 0e).  Excerpt from the packet capture follows:



**<u>Have-all message</u>**:
The first four bytes of the message is the length of the message excluding those
four bytes.  In this case, the message is the next 1 byte (0e).   The area in red
shows the messages is 1 byte in length.  The message itself is located in the
Green box received from uTorrent indicating a "have-all" message.

28. I reviewed the Wireshark captures which was captured on the suspect computer by Loehrs Forensics.    The following list details where I located the "have-all" message showing that uTorrent sent this "have-all" message to Torrential Downpour and, therefore, it can be easily and independently verified by Loehrs Forensics:

- Test series three, test "**TEST07 | HARD DELETE PAYLOAD OF NCT003**", located within Wireshark capture file named "TEST07_NCT003.pcapng". The "have-all" message can be found on line 421 of that packet capture.

- Test series four, test "**TEST03 | MOVE NCT001 TO ENCRYPTED DRIVE**", located within Wireshark capture file named "TEST03_NCT001.pcapng". The "have-all" message can be found on line 362 of that packet capture.

- Test series four, test "**TEST04 | MOVE NCT001 TO NON-SHARED FOLDER**", located within Wireshark capture file named "TEST04_NCT001.pcapng". The "have-all" message can be found on line 30330 of that packet capture.

- Test series four, test "**TEST07 | MOVE NCT001 TO UN-SHARED SUBFOLDER**", located within Wireshark capture file named "TEST07_NCT001.pcapng". The "have-all" message can be found on line 2238 of that packet capture.

- Test series four, test "**TEST08 | DOWNLOAD NCT001 DIRECTLY TO EXTERNAL DRIVE**", located within Wireshark capture file named "TEST08_NCT001.pcapng". The "have-all" message can be found on line 662 of that packet capture.

29. Single Source Download Testing is found in the seventh series of the Loehrs Forensics' testing, addressed on both pages 5 and 143 of the report.

Page 5 of the Loehrs Forensics report states:

> "This test resulted in no obvious failures. Meaning, Torrential Downpour did not connect to other IP addresses to download data when the data was unavailable on the suspect computer. However, during this test Torrential Downpour was manually directed to connect only to a single IP address with no possibility of connecting to other sources or concurrently investigating different suspects. That is, the software was given no opportunity for failure.  Further, the software did not run natively in an automated state as it did during the undercover investigation. Therefore, this test is incomplete and inconclusive."

Page 143 of the Loehrs Forensics report states:

> "This test was executed twelve times and the average of all twelve trials will determine the final pass/fail score. The following chart summarizes the results of the tests which resulted in a score of 100%. Meaning, Torrential Downpour did not connect to other IP addresses to download data. However, during this test Torrential Downpour was manually directed to a connect to a single IP address. The software did not run natively in an automated state nor was it used to investigate suspects concurrently. Therefore, this test is incomplete and inconclusive."

RESPONSE:  The testing methodology was proposed by Loehrs Forensics, agreed to by this Court, and was a valid way to test single-source downloading. Loehrs Forensics states that that the tests are incomplete because they were not automatically initiated.  During my August 16, 2019, testimony at a hearing in front of this Court, I said that manually initiating an investigation is a valid method to initiate an investigation and is still an option for law enforcement to use.  There is also an automated method to initiate an investigation which is what Loehrs Forensics refers to above.  Both methods use the same three pieces of information to initiate a download / investigation[2]:

---

[2] Although not used to initiate an investigation, there is an option to influence the order files are downloaded.  This option can be selected automatically or manually from within Torrential Downpour. The option to influence the order in which files are downloaded exists within uTorrent as well as other BitTorrent clients.

1. The Internet Protocol Address
2. The networking port
3. The infohash / .torrent file

Torrential Downpour passed all 12 of the single source downloads performed. Despites Loehrs Forensics claims that the tests were inconclusive, the tests yielded no issues that would require further investigation.  Whether the three pieces of information are loaded automatically or manually, this does not change the workings of Torrential Downpour.  The source of the three pieces of information is irrelevant to how Torrential Downpour operates.

30. The defense attached two affidavits relating to the testing ordered in this case. The affidavits related to the following cases:

### 8th Circuit Court of Apeals, *US v Roland Hoeffener* "District Court No. 4:16-CR-00374"

This affidavit which was prepared for Hoeffener was dated 11/21/2019 and reported that the testing in Gonzales revealed errors; i.e. the same errors that I have addressed above.

In response to Loehrs Forensics filing an affidavit in Hoeffener, I prepared and submitted to the AUSA in that case a response, explaining that there were no errors in Torrential Downpour, similar to this affidavit in this case; instead that it accurately reported the message that was received.

### Eastern District of Missouri, US v Hesham Jamaledin, "No. 4:18-CR-00503

This affidavit was prepared by Loehrs Forensics for Jamaledin and was dated 12/12/2019.   Loehrs Forensics reported that the testing in Gonzales revealed errors.

In response to Loehrs foresnics filing an affidavit in Jamaledin, I prepared and submitted to the AUSA in that case a response, explaining that there were no errors in Torrential Downpour, similar to the affidavit in this case; instead that it accurately reported the message that was received.

31. Even though both affidavits by Loehrs Forensics, and both of my responses, were filed in these other cases prior to the Loehrs Forensics report dated January 2, 2020, being filed in this case, Loehrs Forensics still reports an error in

Torrential Downpour and does not address the information I provided in these other cases that relates to the data in the packet captures.

32. In writing this affidavit, I also reviewed the motion titled "DEFENDANT'S MOTION TO COMPEL ADDITIONAL DISCOVERY AND NOTICE OF FILING OF TORRENTIAL DOWNPOUR VERSION 1.33 TESTING AND ANALYSIS". I will respond to sections of this motion below:

- "*The defense respectfully underscores that the results of live testing and forensic analysis of the Torrential Downpour software has revealed two important realities. First, contrary to the Government's repeated claims, Torrential Downpour may identify data that exists outside of shared space to include deleted data. Second, the Government cannot rely on log files alone because Torrential Downpour may falsely report that a user possesses data that has been deleted.*"

  Response:  Torrential Downpour received a publicly available BitTorrent protocol message from uTorrent (the Suspect computer) and accurately reported this message.  The purpose of this message is to inform the connected BitTorrent programs which pieces are available to request. Torrential Downpour did not identify data that is outside of shared space, it simply reported the message sent by the Suspect computer, i.e. the sharing client.

- *"The Single Source Download test was designed to determine Torrential Downpour's accuracy in limiting downloads to a sole IP address against the BitTorrent protocol."*

  Response:  The BitTorrent protocol allows for "Single Source Downloads".  As I have testified previously, "Single Source Downloads" happen on a regular basis on the BitTorrent file sharing network.  I will give two examples of this.  1). When a .torrent file is first created by a user and the first potential downloader of the shared data obtains the torrent file.  The data shared by the creator of the .torrent file will at times come from a single source since there is only one source (the creator) to obtain the data from.  This can be easily confirmed by any expert by performing a test between two clients, for instance, two running copies of uTorrent.  The expert would see that single source downloads happen and are permissible to the BitTorrent file sharing network. 2) If there is only one IP

discovered online available to share data, the data can come from a single source.

- *"However, during the testing the Government manually instructed Torrential Downpour to connect to a single IP address. The software did not run natively in an automated state, nor was it used to investigate suspects concurrently. In other words, the test did not allow the software to fail. This would be analogous to testing the safety features of a car without conducting a controlled car crash. Therefore, this test is incomplete and inconclusive."*

Response:  Whether Torrential Downpour runs in an automated state or a manual state (both options available to investigators), there is only one IP address provided to Torrential Downpour.  There is no ability to add a second IP address to the session, regardless of whether the session had been executed manually or automatically.  Each TCP connection can be thought of as a tunnel, allowing for two-way communication only between those connected computers.

- *"The single source download test of Torrential Downpour was conducted to determine if the program limits "downloads to a sole IP address against the BitTorrent protocol." (Exhibit A, p. 4).  More directly, "the question is whether Torrential Downpour will obtain files from other sources when it is unable to conduct a single source download."*

Response:  The testing performed by the Loehrs Forensics was from two internet connected computers.  Twelve single source downloads were performed following the Loehrs Forensics protocol.  Even though the computers were internet connected with other download sources being available, Loehrs Forensics did not find that any other computer was contacted by Torrential Downpour to obtain the file(s) in the .torrent file.  Instead, in every case where the download failed -- due to the files being moved, deleted or otherwise made unavailable -- the download also did not occur from any other source.  The test being suggested in the motion has already occurred.

- *"Testing demonstrates that those logs are flawed".*

Response:  Although it is the opinion of the defense that the Torrential Downpour logs are flawed, the above analysis shows that Torrential Downpour received and properly reported a publicly available "have-all" message.  This message is intended to inform the downloading computer which pieces it should ask to download.  This message was sent prior to uTorrent detecting that Loehrs

Forensics manipulated the data from outside the running uTorrent program.  This is how uTorrent operates.

- *"First, the Government conceded that Torrential Downpour will identify suspects in child pornography investigations who have no illegal content per the Non-Parsed Torrent and Partially Parsed Torrents tests. Because of this, and because the associated torrents and files identified by Torrential Downpour during the FBI investigation were not located on Mr. Gonzales' computer, the defense has evidence that Mr. Gonzales could have been improperly identified by Torrential Downpour when he did not possess any illegal content".*

Response:  The Government stated that the BitTorrent network indices identify download candidates that have recently shown an association with a particular .torrent file.  These indices are not real time and only show an association.  The computer which had contacted the indices could have no content (failed connection through the internet), could have some of the data (just beginning the download of pieces or in the middle of the download), or have all of the content.

The have-all message does not occur between a computer and the indices, instead it happens when the BitTorrent program contacts IP addresses learned from the indices.  When a BitTorrent user connects to a download candidate, both sides are to indicate what pieces of data can be requested to download.  This is where Loehrs Forensics incorrectly claims there was an error.  Shown above, Torrential Downpour properly recorded the "have-all" message sent by uTorrent to Torrential Downpour, i.e. the two peers and not from the indices.

The forensics performed in this case on the defendant's computer, through locating the .torrent files in the AppData folder and other artifacts, corroborate that the .torrent files were present and were subsequently moved or deleted.  This would also indicate that Torrential Downpour had downloaded the material from the computer seized in this investigation.

- "*Second, the testing revealed Torrential Downpour will identify suspects as possessing child pornography for data that has been deleted and unshared. This result, combined with the fact that the associated torrents and files identified by Torrential Downpour during the FBI investigation were not located on Mr. Gonzales' computer, demonstrates that Mr. Gonzales could have been inappropriately identified by Torrential Downpour when he did not publicly share any illegal content. It is anticipated that the Government will argue the difference*

*in Mr. Gonzales' case is that Torrential Downpour reported downloading data whereas the testing only identified the suspect and could not download any content. This raises the third issue".*

Response:  This statement seems to be conflating the separate events of the identification of an IP address from indices and receiving a "have-all" message from a BitTorrent program.  Instead, the information received from the indices is only used as a "tip" or a "lead" to begin an investigation.

The "have-all" message can be sent between two BitTorrent programs and is used to confirm that one peer can request pieces from the other peer.  The defense states above "*Torrential Downpour will identify suspects as possessing child pornography for data that has been deleted and unshared*".  To be clear, BitTorrent programs do not request this data or identify files.  BitTorrent programs simply receive this unsolicited message from the sharing computer.

 Torrential Downpour properly recorded this message received by uTorrent during the Loehrs Forensics testing.

- "*Third, the testing was largely inconclusive due to the limitations imposed on testing the single source download feature of Torrential Downpour. There are essentially two steps in an investigation using Torrential Downpour: the identification of a suspect possessing suspected child pornography and downloading data from the suspect as distribution of child pornography. In this case, Torrential Downpour first identified Mr. Gonzales as a suspect possessing child pornography. The testing revealed Torrential Downpour can and will falsely identify suspects as possessing suspected child pornography that is deleted and unshared. Next, Torrential Downpour allegedly downloaded illegal material from Mr. Gonzales' IP address. The testing did not allow Torrential Downpour to connect to multiple suspects and, therefore, the testing could not determine the possibility that data could have been downloaded from a source other than Mr. Gonzales during the investigation in this case. There are two logical explanations: the data was present in shared space when downloaded or it came from somewhere else. If the data was not on the computer, it must have been downloaded from ICAC COPS or from other users being monitored. Therefore, the Torrential Downpour logs relied upon by the Government as evidence that Mr. Gonzales possessed and distributed suspected child pornography are, in fact, unreliable".*

Response:  In the motion the defense breaks the investigation down into two steps.  The first step, according to the motion, involves identifying the suspect and identifying the files possessed.  The second step, the files are attempted to be downloaded.

However, this does not accurately describe the investigative process, nor does it accurately describe how the BitTorrent network works.  In reality, in step one, Torrential Downpour Receptor (TDR) searches the indices and records the results to ICAC Cops.  This step of the process simply identifies download candidates from the indices.  It isn't until step two, where the download candidate would identify if it possesses any pieces.  Then only if the download candidate claims to possess any pieces, would Torrential Downpour attempt to download data from the download candidate.  This is the defined behavior between two BitTorrent programs as specified by the BitTorrent protocol.

Loehrs Forensics testing protocol starts at step two.  During Loehrs Forensics testing of Torrential Downpour, a "have-all" message was received from uTorrent which was properly recorded by Torrential Downpour.  Had Loehrs Forensics performed the same test between two copies of uTorrent, and under the same conditions, Loehrs Forensics would have discovered that this same "have-all" message is sent by uTorrent.  In other words, taking Torrential Downpour out of the equation, does not affect the messages sent by uTorrent.  I have independently verified this to be true.

Loehrs Forensics testing clearly shows that the downloads only occurred between Torrential Downpour and the suspect computer specified to investigate.  When the files were moved, deleted or otherwise made unavailable, no downloads occurred.

There is nothing in any of the tests which would suggest that (TD) would obtain data from any source except the suspect computer.

- *"Detective Erdely further explained that due to the BitTorrent software's matching of SHA-1 hash values of downloaded pieces 'it would be absolutely impossible to randomly download files from a suspect's computer which are from unshared folders.'"*

Response:  The above is my statement which I stand by.  Loehrs Forensics testing showed when the shared data is deleted, moved or otherwise made unavailable, that downloads of that data were not possible.

There is nothing in any of the tests which would suggest that (TD) would obtain data from any source except the suspect computer.

- *"Although Torrential Downpour was unable to download any deleted and unshared files from the suspect computer during testing, two critical elements were omitted from the test, (i) Torrential Downpour's ability to obtain the files from other sources pursuant to the BitTorrent protocol, and (ii) Torrential Downpour's ability to obtain the files from the ICAC COPS database."*

Response:  In item (i) above, this testing was achieved since both the suspect computer and Torrential Downpour were connected to the internet with public IP addresses.  When the downloads were not able to be completed due to the moving, deleting or making the data unavailable, Torrential Downpour did not download from any other internet sources, as confirmed through Loehrs Forensics testing of Torrential Downpour.

In item (ii) above, I am unfamiliar with any evidence discovered by Loehrs Forensics -- either through examination of the seized devices in this investigation or in Loehrs Forensics testing -- that is evidence of ICAC Cops sending the files which were reported as being downloaded from the suspect computer; rather, all the evidence is to the contrary because there is evidence to show the .torrent files were present by the fact of their being listed in the AppData folder and other forensic data about some files being accessed in jump files.  That leaves the inference that the files were there but removed prior to the device being seized by law enforcement several weeks after the last download by law enforcement.

Finally, I have testified that there is communication between ICAC Cops and Torrential Downpour in the form of the tips and leads available for law enforcement to begin an investigation.  There is no programming on ICAC Cops to allow the downloaded files to be transferred by ICAC Cops to Torrential Downpour.

## **SUMMARY**

The alleged errors reported by Loehrs Forensics were not errors.  Torrential Downpour accurately reported the information received.

It is true that we recorded in the logs that the suspect computer reported having all of the files available to be shared.  This is due to it being the information which was sent from the sharing computer (uTorrent).  The BitTorrent protocol does not have any way for law enforcement to confirm whether the pieces are still present except to request those pieces.  This is the same information that other BitTorrent programs would receive and would be in the same position of Torrential Downpour.  The only way to confirm the files are still present is to request the pieces reported by the sharing computer as being available for download.

An analogy to help illustrate how uTorrent handles when files are deleted or moved from outside of the running program would be:

If a person went to an appliance store to buy a new oven.  The sales representative checks the inventory on the computer which indicates there is one oven in stock.  The person could request to buy the oven but when the appliance store went to retrieve the oven, they find that the oven they had listed in stock was not there.  They could then update their inventory to show zero items in stock.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge and belief.

Detective Robert W Erdely
Date:  6/1/2020